Kris Mayes
Attorney General

Michael R. Niederbaumer (#031931)
Stephanie Elliott (#030872)
Assistant Attorneys General
2005 North Central Avenue
Phoenix, Arizona 85004-1592
Telephone: (602) 542-4860 (M Niederbaumer)
Fax: (602) 542-3393
DefensePhx@azag.gov
Michael.Niederbaumer@azag.gov
Stephanie.Elliott@azag.gov

*Attorneys for State Defendants*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Aaron Wostrel, et al.<br><br>Plaintiffs,<br><br>v.<br><br>State of Arizona, et al.,<br><br>Defendants. | Case No. 2:22-cv-00312-PHX-DLR<br><br>**STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

State Defendants Amber Gattie, Cheryl Kelly, Paulinus Obika, Jennifer Alexander, and Kathryn Ptak,[1] move for summary judgment under Federal Rule of Civil Procedure 56. This case arises from a dependency action that the juvenile court supervised, and in which every issue Plaintiffs now raise was litigated. Each remaining claim fails for at least one of three reasons. First, preclusion bars the children from relitigating their removal (Claim One) and the adequacy of DCS's reunification efforts (Claims Seven and Nine). Second, State Defendants are entitled to qualified immunity on every federal claim (Claims One through Eight), because none of them violated a clearly established right. Third, the state-law claims (Claims Nine through Twelve) fail because

[1] Plaintiffs sued Michael Faust in his official capacity as DCS Director. Current Director Ptak is automatically substituted under Federal Rule of Civil Procedure 25(d).

DCS's dependency obligations create no tort duty, and no Defendant committed a tort. State Defendants are entitled to judgement as a matter of law.

## I. SUMMARY OF REMAINING CLAIMS AND PARTIES

The Second Amended Complaint ("SAC") is the operative complaint. (Doc. 95.) Except as noted, only the children's claims remain. The children assert: **One** – wrongful removal against Gattie (*id.* ¶¶ 281-304); **Two** – failure to protect against Kelly, Obika, and Alexander (*id.* ¶¶ 305-316); **Three**, **Four,** and **Five** – deprivation of right to participate in medical and educational decisions against Kelly, Obika, and Alexander (*id.* ¶¶ 317-333); **Six** – judicial deception against Kelly (*id.* ¶¶ 334-359); **Seven** – failure to make reasonable efforts under § 1983 against Kelly, Obika, and Alexander (*id.* ¶¶ 360-369); **Eight** – malicious prosecution against Kelly (*id.* ¶¶ 370-377); **Nine** – negligent failure to make reasonable efforts against Kelly (*id.* ¶¶ 378-384); **Ten** – gross negligence against Kelly (*id.* ¶¶ 385-390); **Eleven** – negligent hiring/training/supervision against the DCS Director in her official capacity (*id.* ¶¶ 391-396); and **Twelve** – intentional infliction of emotional distress against Kelly (*id.* ¶¶ 397-401). Aaron's only remaining federal claims are the portions of Claims Three and Four concerning C.W.'s 2020 tonsillectomy and S.W.'s 2020 hospitalization. (Doc. 75 at 11.) Aaron also asserts Claims Nine through Eleven.[2] (Doc. 95 ¶¶ 378-396.)

## II. FACTUAL BACKGROUND

### A. Aaron Relinquished Custody Before DCS's Involvement.

Plaintiffs are Aaron Wostrel ("Aaron") and his children, S.W., B.W, and C.W. (the "children"). (Doc. 95, ¶ 27.) The children's mother is Sheila Lay. (*Id.* ¶ 29.) In 2015, Aaron and Sheila stipulated to a Wyoming family court order that gave Sheila primary

---

[2] Plaintiffs voluntarily dismissed all claims against Long and McKay. (Docs. 110 and 119.) The Court dismissed all claims against DCS (doc. 75 at 10), the federal claims against the State and supervisors Diaz, Adams, Long, and Kaplan (*id.* at 10-11); the state-law claims against all defendants except Kelly and Faust (*id.* at 11; doc. 89); and all of Aaron's federal claims except the portions of Claims Three and Four noted above (doc. 75 at 11). To the extent Aaron or the children contend any dismissed claim or dismissed defendant remains, the claims also fail on the merits as set out below.

physical custody and sole legal custody of the children, and Aaron only visitation. (Ex. 1 ¶¶ 30-31; Ex. 2 at 2.) Sheila moved with the children to Arizona that summer with Aaron's consent. (Ex. 1 ¶ 30; Ex. 3 at 181:14-182:18.) Aaron visited the children only once, in December 2015, and by early 2017, he had not seen them in more than a year or spoken to them since August 2016. (Ex. 4 at 75:19-22, 131:16-21, 355:2-9.)

### B. DCS Took Temporary Custody After Police Found the Children in Dangerous Conditions.

On January 12, 2017, Peoria police served a search warrant at Sheila's home. (Ex. 5 at 1.) Officers found loaded guns, ammunition, and drug paraphernalia. (Ex. 5 at 3-6.) They also found S.W. home alone with an infected, untreated injury, and Sheila, intoxicated, attempting to pick up the twins from school. (Ex. 5 at 10-12.) The police allowed Sheila's mother, Joy Lay, to take the children to her own home. (Ex. 5 at 12.) Police reported the conditions to the DCS hotline that night, and DCS assigned the investigation to Gattie the next morning. (Ex. 5 at 12; Ex. 6 at 1-2.)

Gattie allowed the children to stay with Joy Lay during the investigation, and instructed Joy that the children were to remain at her home. (Ex. 7 at 172:4-173:24.) On January 18, Gattie interviewed the children at school. (Ex. 7 at 174:11-23.) S.W. reported past domestic violence between Sheila and Aaron. (Ex. 7 at 132:19-133:2; Ex. 8 at 4.) B.W. described Aaron as someone she rarely saw and had met only once, and C.W. did not mention him at all. (Ex. 8 at 5-6.) B.W. and C.W. both reported current domestic violence, and that Sheila drank daily and had driven after drinking. (*Id.*) Gattie concluded the children were not in present danger in Joy's care. (Ex. 7 at 100:17-25, 175:2-16, Ex. 8 at 10.) Around the same time, Sheila's father, Walter Lay, told Aaron that Sheila had been arrested and urged him to come get the children, but Aaron did not come to Arizona at that time. (Ex. 1 ¶ 36; Ex. 4 at 159:9-25, 161:2-19.)

When Gattie interviewed Sheila on January 23, Sheila identified Aaron as the children's father, told Gattie that a Wyoming order gave her sole custody, described

Aaron as absent from the children's lives, and would not provide his contact information. (Ex. 7 at 85:12-20, 87:13-20; Ex. 8 at 7-8.) The next day, Gattie requested records from Wyoming's Department of Family Services. (Ex. 8 at 4.)

By January 30, the circumstances had changed. (*See* Ex. 7 at 171:25-172:24.) Sheila had tested positive for methamphetamine and the children had been moved to Walter and Jodi Lay's home without DCS's knowledge and against Gattie's instructions. (*Id.*) With the children in a situation she could no longer control, and with nothing to prevent Sheila from taking them back to a home with guns, drugs, and domestic violence, Gattie determined temporary custody was necessary. (Ex. 7 at 171:25-172:24, 179:11-15, 180:2-24; Ex. 9 at 7-8.) She ran background checks on Walter and Jodi Lay, requested a home study, and served Sheila with a Temporary Custody Notice ("TCN"). (Ex. 7 158:2-4, 177:24-178:8, 181:19-22, 183:11-15, 213:18-24.) She placed the children with Walter and Jodi Lay, where they were already staying, subject to a safety plan barring contact with Sheila. (Ex. 7 at 159:1-9, 180:25-181:12; Ex. 8 at 12.) DCS filed a Dependency Petition on February 2, 2017. (Ex 9.)

