# Exhibit A

# DECLARATION OF TIMOTHY TURNER

**Review & Analysis of the Actions of the**
**Arizona Department of Child Safety**
**in Case No: CV-22-00312-PHX-DLR**
***Wostrel, et al. v. State of Arizona, et al.***

## A. Introduction

My name is Timothy Turner and I have been hired by Plaintiff's counsel, DeeAn Gillespie Strub, to be an expert witness at trial. The opinions, analysis and conclusions set forth in this declaration are based upon my education, training, professional experience as well as information made available to me. For this analysis, I have reviewed the materials listed below.

## B. Employment History

### 1. CPS/DCS Experience

Over the course of 20 years, I worked as a senior social worker and social work supervisor for at-risk children and families. During this time, I was employed in California as a CPS Investigations Supervisor. Prior to this, as a Senior Social Worker, I was employed in California (Victorville & Ukiah); Nevada (Las Vegas); New Mexico (Farmington); Texas (San Angelo & Austin); and Virginia (Fairfax).

As for Arizona, I was employed by the Arizona Department of Economic Security (DES), Child Protective Services (CPS), the predecessor of the Arizona Department of Child Safety (DCS), from 2004 to 2007. My position with the agency was a Senior Case Manager, Level III. During this time, I was first assigned to the Prescott Valley office and later in Kingman.

During my career in Child Protective Services, I investigated and assessed the safety of children and families; removed children from the care of their parent(s) when no safe alternative was available; participated in the interviewing of children which included recorded forensic interviews; testified in court; trained and supervised new social workers in the field; worked with law enforcement during joint investigations; made recommendations for placement with licensed foster parents, kinship family care, as well as group homes or congregate care facilities. I conducted over 1,000 CPS investigations over 20 years.

My time in CPS included providing sworn testimony regarding CPS issues to the Mendocino County Grand Jury in 2014, the San Bernardino County Grand Jury in 2012

and the Arizona State Legislature in 2006. In 2014, the Juvenile Court in Ukiah qualified me as a CPS expert witness in evaluating SDM risk assessment tools. During 2020 and 2021, I served two terms as a member of the Mendocino County Civil Grand Jury overseeing CPS responses in this county and making recommendations.

I retired from CPS work in 2017 as an Emergency Response Supervisor in Ukiah, CA. My career began in Texas in 1988. My CV is incorporated by reference as Exhibit A.

**2. Expert Witness Experience**

After I retired, I opened my own consulting and expert witness business, Turner Consultant Services, LLC, where I provided court reports; deposition testimony; and court testimony, on 60 different lawsuits, including a $7.5 million foster care verdict, against San Bernardino County, which was the largest in California history.

I have been qualified to testify as an expert witness in Arizona, (Phoenix & Tucson); California, (9 separate counties); Illinois, (Chicago); Nevada, (Las Vegas); New York, (Buffalo); North Carolina, (Raleigh); Washington State, (Seattle); and Wisconsin, (Madison). I have been consulted in 15 separate lawsuits in Arizona.

My area of expertise is the use of proper procedures to protect vulnerable children during contacts with Child Protective Services. I have testified in Federal Court, once in Arizona, and once in California. While employed by CPS, I testified in Juvenile and Family Court at least 50 times. I've been deposed 12 times in various lawsuits in which I've been a consultant. A list of my former cases is incorporated by reference as Exhibit B.

The opinions and conclusions contained in this declaration are made to a reasonable degree of professional certainty.

## C. Documents Reviewed

I reviewed the following documents in forming my opinions. Legal research including policy and statutes were also reviewed.

1. 2nd Amended Complaint Wostrel v. Arizona
2. Declaration of Aaron Wostrel
3. DCS Policy & Procedures Manual 2019
4. DCS Out-of-Home Dependency Petition
5. DCS Motion to Dismiss Dependency

6. Guardian Ad Litem Dependency Petition
7. DCS Notice of Supplemental Record on Jurisdiction
8. Dr. Daniel Juliano, PhD Evaluation of A. Wostrel
9. DCS Emergency Motion for 72 Hour Assessment
10. A. Wostrel Motion for Contempt Order
11. A. Wostrel Motion for Removal of Guardian Ad Litem
12. A. Wostrel Emergency Motion for Immediate Change of Custody
13. A. Wostrel Objection to DCS Four Concurrent Motions
14. A. Wostrel Motion for Interactive Parent-Child Relationship
15. A. Wostrel Motion for Emergency Telephonic Hearing
16. A. Wostrel Military Discharge
17. Letters of Support for A. Wostrel
    a. Letter of Support from Wostrels' Therapist
    b. Ries Letter of Support for Wostrel
    c. Winchell Letter of Support for Wostrel
    d. Peterson Letter of Support for Wostrel
    e. Elliott Letter of Support for Wostrel
    f. Linder Letter of Support for Wostrel
    g. WYCC Letter of Support for Wostrel
18. Brien Letter Approving Child Placements
19. 2018 Madelynn Wostrel Letter
20. Public Access to Court Information on Walter Lay
21. Arizona v. Sheila Marie Lay Plea Agreement
22. Arrest Information on Steven Lay
23. Arizona Superior Court Records on Sheila Lay
24. DOC Criminal Records on David Rojas
25. DOC Criminal Records on Eric Lay
26. Maricopa County Sentencing Report on David Rojas

