# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Aaron Wostrel, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>State of Arizona, et al.,<br><br>Defendants. | Case No.:<br>CV-22-00312-PHX-DLR |

VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF
TIMOTHY S. TURNER

Kingman, Arizona

July 24, 2026

Prepared by:

Daniel Rohan, CER
Certified Electronic Reporter
CER No. 4137

CERTIFIED TRANSCRIPT

I N D E X


| WITNESS | PAGE |
|---|---|
| TIMOTHY S. TURNER | |
| Examination by Mr. Niederbaumer | 6 |
| Examination by Mr. O'Connor | 211 |
| Examination by Mr. Gruse | 232 |
| Examination by Mr. Connelly | 247 |

EXHIBITS MARKED

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Declaration of Timothy Turner PLTF-WOSTREL-005741 - 005765 | 28 |
| Exhibit 2 | Exhibit A - CV for Timothy Scott Turner PLTF-WOSTREL-005766 - 005776 | 10 |
| Exhibit 4 | Declaration of Aaron Wostrel PLTF-WOSTREL-006050 - 006063 | 45 |
| Exhibit 5 | Exhibit D - Social Media Posts PLTF-WOSTREL-005779 - 005836 | 92 |
| Exhibit 7 | Stipulated Order Establishing Paternity, Custody, Visitation and Child Support, Doc. 181 No. 772 PLTF-WOSTREL-011013 - 011018 | 47 |
| Exhibit 9 | Text Messages ST-Wostrel003795 - 003797 | 112 |

INSTRUCTIONS NOT TO ANSWER

Page 215 Line 10

VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

TIMOTHY S. TURNER

was taken on July 24, 2026, commencing at 10:04 a.m., with the witness appearing from 3535 North Kenneth Road, Kingman, Arizona; with all other participants appearing via videoconference from their respective locations, before Daniel Rohan, a Certified Electronic Reporter and Notary in the State of Arizona.

* * *

For the Plaintiffs:
MILLS + WOODS LAW, PLLC
By: Thomas A. Connelly, Esq.
5055 North 12th Street
Suite 101
Phoenix, Arizona 85014
480-999-4556
tconnelly@millsandwoods.com

For the State Defendants:
OFFICE OF THE ATTORNEY GENERAL
By: Michael R. Niederbaumer, Esq.
Stephanie Elliott, Esq.
2005 North Central Avenue
Phoenix, Arizona 85004
602-542-8346
michael.niederbaumer@azag.gov
stephanie.elliott@azag.gov

For the Defendant Bonnie Platter:
O'CONNOR LAW
By: Danny O'Connor, III, Esq.
7955 South Priest Drive
Tempe, Arizona 85284
602-241-7000
danny.oconnor@occlaw.com.com

For the State Defendants Walter and Jodi Lay:
GRASSO LAW FIRM, PC
By: Karl Gruse, Esq.
3075 West Ray Road
Suite 110
Chandler, Arizona 85226
480-739-1200
kgruse@grassolawfirm.com

Also present: Emma Frederic; Jimmie Sullivan, videographer

TRANSCRIPT OF PROCEEDINGS

THE VIDEOGRAPHER: We are on the record. Time is 10:04 a.m., Arizona time.

10:04:06 Here begins Volume 1, Media Number 1, in the deposition of Timothy Turner, in the matter of Aaron Wostrel, et al., versus State of Arizona, et al., in the United States District Court, for the District of Arizona, case number CV-22-00312-PHX-DLR.

10:04:30 Today's date is July 24, 2026. Our court reporter is Mr. Dan Rohan. I am Jimmie Sullivan, certified legal videographer, representing Coash Court Reporting & Video. This deposition is taking place at 3535 North Kenneth Road, Kingman, Arizona.

10:04:51 Would counsel please identify themselves for the record?

MR. CONNELLY: Thomas Connelly on behalf of Plaintiffs.

MR. NIEDERBAUMER: Michael Niederbaumer, and
10:05:01 with me I have Stephanie Elliott and Emma Frederic -- on behalf of a variety of former and current DCS workers.

MR. O'CONNOR: Danny O'Connor on behalf of Bonnie Platter.