Gattie had searched for Aaron's contact information without success. (Ex. 7 at 87:13-89:19, 150:9-12, 183:20-25.) Aaron first contacted DCS on February 8, after the Lays gave him Gattie's number. (Ex. 7 at 188:13-16; Ex. 8 at 8.) In his calls with Gattie, Aaron acknowledged that he knew Sheila used drugs and was involved in criminal activity, that he had not seen his children in about a year, and that he had not spoken to them in months. (Ex. 7 at 232:18-234:5, 242:19-25; Ex. 8 at 14.) He also told Gattie, falsely, that he had joint custody, and he continued to assert as much to DCS. (Ex. 7 at 191:18-192:1; Ex. 10 at 4-5, 14.) Gattie's initial safety assessment documented her and her supervisor's concerns about Aaron as a placement, including his absence from the children's lives, his knowledge of and failure to act on Sheila's drug use and criminal activity, his history of domestic violence with Sheila, and a prior CPS history in Wyoming. (Ex. 8 at 8, 10-11, 14.)

### C. Kelly and Obika Provided the Services the Juvenile Court Ordered.

Kelly became the ongoing case manager in mid-February 2017. (Ex. 3 at 35:18-20.) She served until January 2018, when she was removed from the case because of Aaron's threatening and aggressive behavior toward her. (Ex. 3 at 35:21-24, 42:4-15.) Obika then took over. Kelly and Obika facilitated court-ordered services, which the court reviewed regularly. (*See e.g*., Ex. 17.)

*ICPC Process.*[3] At the Preliminary Protective Hearing in February 2017, the court ordered that an ICPC be completed for Aaron. (Ex. 12 at 10.) Kelly's efforts to begin the ICPC process were delayed because Aaron would not tell her whether he planned to live in Wyoming or Colorado. (Ex. 3 at 35:25-36:3, 38:11-39:5; Ex. 10 at 1-2, 8, 11-12; Ex. 13 at 7-15.) When he finally provided a Colorado address on March 13, Kelly initiated the request four days later. (Ex. 10 at 15; Ex. 14 at 15.) In summer 2017, Colorado informed Aaron that the home study had been approved, but that final ICPC approval was contingent on a parent-child interaction assessment. (Ex. 13 at 25.) Kelly never received this document. (Ex. 3 at 112:2-5, 116:15-117:5.) Kelly followed up with Colorado repeatedly through January 2018, without a substantive response. (Ex. 3 at 116:15-117:5; Ex. 13 at 1-6, 16-17, 19-21, 38-40.) In April 2018, Obika reported that the ICPC had been completed and that Colorado approved placement with Aaron, again pending a bonding and best interest assessment. (Ex. 15 at 2.) Obika submitted a referral for that assessment shortly thereafter, but was informed by a psychological consultant that it should not occur until Aaron completed a psychological evaluation, which the court had ordered and encouraged Aaron to complete. (Ex. 3 at 121:7-10; Ex. 16 at 2; Ex. 17 at 19, 26, 36, 48.) During the second dependency trial, DCS discovered that Aaron had moved

---

[3] The Interstate Compact on the Placement of Children ("ICPC") is an interstate agreement that functions to "foster cooperation among the states in the placement of children and to promote '[a]ppropriate jurisdictional arrangements for the care of children.'" *J.D.S. v. Franks*, 893 P.2d 732, 740 (Ariz. 1995) (quoting A.R.S. 8-548). The ICPC process ensures that an out of state placement is appropriate by dividing up the responsibility to assess the home, monitor, and provide care for the child, between the sending and receiving state. *See Ariz. Dep't. of Econ. Sec. v. Leonardo*, 22 P.3d 513, 516-17, ¶¶ 8-13 (Ariz. App. 2001)

back to Wyoming, so in January 2019, Obika initiated a new ICPC request there. (Ex. 3 at 220:10-221:20; Ex. 14 at 35-43.) Wyoming's ICPC was competed, approved, and sent to Arizona's ICPC office on April 10, and forwarded to Obika on May 29. (Ex. 14 at 1-2.)

*Evaluations*. In May 2017, the court *sua sponte* ordered that Aaron complete a psychological evaluation and parenting classes because she was "concerned about the children's mental health and well-being if placed with him at this time, given some of his conduct in the past." (Ex. 18 at 6:12-24.) Kelly referred him within three weeks and the court later found no unreasonable delay. (Ex. 19 at 1-5; Ex. 20 at 161:1-12.) Aaron's first scheduled evaluation, in February 2018, could not be completed because of his opposition to the process and conduct with the psychologist. (Ex. 19 at 23.) Obika made yet another referral. (Ex. 19 at 26.) Obika also made a referral for Bonding Assessment in July 2018, but had to refer it again after Aaron refused the initial scheduled appointments. (Ex. 19 at 6-10; Ex. 21 at 1-7.) When Aaron later requested additional psychological evaluations, the court granted them and DCS made the referrals, continuing until a third provider completed the evaluation after the first two declined. (*See e.g*., Ex. 17 at 19, 26, 36, 48; Ex. 19 at 19, 21, 23, 26.)

*Visitation*. The court ordered DCS to supervise interactions between Aaron and the children. (Ex. 17 at 8, Ex. 18 at 10.) Kelly personally supervised Aaron's visit with the children at the airport, and Aaron's own attorney said she went "went above and beyond." (Ex. 10 at 18; Ex. 11[4] at 6-7.) DCS also supervised regular phone calls, but the children frequently declined to participate, even when Kelly personally encouraged them. (Ex. 11 at 8-9, 11-14, 18; Ex. 17 at 19, 26.) The Court several times reaffirmed that whether to participate in phone calls with Aaron was the children's choice. (Ex. 17 at 19, 26.) In September 2018, the court ordered therapeutic visitation, and DCS made the referral the same day. (Ex. 17 at 31; Ex. 19 at 11-15.)

[4] Exhibit 11 includes excerpts of the DCS case file, not every case note created throughout the dependency.

*Medical Care*. The court's temporary orders authorized DCS to consent to routine medical and dental care, including procedures requiring general anesthesia, and behavioral-health and related services, and to make educational decisions for the children. (Ex. 12 at 24-25.) DCS sought and obtained court approval for each non-routine medical decision. S.W. was hospitalized for an emergent mental-health crisis in April 2017, August 2017, and April 2020, and the court approved each admission on DCS's motion. (Ex. 22 at 5, 19, 23.) The children's counseling was discussed and ordered by the court. (Ex. 17 at 19.) And all parties were informed of C.W.'s 2020 tonsillectomy before it was performed. (Ex. 23 at 2.)

*Placement*. Both case managers conducted regular visits at the Lays' home and consistently found the children safe and appropriately cared for. (Ex. 11 at 3-5, 8-9, 11-19.) No report of abuse or neglect by the Lays arose during Kelly's tenure. The reports made later, during Obika's tenure, were investigated, and none was substantiated. (Ex. 24, at 1, 7-8.)

**D. The Juvenile Court Repeatedly Found the Children Dependent as to Aaron and Found DCS's Efforts Reasonable.**

*The Preliminary Protective Hearing*. At the February 9, 2017, Preliminary Protective Hearing, both parents appeared with appointed counsel, and a GAL appeared for the children. (Ex. 12 at 1, 8.) Neither parent contested temporary custody. (Ex. 12 at 9.) The court found that temporary custody was clearly necessary to prevent abuse or neglect, adjudicated the children dependent as to Sheila, and set a trial as to Aaron. (Ex. 12 at 2-3, 11, 17-18, 25.) By May 2017, S.W. had her own counsel appointed. (*See* Ex. 18 at 2.)

*DCS's motion to dismiss and the GAL's substitution*. In May 2017, based on Kelly's assessment that Aaron posed no identified safety threat at that time, DCS moved to dismiss the dependency and place the children with Aaron. (Ex. 18 at 8; Ex. 25 at 3.) The GAL objected on behalf of the children. (Ex. 18 at 8.) The court denied the motion,

noting its own concerns, and that the Wyoming judge had expressed concern "about the emotional well-being of these children if they were to be placed with their father" and "would not place them with him." (Ex. 18 at 4:13-21.) Over the objections of DCS and Aaron, the court allowed the GAL to substitute in as petitioner and file an Amended Dependency Petition. (Ex. 18 at 8.) The Court ordered DCS to continue providing services. (Ex. 18 at 9.)