27. Maricopa County Sentencing Report on Eric Lay
28. 2017 DCS Addendum Report to Juvenile Court on Sheila Lay
29. Social Media Involving the Lay Family
    a. Facebook Post by Eric Lay
    b. Facebook Post by Steven Lay
    c. Facebook Post by Taylor Ostrom
    d. Social Media Post by Steven Lay
30. State of Wyoming Records
    a. State of Wyoming Custody Order for A. Wostrel
    b. State of Wyoming Order of Temporary Custody for A. Wostrel
31. Wostrel Family Photographs
32. College Degrees for A. Wostrel
33. Foster Care License for Rebekah and Aaron Wostrel
34. A. Wostrel's Submarine Qualification Certificate
35. Dr. Andrew Clark's Psychiatric Evaluation Report, March 11, 2025

## D. Case Background

A comprehensive description of the details of the Wostrel case can be found in the Plaintiff's 2nd Amended Complaint and the Declaration by Aaron Wostrel. The following is a synopsis. The plaintiff, Mr. Wostrel, is the legal and biological father of the three children also named as plaintiffs in this complaint. These children will be identified by their initials for their protection.

S.W. is the biological daughter of Sheila Lay. She was seven years old at the time of these events. Mr. Wostrel stepped in to provide stability to S.W. by assuming legal responsibility for her care and placing his name on her birth certificate, following a court hearing. He took S.W. into his care and raised her as his own. Mr. Wostrel began dating Sheila Lay in 2010. The pair eventually had

twin girls, B.W. and C.W., who were five years old at the time these issues with DCS first arose.

In 2011, Mr. Wostrel and Ms. Lay traveled to Arizona, where she grew up, for a visit with her family. The father of Sheila, Walter Lay, the maternal grandfather to the children, lived in what was described as a "compound," where Sheila had grown up.

Sheila Lay, as well as her siblings, Eric and Steven, all adults during the events at issue, had felony criminal records, including significant drug activity, and had been incarcerated in the past. In fact, Sheila Lay, the mother of the minor plaintiffs, is currently serving a 10-year sentence in Arizona for her role in an armed robbery and kidnapping.

Prior to this, Mr. Wostrel was physically attacked by Sheila Lay in 2011 and again in Wyoming in 2013. The latter attack was reported to have occurred in front of the children. Ms. Lay was arrested when the children called 911 and she spent a few days in jail. Mr. Wostrel gained temporary custody of all three girls and made Ms. Lay move out of their home. These were protective actions that demonstrated the love and affection Mr. Wostrel had for his daughters. Mr. Wostrel eventually obtained primary custody of all three children. The father believed that Sheila Lay had relapsed into methamphetamine use, which may have explained her aggression.

In 2015, Ms. Lay moved from Wyoming to Arizona to work for her father and took all three girls with her. Mr. Wostrel agreed to the relocation with the understanding he would have unsupervised access with his daughters in Arizona. Mr. Wostrel traveled to Arizona over the Christmas break in 2015 to visit and spend time with his daughters.

In 2016, Mr. Wostrel moved to Colorado for work. He shared a home with Madelynn Ries, and the couple soon married. He regularly called S.W. on her mother's cell phone and spoke with S.W. and his twin daughters. A few months prior to DCS' 2017 involvement, the phone number for Sheila Lay no longer

worked. Mr. Wostrel did not know why and was not given any other way to contact Mrs. Wostrel or his daughters.

In 2017, Mr. Wostrel received a telephone call from the maternal grandfather, Walter Lay, in Arizona. Mr. Lay told him to “come get his children” because their mother, Sheila, had gotten into trouble with the law and was probably going to prison.

The call came on the eve of Mr. Wostrel leaving to go to West Virginia for a custody trial regarding his oldest son. Mr. Wostrel reasonably contacted Mesa, Arizona police to do a welfare check on his children. He was informed by the police that the children were not in danger. Walter failed to inform Mr. Wostrel that the Arizona Department of Child Safety (DCS) had become involved with the family.

When Mr. Wostrel learned about DCS involvement, he contacted DCS by telephone to inform the Department that he was prepared to care for his daughters. DCS did not inform him that a caseworker had interviewed his daughters at school or about the facts surrounding a police raid on Sheila Lay’s home, while the oldest child, S.W., was home sick. The police search uncovered drug paraphernalia, loaded guns, and ammunition within reach of the children. Sheila Lay was arrested following this search and charged with armed robbery, a felony.