MR. GRUSE: And Karl Gruse on behalf of
10:05:18 defendants Walter and Jodi Lay.

THE VIDEOGRAPHER: Okay. Would the court reporter please swear in the witness?

THE COURT REPORTER: Mr. Turner, would you please raise your right hand?

10:05:30 Do you solemnly swear or affirm that the testimony you're about to give at this time and place will be the truth, the whole truth, and nothing but the truth, under penalty of perjury?

THE WITNESS: I do.

10:05:41 THE COURT REPORTER: Thank you, sir.

THE VIDEOGRAPHER: Michael, you may proceed.

MR. NIEDERBAUMER: Thank you.

TIMOTHY S. TURNER,

the witness herein, having been first duly sworn by the Certified Reporter, was examined and testified as follows:

EXAMINATION

BY MR. NIEDERBAUMER:

10:05:45 Q. Could you please state your name for the record?

A. My name is Timothy S. Turner.

Q. Is there anybody in the room with you right now?

A. No.

Q. And in the last 24 hours, have you ingested any

10:06:03 drugs or medication that would affect your ability to

A. They're partners.
Q. Now, you said you -- you're charging them $300 per hour. Is that correct?
A. Yes.
10:27:28 Q. All right. Now, do you have any financial interest in the outcome of this case?
A. No.
Q. Now, your area of expertise is the process and procedures used to keep children safe in child welfare situations. Is that correct? 10:27:47
A. Yes.
Q. Okay. In this case, you were hired to provide an opinion as to whether the standard of care within your area of expertise was met. Is that correct?
10:28:04 A. Yes.
Q. Now, you're not holding yourself out to be a legal expert, are you?
A. No. I'm not a lawyer.
Q. In fact, you are not qualified to make constitutional judgments, are you? 10:28:21
A. I don't know what --
MR. CONNELLY: Form and foundation.
Go ahead.
THE WITNESS: I know how to research. I know how to read. I know how to study the Constitution 10:28:35

when I need to. But I'm not a qualified expert on constitutional law, no.

BY MR. NIEDERBAUMER:

10:28:52 Q. Okay. And just so -- and just so that we are clear, I just want to show you -- let's see. Hold on a second -- if I can find it.

Do you remember your depo being taken in a case named Wright versus Southern Arizona Children's Advocacy Center?

10:29:33 A. Yes.

Q. Okay. And that was -- deposition was taken on March 11, 2024?

A. I believe so. I'm not looking at --

Q. Okay. And was -- and that was taken by Zoom

10:29:49 video teleconference?

A. Yes.

MR. NIEDERBAUMER: Okay. If I share my screen -- I will mark this as Exhibit 11. I know I'm jumping around on exhibits, but I plan on getting to all

10:30:05 of them.

(Testimony pertaining to document introduced as Exhibit 11 was discussed amongst counsel and all testimony pertaining to said document was agreed to be stricken from the transcript as discussed.)

that particular section and removing it.
MR. CONNELLY: Okay.
BY MR. NIEDERBAUMER:
Q. All right. Moving forward, I just want to just get your question. You are not a constitutional expert, correct?
A. Correct.
Q. Okay. And you are not able to tell us if something violates the constitution or not. Is that correct?
A. Correct.
Q. Okay. Now, before we went on break, I was asking you, like, in your career -- and this is what I mean by this -- in your career, how many times have you been hired as an expert to testify?
A. 63 times.
Q. Okay. And how -- how many of those times resulted in a report?
A. I'd say probably 70 percent of them.
Q. Okay. And how many of those resulted in a deposition? Even if you give me a percentage --
A. I believe --
Q. I'm sorry. I didn't mean to interrupt you.
A. I believe I've been deposed nine times, if I recall correctly.

Q. Now I'm going to turn to your report. Now, this is -- Exhibit 1 is going to be your report, but it's minus the exhibits.

(Deposition Exhibit 1 was marked for identification.)

BY MR. NIEDERBAUMER:

Q. So is this -- does this look like the first page of your report here on Exhibit 1?

A. Yes.

10:47:22 Q. Okay. Have you prepared any subsequent reports for this case?