*The first trial and appeal*. After a trial in 2017, the court found the children dependent as to Aaron because he had failed to protect them from Sheila's substance abuse and domestic violence, and because his behavior placed them at risk of emotional abuse. (Ex. 17 at 12-13; Ex. 20 at 156:14-162:19.) The Arizona Court of Appeals affirmed the failure-to-protect finding, reversed the emotional-abuse finding, and remanded on procedural grounds. (Ex. 26 at 2-5.)

*The second trial and dismissal*. DCS was not substituted back in as the petitioner until April 2018. (Ex. 17 at 25.) After a second trial in late 2018, the court again found the children dependent as to Aaron for failure to protect. (Ex. 17 at 42, 45.) The Court of Appeals agreed that Aaron had failed to protect the children but vacated the dependency finding because the condition he failed to protect them from (Sheila) was not ongoing and could not support a continued dependency. (Ex. 27 at 9.) Before the children could be returned to him, the GAL filed a new dependency petition, again on behalf of the children. (Ex. 28.) However, the action was ultimately dismissed on April 14, 2020. (Ex. 17 at 59.) Throughout the dependency, the children's GAL opposed returning them to Aaron, at one point moving to change the case plan to severance of Aaron's parental rights. (Ex. 17 at 24, 32; Ex. 18 at 8.) S.W.'s attorney also actively opposed reunification. (Ex. 17 at 48.)

*Reasonable-efforts findings*. At every review hearing throughout the dependency, the court found, over Aaron's objections, that DCS had made reasonable efforts to reunify the family – at least nine times in all.[5] (Ex. 29.)

## III. LEGAL STANDARD

"The purpose of summary judgment is 'to isolate and dispose of factually unsupported claims.'" *Daurio v. Ariz. Dep't of Child Safety*, No. CV-18-3299-PHX-GMS, 2020 WL 6940812, at * 2 (D. Ariz. Nov. 25, 2020) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). Summary Judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

A substantive due process claim requires egregious and arbitrary government conduct that "shock[s] the conscience and offend[s] the community's sense of fair play and decency." *Sylvia Landfield Tr. v. City of Los Angeles*, 729 F.3d 1189, 1195 (9th Cir. 2013) (quoting *Marsh v. Cty. of San Diego*, 680 F.3d 1148, 1154 (9th Cir. 2012)). Unwarranted interference in the right to familial association includes "governmental actions that are vexatious and unnecessary, harassing, unfounded or unreasonable and arbitrary, discriminatory, or demonstrably irrelevant." *Daurio*, 2020 WL 6940812, at * 5 (quoting *Martinez v. City of W. Saramento*, No. 2:16-cv-02566-TLN-EFB, 2019 WL 448282, at * 18 (E.D. Cal. Feb. 5, 2019)). Being subjected to an investigation alone is not a constitutional violation. *Capp v. Cty. of San Diego*, 940 F.3d 1046, 1060 (9th Cir. 2019). Claims of children who are taken into state custody are evaluated under the Fourth Amendment, however the same legal standard applies. *Keates v. Koile*, 883 F.3d 1228, 1236 (9th Cir. 2018). A procedural due process claim requires: (1) deprivation of a constitutionally protected liberty or property interest, and (2) denial of adequate

[5] The Adoption and Safe Families Act ("ASFA") sets federal standards for child welfare, including requirements that the department make reasonable efforts to reunify families. Pursuant to 45 C.F.R. § 1356.21(b)(2) and A.R.S. §§ 8-829 and 8-862(B)(2), the juvenile court must regularly determine whether reasonable efforts have been made.

procedural protections. *Krainski v. Nevada ex rel. Bd. of Regents of Nevada Sys. of Higher Educ.*, 616 F.3d 963, 970 (9th Cir. 2010).

For any 42 U.S.C. § 1983 claim, Plaintiffs must prove that each individual defendant was an integral participant in the unlawful conduct and through their own actions, violated the constitution. *Keates*, 883 F.3d at 1242-43.

## IV. ARGUMENT

### A. Claim and Issue Preclusion Bar Plaintiffs from Relitigating the Dependency Through Claims One, Seven, and Nine.

Plaintiffs' wrongful-removal and reasonable-efforts claims ask this Court to revisit questions the juvenile court already decided. Federal courts must give preclusive effect to state-court judgments and may not interfere with domestic-relations matters at all. *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 293 (2005); *Csibi v. Fustos*, 670 F.2d 134, 136-37 (9th Cir. 1982). These doctrines evince a powerful policy demanding respect for state-court judgments, particularly on traditionally state-law matters. This Court applies Arizona preclusion law to Arizona rulings. *See Diruzza v. Cty. of Tehama*, 323 F.3d 1147, 1152 (9th Cir. 2003). Under that law, claim preclusion bars re-litigation of claims that were or *could have been* determined in a prior action when there is: (1) a final judgment on the merits, (2) a common identity or privity between parties, and (3) a common identity of claims. *Hall v. Lalli*, 977 P.2d 776, 779, ¶ 7 (Ariz. 1999). To determine whether claims are the same, Arizona courts have historically applied the same evidence test which precludes the second action when it can be proven with the same evidence as the first. *Ploof v. State of Arizona*, No. CV-21-00853, 2026 WL 236507, at * 8 (D. Ariz. Aug. 14, 2026) (Notice of Appeal filed); *Lawrence T. v. Dep't of Child Safety*, 438 P.3d 259, 264, ¶ 18 (Ariz. App. 2019). However, the Arizona Supreme Court has suggested that the more appropriate test is the transactional test, which bars claims when they arise from the same transaction or series of transactions, "considering 'whether the facts are related in time, space, origin, or

motivation.'" *Crosby-Garbotz v. Fell in and for Cty. of Pima*, 434 P.3d 143, 148, ¶ 19 (Ariz. 2019) (quoting Restatement (Second) of Judgments § 27 (1982)); *Bilardi-Corr v. Bilardi*, No. 1 CA-CV 25-0689, 2026 WL 1961739, at * 16 (Ariz. App. 2026). The result in this case is the same regardless of which test is used.

Issue preclusion operates more narrowly but is equally binding. It bars relitigation of an issue that was actually litigated by the same parties, that the parties had a full and fair opportunity and motive to litigate, and that was essential to a valid and final decision on the merits. *Campbell v. SZL Props., Ltd.*, 62 P.3d 966, 968, ¶ 9 (Ariz. App. 2003). A defendant invoking issue preclusion need not show identity of parties. *See id*. ¶ 10. Both doctrines require finality, but not necessarily a ruling that ends the case; it need only be the court's final word on a subject rather than tentative. *Elia v. Pifer,* 977 P.2d 796, 802-03, ¶¶ 32-33 (Ariz. App. 1998). Applying these principles, the Ninth Circuit has given juvenile court orders preclusive effect in later § 1983 actions. *Smith v. Banner Heath Sys.*, 621 Fed. Appx. 876, 880-81 (9th Cir. 2015).