DCS could have readily obtained Mr. Wostrel’s phone number from Walter or Sheila Lay. DCS Case Manager, Amber Gattie, failed to contact Mr. Wostrel to invite him to participate in a Team Decision Making meeting (TDM) that was held shortly after the girls were removed to determine what was in the best interests of the girls. This was a failure to follow DCS policy. It was also a clear violation of the due process rights of the father and the girls.

These careless actions and failures to act were some of the reasons for this lawsuit. Amber Gattie removed the children from Sheila Lay’s custody and placed them in Walter Lay’s home, despite her knowledge of the dangerous conditions in Sheila Lay’s home when the police searched it finding loaded guns and drug

paraphernalia within reach of the children. Since all three of Mr. Lay's adult children had drug issues, it was inconceivable that he was unaware of the criminal environment in Sheila's home and the fact that the girls were often present in that home at times that Sheila was engaged in criminal activities.

Even assuming Walter's ability to parent, a thorough background check and home study for the Lays should have identified the social media posts of their adult children, Steven, Eric, and Sheila Lay. Social media posts from 2013 to 2016 show that his adult children were displaying antisocial and criminal behavior and talking about smoking and selling crack. In fact, Steven Lay posted photos on Facebook in which he is holding what appears to be an automatic weapon. The social media posts reviewed in preparing this report are attached hereto as Exhibit D. Based on DCS' access to and knowledge of the results of the raid on Sheila Lay's home, DCS knew or should have known that maternal grandfather Walter Lay had failed to protect the children from their mother's dangerous and illegal activity.

DCS filed a dependency petition, without contacting the non-custodial parent first, i.e., Aaron Wostrel, which would have eliminated any need for the children to be in state custody. This failure was a violation of the due process rights of both the father and the minor children. DCS appeared to align itself with Walter Lay. Little case documentation was disclosed to explain exactly why.

Once again, knowing the proper procedures for DCS, I ask why? This will be discussed later in this report. It is my professional opinion that DCS was rewarding Walter Lay and his second wife, Jodi Ostrom, for aligning with DCS and supplying the Department incorrect "evidence" that Mr. Wostrel was neglecting and abandoning his daughters, which was not true.

DCS appeared to have worked tirelessly to prevent Mr. Wostrel from having custody of his children even though the agency possessed no evidence, only supposition and innuendo, to prove that the children were unsafe with their father.

DCS entered false allegations against Mr. Wostrel, alleging that he abandoned his children, did not pay child support, and failed to protect them from maltreatment by Sheila Lay while they were living with her.

Mr. Wostrel stated in his declaration that he was frustrated with DCS because they failed to follow their own policies and procedures and failed to honor valid and legally enforceable Wyoming court orders allowing Mr. Wostrel unsupervised access with his children in Arizona. Mr. Wostrel was allowed an unsupervised weekend with his daughters in May 2017, which went well. Thereafter, DCS demanded that all his contacts be supervised only.

DCS threatened to terminate Mr. Wostrel's parental rights despite the Department's own lack of commitment to reunification, which was the Juvenile Court-authorized case plan. Mr. Wostrel incurred significant legal fees defending himself from the actions of DCS. The apparent desired goal of the agency was to sever Mr. Wostrel's parental rights and allow Walter and Jodi Lay to adopt the children. This was following extensive interference by the private attorney hired by the Lays.

In addition, Bonnie Platter, one of the defendants in this suit, was serving as an Arizona Assistant Attorney General at the time of these civil rights violations. Ms. Platter had apparently been a DCS employee prior to her service in the Attorney General's Office. While with DCS, Ms. Platter became known for her interference with the normal process on the investigations she was assigned.

The management of the Wostrel case within DCS was supposed to be conducted solely by DCS, according to state law, not by AAG Ms. Platter. This level of control of a dependency case by the AAG was not within her scope of employment and infused bias among DCS employees against reunification with Mr. Wostrel.

In 2020, after being deprived of his daughters' custody for three years, the Arizona Court of Appeals ordered the juvenile dependency case dismissed, with the

children to be returned to Mr. Wostrel. This was despite what should be considered contempt of court when DCS continued to follow Ms. Platter's advice and claim that the Appellate Court hearing was invalid.

## E. Interrogatories

I have structured the following information in the style of interrogatories in order to be succinct and prevent disorganization and redundancy. These questions represent the most vital issues involved in this lawsuit.