A. No.

Q. Are all of your opinions about this case contained within this report?

10:47:43 A. Yes.

Q. And another way to ask that is, you don't hold any opinions outside of this report. Is that correct?

A. That's correct.

Q. Okay. Let's begin with the first page.

10:48:01 Actually, the heading, it says "Declaration of" Timmy Turner -- or "Timothy Turner." Is that what it -- correct?

A. Yes.

Q. Okay. And the next line reads "Review and

10:48:14 Analysis of the Actions of the Arizona Department of Child

don't get everything, but you can get some information, some framework on policies and procedures.

10:51:50

Q. And then those policies and procedures online, would those be included in this list?

A. Yes, right there, "DCS Policy & Procedures Manual 2019."

Q. We'll get to that in a minute.

Did you review any documents in forming your opinions that are not included on this list?

10:52:07

A. I don't believe so, no.

Q. Now, you did just mention Number 3 says "DCS Policies & Procedures" -- procedure -- strike that.

DCS -- Number 3 is DCS Policy & Procedures Manual 2019. Is that correct?

10:52:33

A. Yes, that's what's written there.

Q. Okay. Now, the events in this particular case began in 2017, right?

A. Yes.

10:52:52

Q. And why did you review the 2019 manual as opposed to the 2017 manual?

A. Because I did not have access to the 2017 manual at that time, but the revisions are pretty standard from year to year.

10:53:20

Q. Now, if we review this list, the entire DCS file is missing. Is that correct?

BY MR. NIEDERBAUMER:

Q. Right. Well, they're not, right? I mean, because the -- the next steps are -- like, in certain cases, the next steps will be filing a dependency proceeding in a court, correct?

MR. CONNELLY: Form and foundation.

THE WITNESS: Correct.

BY MR. NIEDERBAUMER:

Q. Okay. Or there's other things that people can agree to within those meetings. Is that correct?

A. Correct.

Q. And now the most serious of all the things that could happen at a team decision making meeting is for DCS to decide to file a dependency petition. Is that correct?

12:08:56 A. That's for them to determine whether to do it or not. It's not mandatory that it's being done.

Q. Well, correct. But that is the most serious -- and a lot of things can happen after a team decision making, but that's the most serious thing that happens after a team decision making meeting. Is that correct?

A. It's the most restrictive option, so yes.

Q. Okay. And the court is where due process is provided. Isn't that correct?

MR. CONNELLY: Form and foundation.

12:09:26 THE WITNESS: Well, I'm not a legal scholar

or expert. But, yes, I believe so.

BY MR. NIEDERBAUMER:

Q. Sorry, I'm just looking for my spot here. Let's see.

12:09:45 Okay. Still on -- it's still on 6, but it goes to page 7. I'll highlight the sentence.

Now, this reads, "Amber Gattie removed the children from Sheila Lay's custody and placed them in Walter Lay's home, despite her knowledge of the dangerous
12:10:11 conditions in Sheila Lay's home when the police searched it finding loaded guns and drug paraphernalia within reach of the children." Did I read that correctly?

A. Yes, you did.

Q. Okay. Now, I'm having trouble understanding this
12:10:31 particular sentence, and I think it's because you used the word "despite." So let's break this down, if we could.

A. Okay.

Q. Can we -- can we agree that loaded guns and drug paraphernalia within the reach of the children would be
12:10:45 considered a dangerous environment?

A. Absolutely.

Q. Can we also agree that removing children from an environment with loaded guns and drug paraphernalia within their reach would be a good thing?

12:11:02 A. Yes.

14:23:41

14:23:58

14:24:15

14:24:34

14:24:57

Q. Okay. Now, are you aware that during the conversation between Amber Gattie and Aaron Wostrel, he indicated that he believed that she -- Sheila was on drugs?

MR. CONNELLY: Form and foundation.

THE WITNESS: I believe he probably may have had that discussion with her. I don't know.

BY MR. NIEDERBAUMER:

Q. All right. Let's go back to Exhibit 1. And this is, again, page 7. And I'm going to highlight this sentence. It says, "This failure was a violation of the due process rights of both the father and the minor children." Did I read that correctly?