1. <u>The Juvenile Court's Finding That Removal was Necessary Precludes Claim One.</u>

The children allege that Gattie wrongfully removed them from Sheila's custody. The juvenile court resolved that question at the Preliminary Protective Hearing. (*See* Ex. 12 at 3-4, 11, 17, 25.) At that hearing, the court was required to determine whether there was probable cause to believe that temporary custody was necessary and appropriate to prevent abuse or neglect, and either parent could have demanded a hearing and presented evidence, including testimony, supporting the children's return. A.R.S. § 8-825; Ariz. R. P. Juv. Ct. 50 and 51.[6]

Both parents and the children were represented by counsel and the GAL. (Ex. 12 at 1, 8.) Neither parent contested temporary custody or requested a temporary custody

[6] The Arizona Rules of Procedure for the Juvenile Court were restyled and renumbered effective July 1, 2022. This motion cites the rules that were in effect during the dependency proceedings. Former Rules 47.3, 50, 51, and 58 are now Rules 327, 332, 333, and 341, respectively.

hearing, including Aaron, who now contends, as do the children, that the children should have been immediately released to him. (*Id.*) The court found that continued temporary custody was "clearly necessary to prevent abuse or neglect," that "there is a need for out-of-home care based upon the information presented," that it would be contrary to the children's welfare to return them to Sheila's custody, and that DCS made reasonable efforts to prevent the removal. (*Id.*) Because the children had remained in DCS custody since January 30, that finding necessarily rested on the circumstances of their removal. *See Jensen v. Foley*, 295 F.3d 745, 748 (7th Cir. 2002).

Each element of issue preclusion is met. First. whether the removal was proper was actually litigated because it was properly raised, submitted, and determined. *See* Restatement (Second) of Judgments § 27 cmt. D (1982). Second, the children's interests were represented by the GAL who also did not dispute the need for temporary custody. A.R.S. § 8-824; Ariz. R. P. Juv. Ct. 51. Third, the court's finding was a valid and final decision on the merits – the final word on the necessity of removal and temporary custody by the State. *See Elia*, 977 P.2d at 802-03, ¶¶ 32-33. Fourth, the finding was essential because it was statutorily required. A.R.S. § 8-825. Last, the children were represented parties to the dependency, and importantly, supported the dependency, even in the face of dismissal. (Exs. 18 and 28.) Because Gattie invokes preclusion defensively, she need not be a party. *Campbell*, 62 P.3d at 968, ¶ 10. Issue preclusion applies and the children cannot relitigate their removal here.

2. <u>The Juvenile Court's Repeated Reasonable-Efforts Findings Preclude Claims Seven and Nine.</u>

The children allege that Gattie, Kelly, Obika, and Alexander failed to make reasonable efforts to reunite them with Aaron.[7] (Doc. 95 ¶¶ 360-69, 378-84.) They point

[7] Claim Seven was dismissed as to Aaron as untimely. (Doc. 75 at 11-12.) Claim Nine as to Aaron alleges a state-law claim against Kelly that is subject to the one-year statute of limitations in A.R.S. § 12-821. Kelly was removed from this case in January 2018, and this Complaint was filed in 2021 – more than three years late. (See doc. 75 at 1 n.1, 11.) Kelly is entitled to summary judgment on Claim Nine as to Aaron.

to visitation, evaluations, notice of meetings, and disclosure of documents. (*Id*. ¶¶ 367, 383.) Federal and Arizona law required the juvenile court to decide that exact question at regular intervals. 45 C.F.R. § 1356.21(b)(2); A.R.S. §§ 8-829, 8-862(B)(2); Ariz. R. P. Juv. Ct. 58. And it did. The court found at least nine times over Aaron's objection that DCS had made reasonable efforts to reunify the family and never found otherwise. (Ex. 29.)

The children, meanwhile, opposed reunification throughout the dependency. (*See* Ex. 17 at 24, 32, 48; Ex. 18 at 8; Ex. 28.) Their GAL objected to DCS's motion to dismiss the dependency, substituted as the petitioner to prosecute the dependency, attempted to change the plan to severance, and in 2020 filed a new petition to prevent their return. (Ex. 17 at 24, 32; Ex. 18 at 8; Ex. 28.) S.W.'s attorney is similarly opposed. (Ex. 17 at 48.) The children themselves often refused visits and calls with Aaron, and S.W. in particular, rarely participated, which led the court to order that the children could decide for themselves whether to attend. (Ex. 11 at 8-9, 11-14, 18; Ex. 17 at 19, 26.) The reasonable-efforts findings were contested and litigated at every stage, and the children cannot now claim that DCS did too little to accomplish a result they opposed.

*Claim Preclusion*. This district recently held that claim preclusion barred claims that DCS failed to provide adequate services during a dependency because those claims rested on the same evidence and could have been determined in the juvenile proceeding. *Ploof*, 2026 WL 236507, at * 8. Whether DCS, via these individual defendants, failed to make reasonable efforts to reunite the family "was precisely the question that the juvenile court was tasked to answer," any argument that DCS failed to satisfy that requirement "would have been relevant, and perhaps dispositive, to the juvenile court's order," and "evidence of that failure would be the same no matter if it was presented here or to the juvenile court." *See id*. The children were parties to the dependency proceeding through their GAL and attorney, who was actually prosecuting the dependency for a period of time (Ex. 17 at 25; Ex. 18 at 8.), and Kelly, Obika, and Alexander all acted on behalf of

DCS, *see Hall*, 977 P.2d at 779, ¶ 8 (noting that privity requires a substantial identity of interests and that the interests of the non-party are presented and protected by the party). Each reasonable-efforts finding was the court's final word for its review period. *See Elia*, 977 P.2d at 802-03, ¶¶ 32-33.

*Issue Preclusion*: The same findings bar relitigation of the issue. Whether DCS made reasonable efforts was actually litigated. Every party, including the children, who actively opposed reunification, had a full and fair opportunity and motive to litigate it. And the findings were mandatory and therefore essential to each review order. *Campbell*, 62 P.3d at 968, ¶ 9. Claims Seven and Nine are precluded.

### B. Defendants Have Qualified Immunity Because They Did Not Violate Any Clearly-Established Right.

"Qualified immunity protects government officials from liability under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *Cuevas v. City of Tulare*, 107 F.4th 894, 898 (9th Cir. 2024). This Court can start with either prong, however, qualified immunity applies unless both prongs are met. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

The doctrine protects officials from mere errors in judgment and reasonable mistakes of facts or law by limiting liability to situations where a right's contours are so clear that every reasonable person would have known that the challenged conduct violated it, placing the question beyond debate. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Ashcroft v. al-Kidd*, 536 U.S. 731, 741 (2011). Plaintiffs must identify controlling case law or a consensus of persuasive authority that is "specific enough to alert *these* [officials] *in this case* that their *particular conduct* was unlawful." *Sharp v. Cty. of Orange*, 871 F.3d 901, 911 (9th Cir. 2017) (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)). The Court must not define the right at too high a level of generality. *Kisela v. Hughes*, 584 U.S. 100, 104 (2018). And because there is no vicarious liability under §

1983, Plaintiffs must make this showing as to each defendant's individual conduct. *Keates*, 883 F.3d at 1241-42.

1. <u>Gattie Is Entitled to Qualified Immunity on Claim One Because Exigent Circumstances Justified the Removal and Aaron Had No Legal Custody.</u>

Even if Claim One were not precluded, it fails on both prongs. The children do not seriously contend they should have remained with Sheila. (*See* doc. 95 ¶ 297.) The gravamen of Claim One is that Gattie should have released them to Aaron. (*Id.* ¶¶ 298-300.) The Constitution required no such thing.

*No violation*. An official may remove a child without a court order when she has reasonable cause to believe they are in imminent danger of serious bodily injury and the scope of the intrusion is reasonably necessary to avert it. *Mabe v. San Bernardino Cty., Dep't of Pub. Soc. Servs*., 237 F.3d 1101, 1107 (9th Cir. 2001). The question is whether the child would likely be harmed in the time it would take to obtain court authorization. *Id*. at 1108. Although exigency is often a fact question, summary judgment is appropriate if no reasonable jury could find the removal unreasonable. *Momox-Caselis v. Donohue*, 987 F.3d 835, 844 (9th Cir. 2021).