### 1. What is the definition of Due Process?

The legal definition of Due Process is contained within: **Title 42 United States Code § 1983 (Fourteenth Amendment-Due Process Clause)**

The Fourteenth Amendment to the United States Constitution, ratified in 1868, uses the same eleven words, called the Due Process Clause, to describe the legal obligation of all states. These words have as their central promise an assurance that all levels of American government must operate within the law and provide fair procedures before citizens can be deprived of their fundamental liberty interests, such as by interfering in familial relationships. Due process deals with the administration of justice and acts as a safeguard from arbitrary denial of life, liberty, or property by the government outside the sanction of law.

Due process refers to fair treatment through the normal judicial system, especially as a citizen's entitlement. It ensures that the government follows established legal procedures before depriving someone of a guaranteed right. The concept is rooted in the First, Fourth, Fifth and Fourteenth Amendments of the U.S. Constitution, which together guarantee that no person shall be deprived of fundamental constitutional rights without due process of law.

There are two main types of due process:

- **Procedural Due Process**: Ensures fair procedures, such as notice and a hearing before government action interfering with fundamental rights.
- **Substantive Due Process**: Protects fundamental rights from government interference, even if proper procedures are followed.

**ARS § 8-456**

This Arizona statute states that "the department [DCS] shall train all investigators in forensic interviewing and processes and the protocols established pursuant to section 8-817. The training must include… The duty to protect the legal and due process rights of children and families from the time of the initial contact through case closure."

The statute further states that DCS investigators must "make a prompt and thorough investigation. An investigation must evaluate and determine the nature, extent and cause of any condition created by the parents, guardian or custodian, an adult member of the victim's household or an employee of a child welfare agency where the child is placed that is licensed by and contracted with the department that would tend to support ***or refute*** the allegation that the child is a victim of abuse or neglect and determine the name, age and condition of other children in the home. If an investigator has sufficient information to determine that the child is not a victim of abuse or neglect, the investigator may close the investigation." (Emphasis added.)

The first seven claims being pursued by this lawsuit pertain to due process violations of the rights of Mr. Wostrel and his three daughters, S.W., B.W., and C.W. Due process is paramount in this case as the actions and inactions of the Defendants strongly indicate that the agency employees involved here had never read or been trained about the requirements of the Due Process Clause, especially DCS case worker Gattie, as well as Assistant Attorney General (AAG) Platter. In particular, the State failed to conduct a thorough investigation – they failed to contact the father, Mr. Wostrel, in either a prompt or thorough manner, and then recklessly alleged he had neglected the children without ever speaking with him. Rather, Mr. Wostrel had to seek out the DCS case workers instead.

They later threatened him and his children with a case plan of severance and adoption without any probable cause or evidence to support this drastic and family destroying change. Mr. Wostrel and his children suffered a needlessly prolonged separation and unnecessary emotional trauma because DCS utterly and inexcusably failed in its duty to provide due process via fundamentally fair procedures.

DCS's repeated disregard for state and federal law, including the asserting influence over a lower juvenile court by claiming that a controlling appeals court ruling was invalid, was beyond the pale compared to other DCS lawsuits I've consulted on in the past ten years. The truly shocking part of the Wostrel matter is the fact that the Arizona Attorney General's Office condoned the rogue behavior of AAG Platter, who earned a reputation for disregarding due process, in order to exert unlawful control over the progress of the reunification efforts towards Mr. Wostrel. This interference caused the illegal detention of the children to last over three years.

2. **What were the Due Process violations committed by DCS during the Wostrel Case?**

Below is a list of Due Process violations alleged in this lawsuit:

a. **Unlawful Seizure** of the children by DCS (Procedural).

b. **Dangerous Placement** of the children into Walter Lay's home (Procedural).

c. **Medical Appointments** made for the children by DCS without the knowledge or consent of the legal parent, Mr. Wostrel (Substantive).

d. **Educational Decisions** made for the children without the knowledge or consent of Mr. Wostrel, who still had educational rights over the children (Substantive).

e. **Withholding Exculpatory Evidence** by Amber Gattie, such as the results of an ICPC background check completed on Mr. Wostrel, which was unnecessary (Procedural).

f. **Failure to Provide Reunification Services** which added insult to injury when Gattie submitted a court request to have Mr. Wostrel's case plan changed from reunification to severance and adoption despite providing no services to the father or the children (Procedural).

g. **Malicious Prosecution** is alleged in this lawsuit due to the actions by AAG Platter to attempt to sever the parental rights of Mr. Wostrel in order to facilitate the girl's adoption by Walter Lay. Since Mr. Wostrel had never been substantiated or even charged with neglecting the girls in the past, this prosecution was based solely on innuendo and family stories instead of actual evidence or proof (Procedural).