A. I'm not looking at it.

Q. Oh, I'm sorry. I'm not sharing it. Thank you.

Now I'll say it, "This failure was a violation of the due process rights of both the father and the minor children." Did I read that correctly?

A. That's what's written there, yes.

Q. Okay. And as we said before, you do not have the qualifications to determine whether or not the Constitution was violated. Is that correct?

A. I'm not a constitutional expert.

Q. All right. And so -- but, really, isn't the filing of the dependency petition where the due process

begins?

MR. CONNELLY: Form and foundation. Calls for a legal conclusion.

THE WITNESS: Yes, I'm not an attorney. But, you know, they should -- trying to think here.

It should be their responsibility to do everything they can before. I mean, due process is the process where people are treated fairly in interactions with the government, and that begins the minute that Amber Gattie was assigned this investigation.

BY MR. NIEDERBAUMER:

Q. And -- and that's your belief, correct? But you're not --

A. That's my --

Q. -- you're not a Constitution scholar?

A. Correct.

Q. Is that correct?

A. Yes.

Q. All right. Next two sentences, "DCS appeared to align itself with Walter Lay. Little case documentation was disclosed to explain exactly why." Did I read that correctly?

A. Yes.

Q. Now, you did not have a chance to read the DCS file, correct?

A. I believe so.
Q. Now, interrogatory number 1 says, "What is the definition of Due Process?" Correct?
A. Correct.
14:38:19 Q. Now, we can shorten this deposition if everybody can just concede that you do not have the qualifications to determine whether or not DCS workers violated the due process rights of the plaintiffs. Would you agree with that statement?
14:38:43 A. I'm not a constitutional lawyer. So all I do is look it up and read about it. And then based on my experience level and based on the materials I've been presented, then I come to an educated guess, an educated conclusion --
14:39:00 Q. So can we --
A. -- that's what --
Q. Okay. And so can we agree that you are not going to offer any opinions at trial that due process was violated by DCS workers in this case?
14:39:15 A. I will not be making those kind of opinions at trial.
Q. And can we -- I mean, because this will short form it if I don't have to ask questions about due process.
14:39:25 Can we just state that we can ignore,

14:39:47
14:40:01
14:40:25
14:40:42
14:40:55

wherever you state that the due process rights were violated, because you do not have the qualifications to testify to that effect?

A. Well, you can -- you can put it any way you want to. But I'm not a due process expert. I just read the due process clause and then used it in forming my opinion. But at trial --

Q. Okay.

A. -- I will not be forming that opinion.

Q. If somebody asks you a question about due process, will you just state that you're not qualified to answer that question if that comes up at trial?

A. Well, it's more or less what I've already said today under oath.

Q. And also under this interrogatory number 1, you also include the Arizona Statute ARS 8-456. Is that correct?

A. Yes.

Q. And you are not a legal expert, correct?

A. Correct.

Q. And you are not going to opine as to the application of this statute to the facts in this case. Is that correct?

A. That's correct.

MR. CONNELLY: Form and foundation.

Q. All right. Now, are you aware -- or do you know what the outcome of that dependency action was?
A. I believe the dependency was continued.
Q. Now, while -- after the dependency was continued, are you aware that Superior Court, by a preponderance of the evidence, found that Aaron failed to protect the girls and was a risk to emotional abuse -- or at a risk to emotionally abuse them? Do you know that's what the court found?
MR. CONNELLY: Form and foundation.
THE WITNESS: I wasn't aware of that. But once again, I won't question the court.
BY MR. NIEDERBAUMER:
Q. Okay. Let's go back to your -- sorry, let's go back to your report and start discussing interrogatory number 2.
All right. And, again, this is regarding due process, correct?
A. Yes.
Q. Okay. And this -- these are just what has been alleged in this case. And we could -- because they're just allegations, are you offering any opinions here whatsoever?
A. No. This is just information.
Q. Okay. So we can go ahead and skip to

interrogatory number 3 because you will not be opining as to whether or not there were due process violations in this matter, correct?

A. Correct.

14:46:23 Q. All right. Interrogatory number 3 -- the question of interrogatory number 3 is, "What were the other legal violations committed by DCS during the Wostrel Matter?" Did I read that correctly?