The removal from Sheila was justified. During a criminal investigation, police found loaded guns and drug paraphernalia in her home. (Ex. 5 at 1, 3-6; Ex. 9 at 4-5, 7-8.) They found S.W. home alone with an untreated, infected injury, and located Sheila, intoxicated, trying to pick up the twins from school. (Ex. 5 at 10-12.) Even though Gattie had initially allowed the children to stay with their maternal grandmother while she investigated, by January 30, Gattie faced a different situation where Sheila had tested positive for methamphetamine, the family was not cooperating with Gattie, and she could not ensure their safety. (Ex. 7 at 125:10-19, 171:25-173:24, 180:20-24, 182:10-25.) And a court order was not quickly available. In January 2017, Arizona had no expedited process for pre-removal court authorization. Absent exigency, DCS had to file and litigate a dependency petition before removing a child. A.R.S. § 8-821 (effective through July 1,

2018); *Dep't of Child Safety v. Stocking-Tate*, 247 Ariz. 108, 112 (App. 2019) (describing pre-2018 procedures); Ex. 7 at 45:7-47:1. On these undisputed facts, no reasonable jury could find that Gattie lacked reasonable cause to take temporary custody.

Release to Aaron was not a constitutionally required, or even legally permissible, alternative. The protected interest in removal cases belongs to parents with legal custody. *Burke v. Cty. of Alameda*, 586 F.3d 725, 733 (9th Cir. 2009). Aaron had none because he relinquished it in 2015. (Ex. 2 at 2, 5.) The constitutional rights of non-custodial parents are murky but are "unambiguously lesser in magnitude" than those of custodial parents. *Brittain v. Hansen*, 451 F.3d 982, 992 (9th Cir. 2006). Even for a parent who has shared legal custody, *Burke* recognized that when the non-physical custodial parent "does not reside nearby" and the child is imminent danger, it is "probably reasonable" to take protective custody "without attempting to place the child with the geographically distant parent." 586 F.3d at 733.

That describes Aaron exactly, and more. He lived in another state. He had not seen the children since 2015, or spoken to them since August 2016. (Ex. 4 at 75:19-22, 131:16-24, 355:2-9.) Gattie learned from Sheila that Aaron was out-of-state, uninvolved, and lacked legal custody, and Gattie could not find contact information for him. (Ex. 7 at 87:13-89:19, 150:9-12, 183:20-25; Ex. 8 at 7-8.) Even after Aaron contacted DCS on February 8, Gattie could not have released the children to him or anyone without an order from the court. (Ex. 12 at 12; *see Alexander M. v. Abrams*, 328 P.3d 1045, 1048, ¶ 15 (Ariz. 2014) (stating that the juvenile court must oversee the case including independently reviewing all actions and recommendations of DCS).) Doing so would have itself have raised constitutional concerns. *See David v. Leskovic*, No. 24-3889, 2025 WL 2017459, at * 1 (9th Cir. July 18, 2025) (holding jury could find it unreasonable to transfer a child to a father who lacked legal custody rather than take protective custody).

*Not clearly established*. Even if a jury could second-guess Gattie's judgment, no precedent placed the unlawfulness of her conduct beyond debate. *Ashcroft*, 536 U.S. at

741. The closest case is *Kirkpatrick v. County of Washoe*, 843 F.3d 784 (9th Cir. 2016) (*en banc*), decided six weeks before this removal. There, a case worker removed a newborn based on the mother's drug use, unstable housing, and pending termination proceedings for her other children. *Id*. at 786, 792. The *en banc* court held that a jury could find no exigency because the infant was under a hospital hold and constant medical supervision, and the mother was cooperative. *Id*. Even so, it granted qualified immunity because "it was not beyond debate that the confluence of factors set forth [in this case] would not support a finding of exigency." *Id*. at 793. Gattie faced a more urgent situation. No hospital was monitoring the children, nothing prevented Sheila from taking them, and the family was not cooperating or following instructions. If the law was not clearly established in *Kirkpatrick*, it was not clearly established here.

Nor was there any clearly-established right requiring release of the children to a parent without legal custody. *Wallis v. Spencer*, 202 F.3d 1126, 1136-37 (9th Cir. 2000), held that removal of children from parents' custody implicates their constitutional rights. *Burke* extended the *Wallis* framework to parents who retain legal custody without physical custody. 586 F.3d at 733-34. But, no case has specifically held that a parent who had relinquished legal custody, or children seeking placement with such a parent, enjoyed the same protection. And *Brittain* held that such a parent's interest is diminished. 451 F.3d at 992. Gattie is entitled to qualified immunity on Claim One.

2. <u>Kelly, Obika, and Alexander are Entitled to Qualified Immunity on Claim Two Because DCS Vetted the Placement and Investigated Every Concern.</u>

Under the Fourteenth Amendment, the State must provide reasonable safety and minimally adequate care and treatment to children in its custody. *Henry A. v. Willden*, 678 F.3d 991, 1000 (9th Cir. 2012). A caseworker violates that duty only if (1) the child faced an objectively substantial risk of harm; (2) the caseworker was aware of facts from which the risk could be inferred, and actually drew, or should have drawn that inference, and (3) was deliberately indifferent to it. *Id*. at 1000-01. Deliberate indifference is a high

bar. *Momox-Caselis*, 987 F.3d at 845; *see also Cox v. Dep't of Social and Health Servs*., 913 F.3d 831, 837 (9th Cir. 2019) (conduct must shock the conscience). A series of alleged red flags that turn out to be exaggerated or mistaken will not support it. *Momox-Caselis*, 987 F.3d at 845-46. A caseworker can also be liable if she affirmatively places the children in danger which was known and obvious, that they otherwise would not have faced. *Id*. at 845.

*No violation*. The children were already living with the Lays when DCS took temporary custody (Ex. 7 at 172:4-9, 177:24-178:14), they remained there by function of the court (Ex. 12 at 12), and, as shown below, there was no known or obvious danger to be indifferent to. The children cannot show that the Lays posed a substantial or obvious risk of harm, much less that any individual defendant was indifferent to it. The Lays were vetted before the children remained in their care, including a background and criminal-history check and home study. (Ex. 7 at 158:2-4, 177:24-178:8, 181:19-22, 213:18-21; Ex. 30.) The Lays also became licensed foster parents. (Ex. 31.) Each concern the children now identify (doc. 95 ¶ 313), was investigated and found unsupported.

*Kelly*. Throughout her tenure, Kelly conducted regular visits at the Lay home and no report of abuse or neglect by the Lays was made while she was assigned to the case. (*See e.g*., Ex. 11 at 3-5, 8-9, 11-14.)

*Alexander*. In November 2017, while temporarily serving as Kelly's acting supervisor, Alexander received Aaron's allegation that Walter Lay was trafficking drugs. (Ex. 32 at 1-2, 5.) She investigated, found no evidence supporting it, and invited Aaron to provide any evidence he had. (*Id*.) Aaron conceded it was unlikely anyone in the home was using drugs. (*Id*.)

*Obika*. Obika likewise conducted regular monitoring visits and found the children safe. (*See e.g.,* Ex. 11 at 15-19.) During his tenure, DCS investigated two hotline reports against the Lays and found them unsubstantiated. (Ex. 24 at 1, 7-8.) All three children denied abuse or neglect, and S.W. acknowledged that she had exaggerated the 2019

allegation. (*Id.*; Ex. 11 at 23.) And Dr. Bennett, whose 2019 report the children cite, explored the possibility of abuse, could not corroborate it, and reported that all three children described positive experiences in the Lays' care. (Ex. 21 at 30-31.)

This record shows the opposite of deliberate indifference. Every concern was investigated, and none was substantiated. These are precisely the "exaggerated or mistaken" red flags that *Momox-Casellis* held insufficient. 987 F.3d at 845-46.

*Not clearly established*. The cases finding deliberate indifference involve caseworkers who ignored reports of abuse entirely, *Henry A.*, 678 F.3d at 1001, or disregarded a caregiver's known misuse of a dangerous substance, *D.R. ex rel. Freeman v. Cty. of Contra Costa*, No. 24-6031, 2026 WL 146615, at *2 (9th Cir. Jan. 20, 2026). No case holds that a caseworker violates the Constitution by leaving children in a vetted, court-approved placement after investigating every report and finding each one not credible. Kelly, Obika, and Alexander are entitled to qualified immunity.