**3. What were the other legal violations committed by DCS during the Wostrel Matter?**

In addition to violations of Due Process, DCS was negligent in the following ways:

a. **Gross Negligence** by DCS is alleged due to the complete lack of effort on the part of Amber Gattie to prepare the case for reunification of the children with their father. She stepped in to cancel or restrict Mr. Wostrel's telephone visits with the children and he was forced to seek a court order to compel DCS to begin reunification services (Procedural).

b. **Gross Negligence** by DCS is alleged due to the complete lack of effort on the part of caseworker Gattie and supervisor Diaz to protect the legal rights of the children. They placed the girls into an environment they could have easily

determined to be dangerous where the residents and their guests were involved in narcotics and drugs. In his report, Dr. Clark affirms that the children were punished at the Lays' house with yelling, spanking, beating with a wooden spoon or a belt, excessive chores, and food restrictions. C.W. reported her grandfather pulled S.W.'s hair and repeatedly hit her leg. B.W. reported being thrown against a wall.

Dr. Clark further affirms DCS also noted concerns of the grandparents beating the children with a wooden spoon and restricting their food with locks on the pantry and refrigerator. Jodi Ostrom-Lay is described as defensive, unengaged, and closed off to parenting suggestions. B.W. was described as having serious emotional and behavioral disturbances and being severely malnourished. Lastly, the grandparents badmouthed Mr. Wostrel repeatedly to his children, leading to an attenuation of their relationship. This repeated physical and emotional abuse was entirely preventable had DCS performed a thorough investigation and if they had returned the children to their father rather than needlessly traumatizing this family through a prolonged separation.

c. **Gross Negligence** by DCS is alleged due to the agency's failure to properly hire, train, and supervise their personnel, which led to the debacle of what happened to Mr. Wostrel and the children over the course of three years.

d. **Intentional Infliction of Emotional Distress** is alleged due to the emotional trauma suffered by the children when Amber Gattie and DCS ignored the needs of the girls and set upon a course of denial and deprivation to try and force the termination of Mr. Wostrel's parental rights so the children could be adopted by the Lay family. The mother of S.W., B.W. and C.W., Sheila Lay, has already surrendered her parental rights and admitted to being an unfit parent. The Department placed these children into the same home where Sheila grew up.

e. **Intentional Infliction of Emotional Distress** is alleged due to the apparent incompetence of Gattie and DCS to properly evaluate all placement options openly, including returning the girls to their father. DCS should not have

placed the children with alleged criminals, Walter, Steven, and Eric Lay. Walter's two sons, along with their sister Sheila, had known criminal histories and all but Sheila had access to the girls and likely conducted illegal and dangerous activities in front of them. Steven Lay was posting photos of himself on Facebook holding what appears to be an automatic weapon. Since Eric Lay had a criminal history, and had been incarcerated in the past, it was likely that he was not allowed to own or display any firearms.

**4. What were the duties and responsibilities of DCS Caseworker Amber Gattie during the Wostrel investigation?**

According to a memorandum from the Governor's Office, the following are considered to be basic requirements for an individual to be hired as a DCS caseworker. This memo was produced during Governor Janice Brewer's administration but adequately spells out the qualifications that were in place when Gattie was hired by DCS.

From the memo, "Case manager duties include, but are not limited to, the following functions:

a. Assessing child safety and risk.
b. Conducting interviews/gathering information.
c. Making in and out-of-home contacts with families and children.
d. Attending Court and Foster Care Review Board hearings.
e. Preparing case plans and conducting case plan staffings.
f. Writing professional reports and documentation.
g. Serving as a Community Liaison.
h. Coordinating and monitoring services.
I. Placing children, including transportation, moving possessions.
j. Traveling throughout the designated county and to other areas as assigned.

k. Intensively using a computer and the department's child welfare software program."

This memorandum can be accessed by the public via a Google search. An analysis of the actions taken by Gattie during the Wostrel investigation was an antithesis to the above functions spelled out by the then Governor of Arizona.

For instance, Gattie was apparently blind to the fact that the contact details for Mr. Wostrel were easily available. Instead of "gathering information" as it states in the second function listed above, Gattie used the exaggerated inability to reach Mr. Wostrel as an excuse prior to conducting a Team Decision Making meeting (TDM), on January 27, 2017. This meeting led to the removal of the children on January 30th, following the vilification of the girls' father by Walter Lay. Ms. Gattie had a legal duty to make every effort to notify the out-of-home parent and to document her attempts to locate and contact Mr. Wostrel.

Secondly, Amber Gattie shirked her responsibilities to continue trying to contact Mr. Wostrel prior to filing a dependency petition on February 2, 2017. She had a duty to conduct and document a diligent search since Mr. Wostrel did not live in Arizona. As stated before, all she needed to do was ask Walter or Sheila Lay for the father's telephone number.

Gattie also had a duty to verify that the factual information contained in the dependency petition was accurate. Instead, she documented in the petition details she obtained from Walter, Jodi, and Sheila Lay, all of whom had "axes to grind" against Mr. Wostrel. The majority of the "factual" details were based solely on supposition and inuendo and the father was given no opportunity to rebut any of it prior to the petition going to the Juvenile Court.