A. Yes.

14:46:45 Q. Then your first sentence says, "In addition to violations of Due Process, DCS was negligent in the following ways." Did I read that correctly?

A. Yes. Yes.

Q. Okay. Now in subsection A, it says, "Gross 14:47:07 Negligence by DCS is alleged due to the complete lack of effort on the part of Amber Gattie to prepare the case for reunification of the children with their father. She stepped in to cancel or restrict Mr. Wostrel's telephone visits with the children and he was forced to seek a court 14:47:26 order to compel DCS to begin reunification services." Did I read that correctly?

A. Yeah.

Q. Is that just an allegation, or is that your opinion?

14:47:44 A. Well, it's an allegation. It was procedural. So

report, which is Exhibit 1.
Then the paragraph continues. It says, "This memo . . . produced during Governor Janice Brewer's administration but adequately spells" -- sorry, I'm going to read that again, because I think I missed a word.
"This memo was produced during Governor Janice Brewer's administration but adequately spells out the qualifications that were in place when Gattie was hired by DCS." Did I read that correctly?
A. Yes.
Q. What year was that memo drafted?
A. I don't have it right in front of me, but I believe it came out, like I said, during her administration. Right around the time that they were reforming the department into DCS, I believe she was governor. I --
Q. So around -- Okay. So around 2013 or so?
A. Something like that.
Q. All right. Do you know if those requirements have ever changed?
A. Not the Core requirements. I mean, they -- they may add things, but I don't know that they take things out.
Q. Why did you use this memorandum and not Amber Gattie's job description?

15:38:49 A. Because I didn't have access to her job description.
Q. Okay. And why did you not use the DCS policies and procedures effective in 2017?
A. Because I hadn't seen the 2017 policy and procedure manual. The one I was using was in 2019, which I believe are very, very similar.
Q. Now, to evaluate Gattie's job performance, you compared it to this memo which may no longer be effective,
15:39:11 correct?
MR. CONNELLY: Form and foundation.
THE WITNESS: I don't know if it's effective or not. What I -- what I said here is that it adequately spells out the qualifications. And those are
15:39:24 qualifications I had to meet in Arizona and everywhere else I work. So like --
MR. NIEDERBAUMER: Yes, but --
THE WITNESS: -- I say, I don't think they take things out.
BY MR. NIEDERBAUMER:
Q. All right. And you also --
MR. NIEDERBAUMER: And you're going to object, Tom.
BY MR. NIEDERBAUMER:
15:39:38 Q. But you did not use the DCS file, but just the

professional conclusions. And are these your final conclusions in your report?

A. Yes.

Q. And a lot of this is repeats from before, so do I have to go over the same opinions that you have presented before, or are your answers going to be the same?

A. My answers will be the same.

Q. Right here, though, I want to focus on -- this is again on page 24, Exhibit 1. It says, "These issues were drastic overreaches by the government that were made by DCS agents Gattie, Diaz, Alexander, and Long at different times, during the life of this case. It was clear from a review of the disclosed records that these DCS employees had not been properly trained or supervised while they were employed by the agency." Did I read that correctly?

A. Yes.

Q. Now, you have never reviewed Gattie's training files, have you?

A. No.

Q. You've never reviewed Diaz's training files, have you?

A. No.

Q. Have you ever reviewed Alexander's training files?

A. I didn't review any of -- any training files.

Q. Okay. And so you didn't review Alexander's or Long's training files. Is that correct?
A. Correct.
Q. Have you looked at the training documents that were used at the time each of these individuals were trained?
A. I have not.
Q. So you have no information to support whether or not Gattie, Diaz, Alexander, and Long were properly trained or not, correct.
A. My opinion in that answer there is based on experience and what I saw happening, or in some cases not happening, by the same people that worked for the department I used to work for.
Q. Now, you would agree with me that people sometimes act contrary to their training?
MR. CONNELLY: Form and foundation.
THE WITNESS: I would say that's true, but I'm not training --
MR. NIEDERBAUMER: All right. And so -- Okay. All right.
MR. CONNELLY: I'm sorry. I didn't catch that. What -- what did you say? But you're not what?
THE WITNESS: I'm not a trainer.
MR. CONNELLY: Oh, okay. Thank you.