3. <u>Kelly, Obika, and Alexander Are Entitled to Qualified Immunity on Claims Three Through Five Because Court Authorized the Children's Care and No Clearly Established Law Required More</u>.

Claims Three and Four allege that Kelly, Obika, and Alexander deprived Plaintiffs of the right to participate in the children's medical care, and Claim Five alleges the same as to educational decisions. (Doc. 95 ¶¶ 320, 326, 330.) Aaron's surviving claims are limited to C.W.'s 2020 tonsillectomy and S.W.'s 2020 hospitalization. (Doc. 75 at 11.)

*No violation*. Absent exigency, parents and children have a right to notice and to parental consent or a court order before the State provides medical treatment to children in its care. *Benavidez v. Cty. of San Diego*, 993 F.3d 1134, 1149 (9th Cir. 2021); *Scianna v. Aurora Behav. Healthcare-Tempe, LLC*, No. 25-2989, 2026 WL 1232482, *1 (9th Cir. May 5, 2026). The record here satisfies the constitutional requirements. The juvenile court's temporary orders authorized DCS to provide routine medical and dental care, including procedures requiring general anesthesia, along with behavioral-health and other services. (Ex. 12 at 24-25.) They also authorized DCS to make educational decisions.

(Ex. 12 at 25.) Each event was separately disclosed and approved. (Ex. 22 (S.W.'s hospitalizations); Ex. 17 at 19 (counseling), Ex. 23 (tonsillectomy).)

In the SAC, Plaintiffs did not connect any individual defendant to a particular deprivation. (*See* Doc. 95 ¶¶ 320, 326.) But, Kelly left the case in January 2018, implicating only the court-approved hospitalizations in 2017. (*See* Ex. 22 at 19, 23; Ex. 3 at 35:18-24.) Plaintiffs have no evidence that Alexander, a supervisor, made any medical or educational decision. And every medical event during Obika's tenure was disclosed to the parties and/or approved by the court. (*See* Ex. 12 at 24-25; Ex. 23 at 2.) Nothing in this record shocks the conscience.

Claim Five fails for an additional reason. The right to direct a child's education belongs to a parent with legal custody. *Troxel v. Granville*, 530 U.S. 57, 65-67 (2000). Sheila had legal custody (Ex. 2 at 2) and then the court then placed custody with DCS and authorized it to make educational decisions (Ex. 12 at 25). Aaron never had the right to make educational decisions and no authority recognizes children's right to have a non-custodial parent make their educational decisions when they are in state custody.

*Not clearly established*. Even if Plaintiffs could identify a decision made without adequate notice, no clearly-established law between 2017 and 2020 required more than was done here. *Wallis* held that the State may not subject children to investigatory medical examinations without parental notice and consent, a court order, or exigency. 202 F.3d 1126, 1141-42 (9th Cir. 2000). *Mann v. County of San Diego*, 907 F.3d 1154, 1162 (9th Cir. 2018), extended that rule to dual-purpose examinations performed at removal to look for evidence of abuse. *Benevidez* was not decided until 2021—one year after this dependency concluded. 993 F.3d at 1150. No Ninth Circuit case before then held that the same safeguards are required for routine medical care of children in state custody, particularly where a court order permits DCS to provide such care. *Compare Sangraal v. City and Cty. of San Francisco*, No. C 11-04884 LB, 2013 WL 3187384, at 14 (N.D. Cal. June 21, 2013) (holding that the State may provide routine medical care to

children in its custody without parental consent), *with Pope v. Cty. of San Diego*, 719 F. Supp. 3d 1076, 1087 n.8 (S.D. Cal. 2024) (noting inconsistencies among district courts).

The law was even less settled as to a parent like Aaron whose custody has been curtailed by court order and whose liberty interest is "unambiguously lesser in magnitude" than a custodial parent's. *Brittain*, 451 F.3d at 992. No case has held that a parent who lacked custody before the State's involvement acquired decision-making rights only because the State took custody. Summary judgment is warranted.

4. Kelly Is Entitled to Qualified Immunity on Claim Six Because She Made No Misrepresentation and the ICPC's Status Was Not Material to Any Ruling.

A judicial-deception claim requires "(1) a misrepresentation or omission (2) made deliberately or with a reckless disregard for the truth, that was (3) material to the judicial decision." *Scanlon v. Cty. of Los Angeles*, 92 F.4th 781, 799 (9th Cir. 2024) (quoting *David v. Kaulukukui*, 38 F.4th 792, 801 (9th Cir. 2022)). Materiality is a question of law for the court. *KRL v. Moore*, 384 F.3d 1105, 1117 (9th Cir. 2004). A misrepresentation or omission is only material if the court would have ruled differently had it been corrected. *Keates*, 883 F.3d at 1240-41. Moreover, statements bearing on where a child is placed after removal are not material because they do not deprive a parent of custody or another constitutional right. *L.M.W. v. Arizona*, No. CV-22-00777-PHX-JAT, 2024 WL 3742402, at * 10 (D. Ariz. Aug. 9, 2024). Even a material misrepresentation must be made with the requisite intent and a reporting error or misstatement, without more, does not suffice. *Benavidez*, 993 F.3d at 1146; *see Keates*, 883 F.3d at 1240-41 (caseworker who reported a fact despite some contrary evidence, did not act deliberately or recklessly).

Claim Six alleges that the Colorado ICPC office approved Aaron as a placement and that Kelly deliberately withheld that approval from the court.[8] (Doc. 95 ¶¶ 340-349.) This claim fails on every element.

---

[8] Plaintiffs also alleged that Obika fabricated a report, but this Court held that Obika "has no liability for this allegation" because Plaintiffs alleged that Platter, not Obika, submitted the report. (Doc. 75 at 11.)

*Materiality*. The ICPC had nothing to do with whether the children were dependent and was not material. *See L.M.W.* 2024 WL 3742402, at * 10. The juvenile court found the children dependent because Aaron had failed to protect them. (Ex. 17 at 12-13, 42, 45; Ex. 20 at 156:14-162:19.) An ICPC home study addresses only whether an out-of-state home is a suitable placement. (*See supra* note 3.) It cannot negate a parent's past failure to protect.

*No Misrepresentation*. More importantly, Kelly misrepresented nothing. She initiated the ICPC process once Aaron gave her an address and had not received a response yet by the August 2, 2017, hearing. (Ex. 3 at 116:15-117:5, Ex. 10 at 15; Ex. 13 at 1-6, 16-17, 19-21, 38-40; Ex. 14 at 15.) At that hearing DCS's counsel correctly informed the court that the home study was completed but that they had not received final approval, and Kelly accurately testified that she had spoken with the Colorado worker who completed the home study, that the worker had no safety concerns about the home, and that the worker had expressed concerns about the children's emotional well-being. (Ex. 20 at 15:23-25, 109:3-13, 117:2-7.) Nine days later, on August 11, the Colorado ICPC office sent Arizona's ICPC office (not Kelly) the <u>preliminary</u> home study results, stating that final approval was contingent on additional services and that Colorado would "consider final approval" once those were completed. (Ex. 13 at 23-24.) The information Kelly gave the court was true when she gave it, and Colorado never issued final approval during her tenure.

*No Intent*. Far from concealing anything, Kelly repeatedly pressed for a response from Colorado – 5/23/2017 (prior to the August hearing), 8/1/2017, 8/10/2017 (indicating the home study was done but that they had not received the summary and conclusions), 12/4/2017 (indicating she had not heard from Colorado since July or August), 1/5/2018 (again noting that DCS had not received results). (Ex. 13 at 1-6, 16-17, 19-21, 38-40.) Kelly did not violate the children's rights and is entitled to qualified immunity on Claim Six.

5. Kelly, Obika, and Alexander Are Entitled to Qualified Immunity on Claim Seven Because There Is No Constitutional Right to Reasonable Reunification Efforts.