It has been a long-established best practice in child welfare for the caseworker not to directly provide one parent with negative information on the other parent during the investigation. Instead, Gattie had a duty to accurately relay the

conditions in the home that place the children at risk for abuse and neglect so the Court can make the best decision possible to protect them.

It has always been a principle of DCS documentation training that "if it isn't written down, it didn't happen." I was taught this during my CORE training as far back as 2004.

In this regard, Amber Gattie had a duty to provide court reports to the Juvenile Court detailing all of the facts present in Sheila's home that placed the children at risk of abuse or neglect. If she had performed this duty effectively, the attorney representing Mr. Wostrel would have had access to the reports and in turn, provided the information to his or her client thus allowing him to seek an emergency petition for custody.

When DCS became aware that Sheila's home was raided by the police and weapons and drugs were found within reach of the children, Gattie violated her first duty, which was to "keep children safe." By definition in Arizona law, this is the primary responsibility of a DCS caseworker and should be their focus. Frankly, it is incredulous to me that Gattie and her supervisor, Diaz, convinced the Juvenile Court that placing the girls in Walter Lay's home as a kinship care home was in the best interests of the children.

While accepting unproven details about Mr. Wostrel's ability to effectively parent three girls, Gattie nevertheless refused to accept any information indicating that all of Walter Lay's adult children had serious criminal records and had served time in prison on felony convictions. Steven Lay, who had access to Walter's home and therefore the girls, posted photos on social media of him with the children as well as photos depicting himself holding a firearm.

In my opinion, caseworker Gattie recklessly placed the Wostrel girls in harm's way and engaged in "confirmation bias" by convincing her supervisor and everyone else involved that the father, Mr. Wostrel, was an unfit parent without any proof whatsoever. On the contrary, Mr. Wostrel was fit to parent his daughters as

ultimately determined (twice) by the Arizona Court of Appeals. Unfortunately, the family had been torn apart during the three years it took to reach that legal determination. Mr. Wostrel went to great lengths to comply with everything DCS (unreasonably) requested of him. He and his children suffered a prolonged unnecessary separation.

Confirmation bias is defined as a cognitive bias that occurs when people process information in an illogical manner. It is the tendency to search for, interpret, favor, and recall information in a way that confirms and supports one's prior beliefs or values. Gattie misinterpreted some facts and exaggerated others before the TDM meeting and engaged in confirmation bias when she failed to reveal any exculpatory evidence about Mr. Wostrel before petitioning the court for a finding of dependency against him.

Since there were no substantiated allegations against the father and he was working with DCS to get his children returned, there was no exigency to remove the girls from him and no exigency to prevent reunification of the girls with their father, much less any legitimate reason to move toward termination of father's parental rights. A mere belief that a child "might" be at risk is not enough. The caseworker in this case, Amber Gattie, was required to use established DCS policies, procedures, protocols, and tools to determine whether risk would be present and not merely "believe" it without doing the work.

Drug test results are normally recorded in the DCS file and disclosed to the Court. However, the Health Insurance Portability and Accountability Act of 1996, (HIPAA) is a federal law that protects a person's drug test results from public disclosure. The fact that Sheila had failed her drug tests repeatedly was to be disclosed to the Court and once again, be available to the father's attorney through the filed DCS reports. What should have occurred was that Gattie should have done her due diligence in trying to locate Mr. Wostrel before proceeding in Juvenile Court.

Then, she could have informed him that DCS was aware of conditions that made the girls unsafe in the mother's home and the maternal grandfather's home.

The deliberate attempts by DCS Gattie as well as AAG Platter to circumvent Mr. Wostrel's rights had consequences that they were aware of, so they were not unintended. They were deliberate. Otherwise, since Mr. Wostrel was more than cooperative with DCS in the beginning, the desired situation would have been conversations held between Gattie and Mr. Wostrel that could have envisioned that the girls were unsafe in their present environment without violating HIPAA laws or being specific about the reasons why the out-of-home parent should pursue emergency custody in a family court due to serious risk in their mother's care. If this case had been handled appropriately from the start, there would have been no need to file a dependency petition.

According to the Governor's memo discussed above, it was DCS caseworker Gattie's duty to verify the information she gathered and make sure it was accurate before presenting it to the Court in a report. Amber Gattie failed to review the Wyoming court documents that granted Mr. Wostrel unsupervised access to his children in Arizona. There was absolutely no justification for DCS to demand that all his access with his daughters be supervised. This was an illegal violation of the constitutional rights of Mr. Wostrel and his daughters.