BY MR. NIEDERBAUMER:
Q. Okay. Would you state -- I mean, do you know of any training program anywhere regarding people and driving automobiles that train them to get into accidents?
16:58:34 A. No.
Q. Okay. So people get in accidents every day, right?
A. That's why they're called accidents, yeah.
Q. Correct. And so someone was acting outside of
16:58:45 the course of their training, were they not, then, where those accidents to occur?
A. I'm assuming you're correct.
Q. And the fact that they got into an accident isn't indicative of the quality of their training, correct?
16:59:06 MR. CONNELLY: Form and foundation.
THE WITNESS: I suppose that would depend on what the nature is of the accident.
BY MR. NIEDERBAUMER:
Q. But the mere fact that they got into the accident
16:59:18 is not, correct?
A. I guess you're correct.
Q. Okay. Now, let's get into that they were not properly supervised. Have you ever looked at any of these individuals' personnel files?
16:59:38 A. No. I was never given access to those.

directed DCS employees and other persons not employed by the Attorney General Office to take certain actions.

Okay. So those -- had you ever read that before?

17:24:40 A. No, I had not.

Q. Were you aware that that was kind of the scope of the claims remaining against Ms. Platter?

A. I was not aware of what's left.

Q. Okay. But you -- would you agree with me, now
17:24:57 that you know that, that really the -- the relevant claims and -- as -- with respect to your opinions in this case are -- are simplified a little bit?

MR. CONNELLY: Form and foundation.

THE WITNESS: Well, my entire report is --
17:25:20 is -- I don't want to call it simplified, but it is made to be concise and succinct. So some of that may not get put in the final report.

BY MR. O'CONNOR:

Q. Okay. But, I mean, would you agree that the
17:25:36 relevant facts and allegations and claims that are discussed in your report and that you opine on are limited to Platter's -- Ms. Platter's out-of-court actions directing DCS employees or others to take certain actions?

A. I believe that's correct, yes.

17:26:03 Q. Okay. And so once again, I mean, you've --

you've testified at length -- we've established you're not an attorney, you're not a legal expert, you're not going to opine on due process violations or constitutional violations in this case. Would you agree with that?
17:26:28 A. Yes.
Q. Okay. And so the only -- correct me if I'm wrong. I think the only relevant allegations that you discuss with respect to out-of-court actions that Ms. Platter took are contained in this section, which is
17:26:48 the first section, the background -- her case background. Is that -- is that fair?
A. Yes.
Q. Okay. And so that's what we're -- that's what we're talking about here, that she directed DCS employees,
17:27:05 right?
A. Yes.
Q. And you can't point me to any specific actions that she took that would meet that description?
A. No, because I didn't have the court file.
17:27:23 Q. Okay. And you can't -- obviously you can't point me to any evidence that would support those allegations?
A. These are my professional observations and my opinions based on the documentation I was given, along with my training and experience.
17:27:43 Q. I understand that. And I'm trying to understand

Q. And did you ever have cases that you investigated where you -- where you left -- put the children in the care of a non-custodial parent?

A. There were times. If I didn't have any parent to go to, one parent's in jail or, you know, passed away or whatever, then you go to the other parent.

Q. Did you have cases where there was a non-custodial parent that lived out of state?

A. Yes. That was where the ICPC came in, if the agency was trying to place the kids with the out-of-state parent.

Q. And in those cases, did you ever file a dependency petition without first contacting and interviewing the non-custodial parent?

A. No.

Q. Do you believe it was below the standard of care for DCS to file a dependency petition without first contacting and talking to Aaron Wostrel?

MR. NIEDERBAUMER: Form. Foundation.

THE WITNESS: I do believe that fell below the standard of care, and it was not in the best interest of the kids.