Even if Claim Seven were not precluded, it fails at the threshold. The children allege that Kelly, Obika, and Alexander violated their substantive due process rights by failing to make reasonable efforts to reunite them with Aaron. (Doc. 95 ¶¶ 360-694.) No such constitutional right exists. Claim Nine, the children's state-law counterpart, fails for lack of a tort duty and is addressed below.

*No constitutional right*. The right to familial association is a "negative right" – a right to *be free from* unjustified interference in familial relationships. *Jeremiah M. v. Crum*, 695 F. Supp. 3d 1060, 1098 (D. Ala. 2023) (citing Supreme Court and Ninth Circuit cases). A right to be free from interference in an existing familial relationship does not translate into a broad affirmative right to have the State build or restore one. *Id*. at 1093-94; *Mullins v. Oregon*, 57 F.3d 789, 794 (9th Cir. 1995). Courts have consistently declined to impose such a constitutional right. *Jeremiah M*., 695 F. Supp. at 1094. The affirmative duty that custody creates is a duty to provide reasonable safety and minimally adequate care, *Henry A*., 678 F.3d at 1000, not a duty to deliver reunification services. Similarly, courts have declined to recognize a substantive due process right to placement in the least restrictive environment, or reunification within a reasonable time. *Jeremiah M*., 695 F. Supp. 3d at 1093-94.

The reasonable-efforts obligation the children invoke originates in a federal statute that conditions federal funding on state plans that provide for reasonable efforts to preserve and reunify families. 42 U.S.C. § 671(a)(15). This provision does not create a right enforceable under § 1983. *Suter v. Artist M*., 503 U.S. 347, 363 (1992); *see also* 42 U.S.C. § 1320a-10 (preserving *Suter*'s holding as to § 671(a)(15)). Arizona's parallel statutes cannot fill the gap. This District has rejected this theory, explaining that "Plaintiffs seem to operate from the mistaken premise that a § 1983 claim may be based

on alleged violations of state law." *Jimenez-Bencebi v. State*, No. CV-23-02075, 2024 WL 5046434, at *18 (D. Ariz. Dec. 9, 2024). It may not. *Samson v. City of Bainbridge Island*, 683 F.3d 1051, 1060 (9th Cir. 2012).

Even if the claim were cognizable, the record forecloses any claim that it was violated. The children now fault State Defendants for various alleged failures. (Doc. 95 ¶ 367.) The record shows otherwise and it shows that the children's representatives opposed reunification all along. Nevertheless, DCS supervised visits and calls that the children often declined (Ex. 11 at 8-9, 11-14, 18); referred Aaron for evaluations (Exs. 16 and 19), and accurately reported the ICPC's status (*see supra* §§ II.C and IV.B.4). Plaintiffs have no evidence that any Defendant failed to notify Aaron of a meeting, or that Alexander was personally responsible for any of these services. *See Keates*, 883 F.3d at 1241-42 (requiring personal participation). Nor would an occasional missed visit or delayed referral over a three-year dependency come close to a constitutional violation. Substantive due process is violated only by conduct that "shocks the conscience," *Sylvia Landfield Tr.*, 729 F.3d at 1195, and negligence never does, *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998). Most importantly, the juvenile court found DCS's efforts reasonable every time. (Ex. 29.)

*Not clearly established*. At a minimum, Plaintiffs can identify no controlling precedent applicable from 2017-2020, holding that caseworkers violate the Constitution by failing to provide reunification services beyond those the juvenile court repeatedly found reasonable, and no reasonable caseworker would have understood that. Indeed, controlling precedent pointed the other way: *Mullins* rejected an affirmative familial-association right two decades earlier, 57 F.3d at 794, and *Suter* held that the federal reasonable-efforts mandate crates no privately enforceable right, 503 U.S. at 363. Every reasonable caseworker would also have understood that whether DCS's efforts were adequate was a question for the juvenile court who oversees the dependency, "independently review[s] the decisions and recommendations of [DCS]," *Alexander M.*,

328 P.3d at 1048, ¶ 15, and determines whether DCS had made reasonable efforts, *Christina G. v. Ariz. Dep't of Econ. Sec.*, 256 P.3d 628, 632, ¶ 14 (Ariz. App. 2011). Kelly, Obika, and Alexander are entitled to qualified immunity on Claim Seven.

6. Kelly Is Entitled to Qualified Immunity on Claim Eight Because She Never Prosecuted the Dependency and No Clearly Established Law Recognizes a § 1983 Claim for Civil Malicious Prosecution.

Claim Eight alleges that Kelly maliciously seized the children, sought a dependency finding based on false allegations, and pursued the dependency without probable cause. (Doc. 95 ¶¶ 373-74.) The claim fails as a matter of law, and the undisputed record refutes each allegation.

*No constitutional right*. A § 1983 malicious-prosecution claim, borrows the elements of the state-law tort. *Mills v. City of Covina*, 921 F.3d 1161, 1169 (9th Cir. 2019). In Arizona, those elements begin with "a criminal prosecution." *West v. City of Mesa*, 128 F. Supp. 3d 1233, 1240 (D. Ariz. 2017) (quoting *Bearup v. Bearup*, 122 Ariz. 509, 510 (App. 1979)). That is consistent with the claim's constitutional footing in the Fourth Amendment's protection against unreasonable seizure pursuant to legal process. *Thompson v. Clark*, 596 U.S. 36, 42 (2022). The Ninth Circuit has held that malicious prosecution is generally not cognizable under § 1983 outside criminal proceedings. *Paskaly v. Seale*, 506 F.2d 1209, 1212 (9th Cir. 1974). This District has likewise found no authority "establishing a *civil* malicious prosecution claim is actionable under Section 1983. In fact, existing authority points to the opposite conclusion." *Demaree v. Krause*, No. CV-11-00046, 2012 WL 12548135, * 6 (D. Ariz. Apr. 17, 2012).

Even if the Court looked to Arizona's civil analogue, wrongful institution of civil proceedings, the claim would fail. That tort requires proof that the defendant instituted a civil action, with malice and without probable cause, that terminated in the plaintiff's favor. *Stephens v. State*, 589 P.3d 846, 852, ¶ 25 (Ariz. 2026). Kelly did none of those things. She did not seize the children – indeed she was not assigned to the case until mid-February. (Ex. 3 at 35:18-20.) She did not institute the dependency: an Assistant Attorney

General filed the Petition on February 2, verified by Gattie. (Ex. 9 at 16, 18.) And she did not maintain it – *the children's representative did*. (Ex. 18 at 8.) DCS moved to dismiss the dependency in May 2017, based on Kelly's assessment. (Ex. 18 at 8; Ex. 25 at 3.) The GAL continued it. (Ex. 18 at 8.) Kelly left case in January 2018, months before DCS was substituted back in as Petitioner. (Ex. 3 at 35:21-24, 42:4-15; Ex. 17 at 25.) The only action Kelly took regarding the dependency's continuation was to recommend that it end.[9] Moreover, probable cause was established as a matter of law. The juvenile court adjudicated the children dependent as to Aaron and the Court of Appeals affirmed that Aaron had indeed failed to protect them at the time of removal. (Ex. 27 at 9.) A dependency adjudication is conclusive evidence of probable cause, even if later reversed, unless it was procured by fraud, which is not alleged here. *Stephens*, 589 P.3d at 853, ¶¶ 28-30.

*Not clearly established*. Plaintiffs cannot identify controlling precedent recognizing a § 1983 malicious-prosecution claim arising from a civil dependency proceeding, and the authority above points the other way. No reasonable caseworker could have understood that recommending dismissal of a dependency violated any clearly established right. Kelly is entitled to qualified immunity on Claim Eight.