**5. Were there any less intrusive or least restrictive measures that DCS could have taken to protect the children short of removing them from their father's custody?**

Simply stated, the answer is yes. For the entire twenty years that I worked for CPS, I was taught in each state in which I worked that removing a child(ren) from the custody of a parent is considered the most restrictive option on a list of available options for keeping children safe.

The DCS Policy and Procedures Manual, Chapter 2, Section 6, dealing with Emergency Interventions and Removals, in effect in 2017, with few changes up to today states:

*"It is the responsibility of the Child Safety Specialist to engage the child's family to the greatest extent possible in discussions about the child's safety and planning for voluntary interventions that minimize intrusion in the life of the family. Alternatives that should be considered include:*

*In-Home Solutions (Ensuring availability of needed services)*

*Leaving home and going to a safe place*

*Voluntary placement agreement*

*Temporary custody with parental knowledge*

*Emergency removal without caregiver's knowledge"*

This language illustrates that an emergency removal of children from a parent's home, without that parent's knowledge, is at the bottom of the list of available options when a child(ren) is unsafe or at risk in the home of another caregiver. Removal actions are known to traumatize the children involved, like S.W., who suffered through two psychiatric holds, due to self-harming behaviors while placed in the Lays' home instead of with her father.

**6. Was the decision to remove the children without consulting the father a rush to judgement?**

Removal from the home, while sometimes necessary for safety, can have significant emotional, psychological, and social effects on a child. Some potential impacts include:

a. **Emotional distress** in which a child may experience fear, confusion, sadness, and anxiety when separated from their family.

b. **Attachment issues** in which a child's ability to form healthy relationships in the future are affected by the disruption of removal from the home.

c. **Identity struggles** caused by feelings of displacement or loss of cultural and familial identity when they are taken from their home environment.

d. **Academic challenges** leading to difficulties with learning and focus when they have to adjust to a new school or academic environment.

e. **Behavioral changes** in which some children develop coping mechanisms such as withdrawal, aggression or difficulty trusting adults.

f. **Instability and trauma** caused by multiple placements in foster care which can contribute to instability, making it harder for a child to feel secure.

g. **Long-term mental health effects** such as depression, anxiety and post-traumatic stress disorder (PTSD) are common among children who experience separation from their families.

The most desirable option is to keep the children with their natural or adoptive parent and stabilize the issues leading to risk of harm. In-home solutions, available to the DCS worker and supervisor, include instituting a Safety Plan, allowing a safety monitor to live with the family temporarily and report to DCS any issues, scheduling individual and family therapy, community support from outside contractors, and having the offending parent move out of the home and have supervised visitations.

It was a due process violation for Gattie to rush to an emergency removal as the only available option. This was essentially the equivalent of reading the end of a novel first, except with dire consequences. Since Mr. Wostrel was never investigated or substantiated for abuse or neglect of his children, his parental rights

should have remained intact while he traveled from out of state to Arizona. In my opinion, the actions that Gattie and DCS took to keep Mr. Wostrel in the dark about the TDM; the removal; the dependency petition and failing to recognize and comply with the Wyoming court-authorized visitation orders resulted in unnecessary DCS involvement and unnecessary, prolonged trauma to the children and Mr. Wostrel.

**7. What is the Interstate Compact?**

The ICPC is a legal agreement among all fifty U.S. states, the District of Columbia, and the U.S. Virgin Islands that governs the placement of children across state lines for foster care or adoption. It ensures that children moving between states receive adequate protection and support, and that both the sending and receiving states comply with legal and administrative procedures. The ICPC establishes:

**Legal and financial responsibility** for the child's placement.

**Assessment procedures** to ensure the child is placed in a suitable environment.

**Jurisdictional arrangements** to promote the child's welfare.

**Approval processes** before a child is moved across state lines.

The ICPC is generally required when moving a foster child across state lines, but there are exceptions where it may not be necessary. The first exception is known as Parental Relocation. If the child is placed with their biological or legal parent, who has legal custody, ICPC approval is typically not required. Mr. Wostrel was still in possession of his parental rights to S.W., B.W. and C.W. since a Court had never terminated them. All a dependency does is temporarily suspend a parent's rights until safety interventions can be put into place and court hearings are completed. DCS Gattie had no legal grounds to deprive Mr. Wostrel of his children without a proper investigation and without allowing him to visit his children on a regular basis.

**8. What is a Temporary Custody Notice?**

When Amber Gattie removed the Wostrel children temporarily on January 30, 2017, she did so through the use of a Temporary Custody Notice (TCN) which was not according to DCS policy. A TCN is an internal DCS document that is typically not reviewed by a judge before it is served on the parent(s) to notify them that their children are in the temporary custody of the state of Arizona.

This document was designed for situations in which it is reasonably believed that a child is likely to be harmed immediately, before DCS has time to present its case to the Juvenile Court. It is only to be used in case of an emergency, like abuse or neglect that is reported after hours, on weekends and holidays, which is typically when the Court is closed, or if removal is necessary to avoid imminent serious bodily injury or death.