BY MR. CONNELLY:

Q. Did you have cases that you investigated or supervised where the investigation ended with the case

18:47:05
A. Yes, sir.
Q. Would it be fair to say that wherever you say in your report that plaintiff's due process rights were violated, that what that means is that the DCS actions pertinent to that opinion fell below the applicable standard of care?
MR. NIEDERBAUMER: Form. Foundation.
THE WITNESS: Correct.
BY MR. CONNELLY:
18:47:25
Q. There was some discussion and questioning about DCS actually moving to dismiss the petition against Mr. Wostrel in May of 2017 and that the GAL objected, and so the case continued. Mr. Niederbaumer correctly noted to you that the GAL then stepped in and -- and took over the case. However, he failed to note to you that later down the road, the State then again took over the prosecution of that petition. Did you -- were you aware of that?
18:47:51
MR. NIEDERBAUMER: Form. Foundation.
18:48:09
THE WITNESS: Yes, I believe I read that in the material.
BY MR. CONNELLY
Q. And have you ever seen any other child protection agencies that you worked for, whether in Arizona or in any other state, continue to urge and advocate for dismissal
18:48:34

it best practices to investigate social media?
A. Well, once again, considering how prevalent social media is, it's a big part of everybody's lives nowadays, so yes.
19:17:12 Q. And let me ask you about your interrogatory number 3, 3a, where you discuss gross negligence. You say DCS is alleged, due to the complete lack -- "Gross negligence by DCS is alleged due to the complete lack of effort on the part of Amber Gattie to prepare the case for
19:17:40 reunification of the children with their father."
Did you also mean to include the ongoing caseworkers, the supervisors, who came after Amber Gattie, who are defendants in the case?
A. Yes.
19:17:59 MR. NIEDERBAUMER: Form. Foundation. Outside the scope of his opinion.
BY MR. CONNELLY:
Q. Bear with me for a moment, please.
And when you're talking about gross
19:19:05 negligence, claim 9 is asserted against Defendant Kelly. So when you're discussing gross negligence in your interrogatories, did you mean to be referring to -- to Defendant Kelly instead of Defendant Gattie?
A. I believe so. I think --
19:19:33 MR. NIEDERBAUMER: Objection. Outside the

scope of his opinion, has not been disclosed. Form. Foundation.

MR. CONNELLY: You can answer.

THE WITNESS: I believe -- I believe I stated that that -- as opposed to just specifically her, because she was just the investigator, that it -- what I meant there was that ongoing case managers who became responsible for the case as it moves through the system.

BY MR. CONNELLY:

Q. The same would be the case with your discussion of gross -- the gross negligence claim?

A. Yes.

MR. NIEDERBAUMER: Form. Foundation. Outside the scope. Failure to disclose.

THE WITNESS: Yes.

BY MR. CONNELLY:

Q. And that would be the same in regards to your discussion about intentional infliction of emotional distress, right?

MR. NIEDERBAUMER: Form. Foundation. Outside scope of his opinion. Failure to disclose.

THE WITNESS: Correct.

BY MR. CONNELLY:

Q. And your reference to these claims are the claims as they're stated in the second amended complaint, right?

A. Correct.
MR. NIEDERBAUMER: Form. Foundation.
BY MR. CONNELLY:
Q. So you just -- your discussion of those claims as -- is in relation to the way they're set forth in the second amended complaint and directed towards the defendants that are mentioned in the second amended complaint for those claims, correct?
MR. NIEDERBAUMER: Form. Form. Foundation. Outside the scope of his opinion, as well as failure to disclose.
THE WITNESS: Correct.
BY MR. CONNELLY:
Q. So I'm going to wrap up here with just a few quick questions about standard of care.
Was it below the standard of care for Amber Gattie to not contact Aaron Wostrel as part of the investigation?
MR. NIEDERBAUMER: Form. Outside the scope of his opinion. Failure to disclose. And asked and answered.
THE WITNESS: I do believe it fell below the standard of care.
BY MR. CONNELLY:
Q. Was it below the standard of care for Amber

Gattie to not inform Aaron about the safety plan that she had put in place with the -- with the girls in the custody of Sheila Lay with Joy Lay as a safety monitor?

MR. NIEDERBAUMER: Form. Foundation. Outside the scope of his opinion. Failure to disclose.

THE WITNESS: Yes, it fell below the standard of care, because Mr. Wostrel didn't even know that the kids were still in -- with Sheila after she had been investigated.