### C. Kelly and Ptak Are Entitled to Summary Judgment on the State-Law Claims.

#### 1. <u>Claims Nine and Ten Fail Because DCS's Dependency Obligations Create No Tort Duty and Kelly Did Not Breach Any Duty.</u>

Claim Nine alleges that Kelly negligently failed to make reasonable efforts to reunify the family, and Claim Ten alleges that her handling of the case was grossly negligent. (Doc. 95 ¶¶ 378-390.) Claim Nine is precluded, *see supra* § V.A.2, and both fail to meet the first element.

---

[9] Even if Kelly could be said to have pursued the dependency, she would be absolutely immune for her quasi-prosecutorial actions. *Beltran v. Santa Clara Cty*., 514 F.3d 906, 908 (9th Cir. 2008); *Miller v. Gammie*, 335 F.3d 889, 898 (9th Cir. 2003). Because a malicious-prosecution claim challenges precisely those functions, a social worker "has absolute immunity for the § 1983 malicious prosecution claim." *Ramsey v. Arizona*, CV 05 3130, 2007 WL 779663, at *3 (D. Ariz. Mar. 12, 2007).

*No duty*. Duty is a threshold element of any negligence claim and it is a question of law. *Lorenz v. State*, 364 P.3d 475, 477, ¶ 11 (Ariz. App. 2015). A statute may give rise to a tort duty only if it is designed to protect the class of persons that includes the plaintiff against the particular harm that occurred. *Id*. at ¶ 13; *Quiroz v. ALCOA Inc.*, 416 P.3d 824, 829, ¶ 15 (Ariz. 2018). DCS's obligations in dependency proceedings do not meet that test. *Black v. State*, 1 CA-CV 20-0333, 2021 WL 2435626, at *3 (Ariz. App. June 15, 2021). "DCS's statutory duty requires it to make reasonable efforts to preserve the family," but "[w]hether DCS made reasonable efforts to preserve the family . . . are questions for the juvenile court." *Id*. DCS policies and procedures likewise create no tort duty. *Lorenz*, 364 P.3d at 478, ¶ 19. Nor does A.R.S. § 8-802(D), which requires that child safety workers be trained to protect children's legal rights. A general training mandate is not an actionable standard of care. And as to Aaron, Arizona's child-welfare statutes protect children, not parents, so they create no duty to him at all. *Lorenz*, 364 P.3d at 477-78, ¶ 14.

*No breach*. Gross negligence requires reckless indifference to an unreasonable risk so great that harm is highly probable. *Roebuck v. Mayo Clinic*, 575 P.3d 375, 383, ¶ 18 (Ariz. 2025). The record does not support even ordinary negligence, let alone gross negligence. Indeed, the juvenile court found DCS's efforts reasonable (Ex. 29), and conduct that the supervising court repeatedly approved cannot have been recklessly indifferent. Each act alleged in ¶ 389 of the SAC is refuted above in § V.B above. No reasonable jury could find that Kelly acted with reckless indifference.

2. <u>Claim Eleven Fails Because Kelly Committed No Tort and Platter Was Not a DCS Employee.</u>

Claim Eleven alleges that DCS negligently hired, trained, and supervised its employees, and the only individuals it identifies are Kelly and Platter. (Doc. 95 ¶¶ 391-396.) Each theory requires proof that the employer was negligent in its own right and that the negligence caused the plaintiff's injury. An employer is liable for negligent hiring if it

negligently employs an unfit person in work involving a risk of harm to others. *Kassman v. Busfield Enters., Inc.*, 639 P.2d 353, 356 (Ariz. App. 1981). Negligent supervision requires proof that the employer knew or should have known the employee was not competent and that its failure to supervise caused the injury. *Rice v. Brakel*, 310 P.3d 16, 21, ¶ 18 (Ariz. App. 2013). Negligent training requires the plaintiff to show how the training was deficient and that the deficiency proximately caused the injury. *Inmon v. Crane Rental Servs., Inc.*, 67 P.3d 726, 733, ¶ 28 (Ariz. App. 2003). And all three require that an employee committed an underlying tort. *Mulhern v. City of Scottsdale*, 799 P.2d 15, 18 (Ariz. App. 1990).

Claim Eleven fails because Kelly committed no underlying tort (*see supra* § V.C.1.) and Platter was not a DCS employee during this dependency, she was an AAG, and DCS had no authority to hire, train, or supervise her in that role (doc. 95 ¶¶ 20, 161). Claim Eleven's reference to employees "including but not limited to" Kelly does not expand the claim, because Plaintiffs may not add new theories or underlying factual allegations through summary-judgment briefing. *Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968-69 (9th Cir. 2006); *Omar v. Safety Holdings Inc.*, No. CV-23-02532, 2026 WL 775598, at *4 (D. Ariz. Mar. 19, 2026). Furthermore, Plaintiffs have no evidence that any employee's hiring, training, or supervision was deficient, that DCS knew or should have known of any deficiency, or that any deficiency caused their injuries.

3. <u>Claim Twelve Fails Because Kelly's Conduct Was Neither Extreme nor Outrageous.</u>

Claim Twelve alleges that Kelly intentionally inflicted emotional distress on the children by keeping them from Aaron. (Doc. 95 ¶ 398.) To prevail, Plaintiffs must prove (1) conduct that is extreme and outrageous; (2) intent to cause emotional distress or recklessly disregard of the near certainty that distress will result, and (3) severe emotional distress caused by the conduct. *Ford v. Revlon, Inc.*, 734 P.2d 580, 585 (1987). The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond

all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Id.* (quoting Restatement (Second) of Torts § 46 cmt. b (1965)). This Court must determine whether conduct could reasonably be regarded as meeting that standard. *Mintz v. Bell Atl. Sys. Leasing Int'l, Inc.*, 905 P.2d 559, 562-63 (Ariz. App. 1995).

Kelly's conduct does not come close. She did not remove the children or keep them from Aaron. (*See* Ex. 8 at 12 (removal by Gattie).) She recommended that the dependency be dismissed and the children be placed with him, and it was the children themselves via the GAL, and the juvenile court that kept the case open. (Ex. 18 at 8; Ex. 25 at 3.) In the meantime, she accurately reported to the court, referred the services it ordered, and supervised Aaron's visits. *See supra* §§ V.B.4, V.B.5. That conduct is not wrongful, much less atrocious. Plaintiffs have no evidence that Kelly intended to cause anyone distress or acted in reckless disregard of a near certainty that distress would result. Kelly is entitled to summary judgment on Claim Twelve.

## V. CONCLUSION

This was a dependency that the children, through their representatives, advocated for all along, even in 2020, in the face of dismissal. All of the claims either fail as a matter of law, were already litigated in the juvenile court, or both. State Defendants are entitled to summary judgment.

Dated this 21st day of October, 2026

Kris Mayes
Attorney General

*s/ Stephanie Elliott*
Stephanie Elliott
Michael R. Niederbaumer
Assistant Attorneys General
*Attorneys for State Defendants*

ORIGINAL filed via CM/ECF
and a COPY e-mailed
this same date to:

Thomas A. Connelly
Robert T. Mills
Sean A. Woods
Mills + Woods Law PLLC
5055 N. 12th Street, Suite 101
Phoenix, AZ 85014
tconnelly@millsandwoods.com
docket@millsandwoods.com
*Attorneys for Plaintiffs*

DeeAn Gillespie Strub
Natalie Newell
Gillespie, Shields, Goldfarb & Taylor
7319 N. 16th Street
Phoenix, AZ 85020
dgillespie@gillaw.com
nnewell@gillaw.com
mailroom@gillaw.com
*Co-Counsel for Plaintiffs*

Daniel J. O'Conner
Danny O'Connor, III
O'Conner & Dyet
7955 S. Priest Drive
Tempe, AZ 85284
daniel.oconnor@occlaw.com
danny.oconnor@occlaw.com
*Attorneys for Defendant Bonnie Platter*

Nathan T. Metzger
Grasso Law Firm
3075 W. Ray Rd., Ste. 110
Chandler, AZ 85226
Nathan.metzger@grassolawfirm.com
*Attorneys for Defendants Walter and Jodi Lay*

s/ G. Ybarra