The TCN is a carbon copy form in which the front of the document contains numerous check boxes to describe virtually every abuse or neglect situation that meets legal definitions. It is rare when a DCS worker cannot locate a checkbox to apply to their situation. However, DCS Gattie managed to find one. She did not check any preprinted boxes; rather, in the blank space for the "Other" box, where the "other" reasons for removal or to be explained, she simply wrote "DV," meaning domestic violence. This was a disingenuous entry since the only time Mr. Wostrel was involved in anything "physical" that could approximate "DV" were the two times that Sheila assaulted him, to which he did not respond in kind but simply notified the police. He was never alone with the girls where he could have committed domestic violence against anyone.

In special circumstances, a TCN serves in place of a Court Authorized Removal (CAR) and it doesn't usually pass muster during hours when the Court is open. This procedure was the same for me when I worked for DES in 2007. By serving a TCN, an internal DCS document, instead of a CAR, through the Court,

Gattie, and Diaz were allowed to avoid the scrutiny of the Court until they were able to "stack the deck" against Mr. Wostrel.

**9. What are the legal precedents that apply to the Wostrel case?**

The Fourth Amendment to the United States Constitution, made applicable to state actors through the Fourteenth Amendment, guarantees citizens the right against unlawful search and seizure. The same rights must apply to a parent's ability to raise his children without government interference absent probable cause to believe the child has been a victim of child abuse or neglect.

This is one of the bedrock principles that resulted from a federal case, *Wallis v. Spencer, 202F.3d 1126, 1136 (9th Cir. 2000).* This case also established the precedent that any social worker who plans to remove a child must do so with a warrant or court order unless the worker has information to reasonably believe the child is in **imminent** danger of serious bodily injury and then the scope of the intrusion must be the least restrictive. In the Wostrel case, the father was not even in town when his children were unlawfully seized. There was no risk of imminent harm present when DCS decided to make the illegal moves that are central to this lawsuit.

Another relevant precedent came with the decisions made in the federal case of *Birair v. Kolycheck, (CV-15-01807-PHX-DJH, 2018)*. In fact, I was fortunate to write the Court Report and submit to a deposition in the *Birair* lawsuit, in 2018, to assist the attorney who hired me in securing a favorable verdict and setting a precedent.

The *Birair* case stated that, "Exigent circumstances exist in this context only when government officials have reasonable cause to believe that: (1) at the time of seizure, the children are in imminent danger of suffering serious physical injury; (2) the scope and degree of the intrusion is reasonably necessary to avert

that specific injury; and (3) there is insufficient time to obtain a warrant to prevent such injury.

## F. Professional Conclusions

The Due Process violations by DCS and the Attorney General's Office prolonged the suffering of the three Wostrel girls, as well as that of their father. The Defendants began with the unlawful seizures and moved forward into the deliberate actions by DCS to keep Mr. Wostrel uninformed of the negative actions they were taking against him. Next, the Defendants progressed to refusing to tell the father when they scheduled medical procedures for his children. This included two mental health hospitalizations for S.W. due to self-harm and suicidal ideation while in the Lay placement. Mr. Wostrel had an inalienable right to schedule and be present for any medical procedure that was deemed necessary for one of his daughters.

In addition, Mr. Wostrel possessed the right to make educational decisions for his children. This was another violation of his due process rights. Absent being stripped of his parental rights, DCS had no right to prevent the father from knowing what was going on in school for any of his children.

These issues were drastic overreaches by the government that were made by DCS agents, Gattie, Diaz, Alexander, and Long at different times, during the life of the case. It was clear from a review of the disclosed records that these DCS employees had not been properly trained or supervised while they were employed by the agency.

AAG Platter managed to convince the Juvenile Court that it was not bound by a higher court, the Arizona Court of Appeals, or by the courts in the State of Wyoming. AAG Platter is a defendant in Claim #8 alleging malicious prosecution for pursuing the severance of Mr. Wostrel's parental rights in order to allow Walter and Jodi Lay to adopt the girls. These actions were at the heart of Plaintiffs' claim

#12 alleging Intentional Infliction of Emotional Distress, by Platter, for prolonging the Wostrel case much longer than necessary.

The reckless and lawless behavior on the part of DCS caused Mr. Wostrel and his daughters to be subjected to years of unnecessary separation, suffering, and trauma.

All my opinions were reached and are made within a reasonable degree of certainty and probability within the field of Children's Social Services. Should further discovery provide additional information, the right is reserved to amend this report.

Respectfully submitted,

Timothy Turner
Timothy Turner (Jun 4, 2025 12:50 PDT)

Timothy Turner, CPS Consultant

Date: May 30, 2025