19:23:04 BY MR. CONNELLY:

Q. And you testified earlier it was below the standard of care to not inform him about the TDM, right?

MR. NIEDERBAUMER: Form. Foundation.

THE WITNESS: Correct.

19:23:12 BY MR. CONNELLY:

Q. And it was below the standard of care for her to not inform him about the temporary custody notices and temporary custody being taken, right?

MR. NIEDERBAUMER: Form. Foundation. Outside the scope of his opinion. Failure to disclose.

THE WITNESS: Correct.

BY MR. CONNELLY:

Q. Was it below the standard of care for Amber Gattie to cause the -- the dependency petition to be filed alleging that Aaron was not paying child support without

first obtaining the Wyoming custody order to see what it said about child support?

MR. NIEDERBAUMER: Form. Foundation. Illogical. Outside the scope of his opinion, as well as failure to disclose.

MR. GRUSE: Why not join?

THE WITNESS: It fell below -- it fell below the standard of care.

BY MR. CONNELLY:

Q. Did it fall below the standard of care for the State to allege abandonment by Mr. Wostrel without first contacting him and talking to him about contacts that he had with the kids after Sheila moved to Arizona?

MR. NIEDERBAUMER: Form. Foundation. Outside the scope of his opinion. Failure to disclose.

THE WITNESS: I believe it was best practice, as we discussed earlier, about what the best idea would be versus the minimum standard.

BY MR. CONNELLY:

Q. So it was or was not below the standard of care?

A. I believe it was.

MR. NIEDERBAUMER: Form. Foundation.

BY MR. CONNELLY:

Q. In your Professional Conclusions, in the third paragraph you say, "These issues were drastic overreaches

by the government that were made by DCS agents, Gattie, Diaz, Alexander, and Long at different times."

Did you also mean to include Kelly in that list?

19:25:17 MR. NIEDERBAUMER: Form. Foundation. Failure to disclose. Outside the scope of his opinion.

THE WITNESS: Yes, I did mean for Kelly to be included. He was in that line of workers.

BY MR. CONNELLY:

19:25:29 Q. And then there's the paragraph that begins, "AAG Platter managed to convince the Juvenile Court," and then you go on. And then the second sentence says, "AAG Kelly [sic] is a defendant in claim number 8." Did you mean to say that it's Defendant Kelly and not AAG Kelly?

A. Yes.

MR. NIEDERBAUMER: Form. Foundation. Outside scope of his opinion. Failure to disclose.

MR. CONNELLY: Okay. I think that's all the questions that I have.

19:26:28 MR. NIEDERBAUMER: Can we take a five-minute break to see if any of us have follow-up?

MR. CONNELLY: Of course.

THE VIDEOGRAPHER: All right. We are off the record. Time is 7:27.

19:26:44 (A recess ensued.)

THE VIDEOGRAPHER: We are back on the record. Time is 7:32.

MR. CONNELLY: I have nothing further.

Danny?

19:31:57 MR. O'CONNOR: Nothing further for me.

MR. GRUSE: And nothing further from me either.

MR. CONNELLY: Great. We'll read and sign.

THE VIDEOGRAPHER: Okay. And with that, we

19:32:07 are off the record. Time is 7:32. This ends Volume 1, Media Number 4, of the deposition of Timothy Turner.

(The deposition was concluded at 7:32 p.m.)

______________________________
TIMOTHY S. TURNER

STATE OF ARIZONA )
COUNTY OF MARICOPA )

BE IT KNOWN the foregoing proceedings were taken before me at the time and place herein set forth; that I was then and there a Certified Electronic Reporter and Notary Public in and for the County of Maricopa, State of Arizona; that the questions propounded by counsel and the answers of the witness thereto were taken by me electronically and thereafter reduced into typewritten form under my direction; that the foregoing pages are a full, true, and accurate transcript of all proceedings and testimony, all to the best of my skill and ability.

I FURTHER CERTIFY that I am in no way related to nor employed by any parties hereto nor am I in any way interested in the outcome hereof.

DATED at Phoenix, Arizona, this 3rd day of August, 2026.

Daniel Rohan, CER
Certified Electronic Reporter #4137
and Notary Public
My Commission Expires: June 28, 2027