Thomas A. Connelly (AZ Bar #019430)
Robert T. Mills (AZ Bar #018853)
Sean A. Woods (AZ Bar #028930)
**MILLS + WOODS LAW PLLC**
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
Telephone 480.999.4556
docket@millsandwoods.com

DeeAn Gillespie Strub (AZ Bar #009987)
GILLESPIE, SHIELDS, & TAYLOR
7319 North 16th Street
Phoenix, Arizona 85020
Telephone: (602) 870-9700
Fax: (602) 870-9783
mailroom@gillaw.com

*Attorneys for Plaintiffs*

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014-2555
480.999.4556

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Aaron Wostrel, *et al.*,<br>Plaintiffs<br>v.<br>State of Arizona, *et al.*,<br>Defendants. | Case No.: 22-cv-00312-PHX-DLR<br>**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br>(Hon. Douglas L. Rayes) |

Plaintiffs Aaron Wostrel, S.W., B.W., and C.W., by and through their counsel, hereby move for partial summary judgment on the established elements and defenses of their surviving claims, and for an order fixing the undisputed material facts under Rule 56(g), as to the remaining claims against Defendants Faust, Gattie, Diaz, Kelly, Obika, Alexander, Kaplan, and Adams ("State Defendants") and Defendant Platter ("Platter"). This motion is supported by the following Memorandum of Points and Authorities and the exhibits submitted herewith.

///

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Plaintiffs move for partial summary judgment under Rules 56(a) and 56(g) of the Federal Rules of Civil Procedure. The motion does not ask the Court to resolve every remaining question in this case. It asks the Court to decide what the record already decides: that DCS's own documentation establishes no safety threat in Aaron's care, successful unsupervised visits, favorable independent professional findings, a recommendation to place the twin girls with him, an approved and inspected home, and a dependency vacated for lack of evidence.

Defendants have produced no documentary safety finding that supports the separation that lasted from January 2017 until April 2020. State Defendants' own Program Administrator, Jason Keith, reviewed the case file and found nothing on Aaron except an "untreated" mental health label, which he agreed was legally insufficient for dependency, custody withholding, or denial of unsupervised contact. He agreed the prolonged dependency was "hard to justify," the prolonged visitation restrictions were "hard to justify," and that the case "lasted too long and should have been dismissed earlier." He agreed there were "a lot of opportunities" to return the children earlier. These are not Plaintiffs' characterizations; they are the admissions of the DCS Program Administrator who oversaw the region that managed this case.

The motion requests: (1) partial judgment on the children's custodial right to reasonable safety in State-arranged foster placement (Claim Two); (2) partial judgment on Kelly's duty of reasonable care in performing the protective and reunification work she was assigned and undertook (Claims Nine and Ten); (3) partial judgment rejecting absolute prosecutorial immunity for Platter's operational administration of evaluations, services, and reunification outside the courtroom (Claim Seven); and (4) partial judgment establishing favorable termination of the dependency vacated on September 26, 2019 (Claim Eight).

The Court should also enter Rule 56(g) findings establishing the specific admitted facts set forth in Section IV.M.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

Plaintiffs reserve individualized liability, causation, and damages for trial.

## II. SURVIVING CLAIMS AND RELIEF PRESENTED

This motion addresses the children's remaining federal claims concerning seizure without adequate investigation (Claim One), placement safety (Claim Two), medical decisions and participation (Claims Three–Four), education (Claim Five), and judicial deception in court submissions (Claim Six); the familial-association claim against Platter (Claim Seven); and the children's state-law claims concerning malicious prosecution (Claim Eight), Kelly's reunification and protective duties (Claims Nine and Ten), Faust's hiring, training, and supervision (Claim Eleven), and emotional distress against Kelly and Platter (Claim Twelve). Aaron's individual recovery remains confined to his surviving medical claims and claims against Platter. Doc. 75 at 8–10, 13–14; Doc. 89 at 2–3; Doc. 127 at 2–4.

Claim Seven proceeds only against Platter. Claim Six concerns Kelly and Obika. The motion seeks no Rule 56(a) judgment against Kaplan individually; Kaplan's role in the established record is addressed in Section IV.L. Defendants Long and McKay have been voluntarily dismissed and are no longer parties; however, the documentary evidence obtained through Long's deposition and the DCS business records in which Long and McKay may appear remains part of the evidentiary record and is addressed where relevant. The motion does not renew claims based on Platter's protected courtroom advocacy.

## III. RELEVANT UNDISPUTED FACTS

The following numbered facts are supported by the exhibits and deposition testimony described herein. The exhibit numbers correspond to the Numerical Table of Contents at the end of this motion.

### A. Investigation Period: December 2016 Through February 2017

***Fact 1***. By January 18, 2017, DCS investigator Amber Gattie's case record identified Aaron Wostrel as the father of B.W. and C.W. By January 23, Mother advised Gattie that Aaron was also identified as S.W.'s father on her birth certificate, that Wyoming custody

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

orders existed, and that there were no restrictions on Aaron's contact with the girls. Ex. 1, Diaz Dep. Tr. at 58:1–59:25; Ex. 46 (Dep. Ex. 3—WY Custody Order) at 2.

***Fact 2***. The DCS record does not document Gattie requesting Aaron's contact information during the January 23 interview. Diaz and Compian testified that DCS policy required attempts to obtain and use a parent's contact information to be documented. Ex. 1, Diaz Dep. Tr. at 59:17–61:25; Fact 94.

***Fact 3***. Before the dependency was filed, Gattie had not contacted Wyoming authorities to obtain Aaron's address, could not recall conducting a Google search for him, and had not used DCS's own parent locator service to attempt to locate him; she agreed such efforts should have been documented. Ex. 2, Gattie Dep. Tr. at 88:12–90:10.

***Fact 4***. Once Aaron contacted DCS, he told DCS he was willing to be assessed so his daughters could be placed with him. He also accurately advised Gattie that the Wyoming custody order provided unsupervised parenting time with no restriction on the duration or frequency of visits. Ex. 2, Gattie Dep. Tr. at 112:10–25; 114:13–115:1; Ex. 46 (Dep. Ex. 3—WY Custody Order) at 2.

**B. <u>May 2017 Safety Findings</u>**

***Fact 5***. The May 2017 update contained in DCS's Supervisory Case Progress Review stated: "No safety threats have been identified in the care of the father." Ex. 3, Keith Dep. Tr. at 104:10–15; Ex. 24 (Dep. Ex. 30) at 7.

***Fact 6***. The May update recorded successful overnight unsupervised visits with Aaron and stated, "CS has no grounds for dependency with father," and that the judge was expected to return the children to Aaron at the next hearing. Ex. 3, Keith Dep. Tr. at 104:11–20; Ex. 24 (Dep. Ex. 30) at 7.

***Fact 7***. The May 19, 2017, email shown to Adams circulated a motion to dismiss the dependency and a motion to arrange a UCCJEA conference. Adams believed dismissal required approval above the case-manager level. Ex. 4, Adams Dep. Tr. at 138:1–140:25; Ex. 29 (Dep. Ex. 39).

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

***Fact 8***. Reviewing the August 2017 supervisory report update, which stated DCS had moved to dismiss its dependency petition because it had no safety concerns about Aaron, Keith testified the children should at least have had unsupervised visits with him absent a safety concern, and agreed holiday parenting time could occur in Aaron's state of residence. Keith further testified that based on the lack of safety threats and the Wyoming court orders, DCS should have objected to the GAL's dependency petition and returned the children to Aaron. Ex. 3, Keith Dep. at 108:1–110:1; Ex. 24 (Dep. Ex. 30) at 7.

### C. Colorado ICPC and Military Psychiatric Evaluation—Favorable Evidence in DCS's File Before September 2018

***Fact 9***. The August 2017 supervisory case progress review recorded that Colorado ICPC personnel had conducted at least two in-home visits at Aaron's Colorado residence and verbally communicated to the case manager that they were "not seeing a safety concern," and that "DCS withdrew motion for dependency because we don't have any safety concerns." Ex. 9, Kelly Dep. Tr. at 98:23–100:10; Ex. 24 (Dep. Ex. 30) at 7.

***Fact 10***. The same August 2017 supervisory review recorded that Aaron had provided DCS a military psychiatric evaluation stating, "there were no MH concerns." The supervisory review, a DCS business record, establishes that this favorable finding was in the agency's possession. Ex. 9, Kelly Dep. Tr. at 99:25–100:10; Ex. 24 (Dep. Ex. 30) at 7.

***Fact 11***. By August 2017, DCS possessed three independent favorable findings about Aaron: its own May 2017 safety assessment recording no identified threat, the Colorado ICPC in-home determination of no safety concern after at least two visits, and a military psychiatric evaluation clearing Aaron of mental health concerns. All three preceded the September 10, 2018, DCS progress report to the dependency court.

### D. Insufficiency of "Untreated Mental Health Issues" and Hostile Emails—Agency Admissions

***Fact 12***. Keith testified that alleged "untreated mental health issues," standing alone, would not justify denying Aaron unsupervised parenting time or refusing to return the children to his custody. Ex. 3, Keith Dep. Tr. at 68:7–19.

***Fact 13***. Adams separately testified that angry or hostile communications from Aaron, by themselves, did not establish that he was unfit, did not justify dependency, and did not justify severance and adoption. Ex. 4, Adams Dep. Tr. at 160:20–162:8.

***Fact 14***. Keith testified that in a case where the Department's only concern about a father was "untreated mental health issues" and the fact that he may have been sending "some belligerent e-mails," severance and adoption as an alternative case plan would have been "inappropriate." Ex. 15, Keith Dep. Tr. at 95:20–96:4.

**E. <u>Dr. Juliano's June 2018 Psychological Evaluation</u>**

***Fact 15***. Dr. Juliano's June 7, 2018, psychological evaluation documented that during a nearly five-hour assessment, Juliano on numerous occasions deliberately challenged and confronted Aaron to test for anger management problems. Juliano reported that Aaron "did not overreact and explode, so he did exhibit good behavioral control," and that "[t]he challenges were such that if he did have major anger management problems, it likely would have been elicited." Ex. 25 (Dep. Ex. 33, Juliano Psych. Eval.), at 10–11.

***Fact 16***. Juliano confirmed in his referral-question responses that "this evaluator was fairly confrontive and Mr. Wostrel did not lose his cool or exhibit anger management problems." Juliano's formal diagnostic impressions were Adjustment Disorder with Mixed Mood and Prominent Narcissistic Features; he identified no serious mental illness, psychosis, thought disorder, or substance abuse. Ex. 25 (Dep. Ex. 33, Juliano Psych. Eval.), at 16–17.

***Fact 17***. Dr. Clark, Plaintiffs' expert, testified that Juliano's June 2018 evaluation identified no serious mental illness, impaired reality testing, or grave concern about Aaron's functioning as a parent. Dr. Clark characterized the December 2017 untreated-mental-health and grave-risk allegations as poorly supported and inflammatory, and testified that Juliano's June 2018 evaluation did not support the grave-risk language repeated in the September 10, 2018, DCS Progress Report to the court. Ex. 5, Clark Dep. Tr. at 142:7–146:23; 144:1–8; 145:9–24; *see also* Ex. 53 (Clark Report, March 11, 2025).

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

### F. Kelly-to-Obika Case Manager Transition

***Fact 18***. Cheryl Kelly served as the assigned DCS case manager from approximately February 2017 through January 2018—an approximately eleven-month tenure. Paulinus Obika succeeded Kelly as case manager in approximately January 2018 and remained the assigned case manager through April 2020—an approximately twenty-six-month tenure. The September 10, 2018, Progress Report to the dependency court bore Obika's name as the responsible case manager; Kelly had departed the case approximately nine months before that report was submitted. Ex. 6, Obika Dep. at 76:14-22; Ex. 14, Long Dep. Tr. at 40:17-24.

***Fact 19***. Dr. Juliano's June 7, 2018, psychological evaluation was received by DCS approximately three months before Obika submitted the September 10, 2018, Progress Report. Obika was the assigned case manager at the time the Juliano evaluation was completed and received. He was also the responsible case manager when DCS received Bennett's March 2019 assessment and Wyoming's April 4, 2019, home study approval. His inability to recall the case at his deposition does not contradict the documentary record of what was in his file at each of those dates. Ex. 6, Obika Dep. at 93:18-94:1, 114:20-115:2, 119:1-10; Ex. 25, 26, 35 (dep. exhs. 33, 34, 74).

### G. Bennett Assessment—March 2019

***Fact 20***. In March 2019, DCS-retained evaluator Dr. Bryce Bennett completed a bonding and best-interest assessment. Bennett reported "no observable discomfort from any of the girls during the observation that suggested they were scared or intimidated by Mr. Wostrel," described the interaction as positive, and found an observable bond and relationship between Aaron and the girls. Ex. 4, Adams Dep. Tr. at 115:10–116:25; Ex 26 (Dep. Ex. 34) at 23.

***Fact 21***. Bennett concluded that Aaron "appears capable of meeting the needs of all three girls" and was "capable, willing, and able to provide and care for all three girls." Ex. 4, Adams Dep. Tr. at 116:1–25; Ex. 26 (Dep. Ex. 34) at 23.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

***Fact 22***. Bennett noted that the girls had done well overall while residing in Aaron's care and that there was no indication Aaron's aggressiveness had been directed at the girls. Ex. 4, Adams Dep. Tr. at 117:1–6; Ex. 26 (Dep. Ex. 34) at 23.

***Fact 23***. As to B.W. and C.W., Bennett concluded: "Regarding the twins, it is likely in their best interest to be placed in Mr. Wostrel's care." Ex. 4, Adams Dep. Tr. at 117:11–15; Ex. 26 (Dep. Ex. 34) at 24.

***Fact 24***. Bennett's recommendation for S.W. differed: he recommended she remain in the Lay placement while she and Aaron engaged in family counseling to repair their relationship and communication, with therapeutic visitation as a precursor to return. Ex. 4, Adams Dep. Tr. at 117:17–118:7; Ex. 26 (Dep. Ex. 34) at 24-25.

***Fact 25***. Obika acknowledged the referral questions and favorable capability language in Bennett's assessment when shown the document at his deposition. He did not recall the case, report, or referral circumstances. Ex. 6, Obika Dep. Tr. at 118:1–124:5; Ex. 26 (Dep. Ex. 34) at 23-25.

***Fact 26***. Keith testified that, in light of Bennett's recommendation, he saw no reason DCS should not have returned the twins to Aaron in 2019 absent a safety concern. Ex. 3, Keith Dep. Tr. at 114:1–11.

**H. <u>Wyoming ICPC Approval—April 2019</u>**

***Fact 27***. Wyoming's Department of Family Services approved placement of S.W., B.W., and C.W. with Aaron. Its April 4, 2019, approval letter reported no safety concerns in the home and Aaron's appropriate concern and care for the children. Ex. 7, Platter Dep. Tr. at 248:1–249:4; Ex. 35 (Dep. Ex. 74) at St-Wostrel 010575.

***Fact 28***. Platter acknowledged that the Wyoming home study approved placement with Aaron and found Aaron and his home safe. She identified May 29, 2019, as the Department's receipt date and acknowledged that Bennett's recommendation and Wyoming's approval were received within approximately two months of each other. Ex. 7, Platter Dep. Tr. at 248:15–249:25.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

## I. Keith's Sweeping Institutional Admissions

***Fact 29***. Keith agreed that "based on what's been discussed today there was [sic] a lot of opportunities" when the children could and should have been returned to Aaron earlier in the case. Ex. 15, Keith Dep. Tr. at 135:5–8.

***Fact 30***. Keith agreed that the prolonged dependency, where the Department had little beyond untreated mental health issues, "is hard to justify," that the prolonged restrictions on Aaron's visitations "are hard to justify," and, absent devastating facts not identified at his deposition, that "this case lasted too long and should have been dismissed earlier." Ex. 15, Keith Dep. Tr. at 136:16–137:9.

***Fact 31***. Keith's own April 14, 2020, email to Adams, written after the Arizona Court of Appeals ordered the children returned to Aaron, stated: "Have you looked at the CCSRA? There is nothing on Father except for 'untreated' mental health issues." Keith confirmed that wording at his deposition and agreed that untreated mental health issues were not a sufficient reason for dependency, withholding custody, or preventing unsupervised visits. Ex. 3, Keith Dep. Tr. at 130:10–132:16; Ex. 54 (Keith email to Adams, April 14, 2020).

## J. AG's Role—Keith's Admissions

***Fact 32***. Keith testified it is not the Attorney General's role to determine the Department's objectives or to steer the Department's case decisions. If a difference of opinion arose, it should be resolved according to the Department's desires, not the AG's. Ex. 15, Keith Dep. Tr. at 52:17–53:4; 135:12–136:4.

***Fact 33***. Keith testified that it is the Department's decision—not the assistant AG's—to determine which service providers should be approached for psychological evaluations; if the assistant AG (i.e., Bonnie Platter) were deciding which providers to approach, she would be "stepping outside of her role." Ex. 15, Keith Dep. Tr. at 78:9–79:12.

***Fact 34***. Keith testified that if the assistant AG directed that the Lays be included in the Bennett assessment referral questions, that inclusion would have been "improper" and

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

the assistant AG would have been "stepping outside of her role" and "improperly influencing the Department's decisions." Ex. 15, Keith Dep. Tr. at 111:7–16.

***Fact 35***. Keith testified that after Southwest Human Development ("SWHD") determined the Lay placement was inappropriate in March 2017, the Department "should have reassessed" at that time; it would NOT have been appropriate to engage another provider to conduct a second home study of the same home, particularly one aligned with the grandparents' adoption effort (i.e. AASK). Ex. 15, Keith Dep. Tr. at 82:18–83:22.

**K. Southwest Human Development—Placement Before Home Study; Negative Recommendation Ignored**

***Fact 36***. DCS placed the children in the Lay home on January 30, 2017—without the benefit of a completed professional home assessment. The SWHD home study of the Lay home was not conducted until March 9, 2017, and was not completed until March 23, 2017—fifty-three days after the children had already been placed there. When completed, SWHD recommended against the Lay placement. Kelly did not recall being informed that SWHD had recommended against placing the children with the Lays; DCS left the children in the home regardless. This sequence establishes that DCS placed the children in an unvetted home, then received a professional recommendation against that placement and took no corrective action. Ex. 9, Kelly Dep. Tr. at 37:5–9; Ex. 36 (Dep. Ex. 34—SWHD Home Study, March 23, 2017) at 11.

**L. March 2020 Emails—CAR, "Lookout," and Lake Havasu Trip**

***Fact 37***. On March 23, 2020 the Court of Appeals issued the mandate for *Aaron II*, which reversed the finding of dependency and directed the dependency court to dismiss the case. Ex. 47 (Appellate Court Mandate). In a March 2020 email chain, Alesha Asheim, a DCS employee, reported completing a draft Court Authorized Removal ("CAR") application and attempting submission. Keith responded: "I don't think we are ready to submit it just yet. I just wanted one drafted and ready for when the time comes." Adams did not recall the underlying discussions. Ex. 4, Adams Dep. Tr. at 168:5–170:1; Ex. 31 (Dep. Ex. 50).

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

***Fact 38***. Keith acknowledged at his deposition that he would not have asked for a CAR to be drafted if he had no safety concerns. However, his own contemporaneous review of the CSRA found "nothing on Father except for 'untreated' mental health issues," and he separately agreed that untreated mental health issues were insufficient to justify dependency, custody withholding, or denial of unsupervised contact. A Program Administrator such as Keith, whose own record review discloses nothing beyond an insufficient mental-health label, did not possess legally adequate safety concerns within the meaning of this motion's claims. Ex. 15, Keith Dep. Tr. at 145:3–17; Ex. 3, Keith Dep. Tr. at 130:10–132:16.

***Fact 39***. In a March 2020 email to Obika and Higby, Adams wrote: "Be on the lookout for anything related to Wostrel happening today, as he [Aaron] said he was coming to get his kids today." When Obika responded that placement was taking the children to Lake Havasu, Adams replied: "That will help." Ex. 4, Adams Dep. Tr. at 170:10–171:13; Ex. 32 (Dep. Ex. 51).

***Fact 40***. Keith agreed that following a Court of Appeals return direction, an after-hours alert would be appropriate only to coordinate pickup; agreed it would be inappropriate to tell S.W.'s hospital it could not speak with Aaron or release her to him; and agreed aftercare without a dependency was voluntary; that is, Aaron's refusal to sign an aftercare plan would not justify withholding custody. Ex. 3, Keith Dep. Tr. at 96:15–98:20.

***Fact 41***. Adams was unable to explain the basis for keeping the children from Aaron across the nearly three years of the case; he testified that he lacked sufficient recollection to answer properly. Ex. 4, Adams Dep. Tr. at 176:24–177:21.

**M. <u>May 26, 2017 Order—Kelly's Court-Assigned Responsibility</u>**

***Fact 42***. The May 26, 2017, order required DCS to provide expedited case aide visits, a psychological evaluation of Aaron, and parenting classes in Colorado. Kelly acknowledged that arranging the evaluation was her responsibility. The order also

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

confirmed that Aaron was entitled to visitation. Ex. 9, Kelly Dep. Tr. at 87:7–88:5; Ex. 3, Keith Dep. Tr. at 106:8–15; Ex. 23 (Dep. Ex. 28).

**N. June 9, 2017 Contact Failure Emails—Kelly and Alexander**

***Fact 43***. The June 9, 2017, email shown to Kelly—which Kelly identified as the document she meant when she described the June correspondence regarding contact failures—was copied to Alexander, whom Kelly identified as the case aide's supervisor. Kelly did not know whether Alexander had contacted Jodi Lay in response. Ex. 9, Kelly Dep. Tr. at 82:18–83:19; Ex. 21 (Dep. Ex. 26).

***Fact 44***. Kelly's June 16, 2017, email recorded that placement had picked up the children, was not answering Kelly's calls, and that she had staffed the issue and would contact placement in writing. She agreed that supervisor staffing and a decision to contact placement were reasonable inferences from her email. Aaron subsequently reported three weeks of missed telephone visits. Ex. 9, Kelly Dep. Tr. at 82:3–85:22; Exs. 21-22 (dep. exs. 26–27).

**O. Kelly's Sworn Trial Admission**

***Fact 45***. Kelly confirmed under oath at the December 18, 2018 dependency trial that she understood why parents become angry when their children are taken by DCS, and that Aaron's "nasty e-mails" did not reflect on his ability to be a good parent. Kelly confirmed at her subsequent deposition in this matter that she was under oath at that trial and that she tells the truth under oath. Ex. 9, Kelly Dep. Tr. at 93:24–94:9; 102:18–103:4.

**P. February 26, 2019 Email—Placement Walter Lay's Criminal History**

***Fact 46***. Adams discussed a February 26, 2019, email asking whether placement's criminal history had been rerun. He did not recall receiving a domestic violence assault history for Walter Lay. Asked about that history together with Walter's adult children's criminal and drug histories and the original removal circumstances involving Mother's drug use and criminal involvement, he testified the combination could cause concern about placement with Walter. Ex. 4, Adams Dep. Tr. at 147:3–149:24.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

**Q. Jodi Ostrom's May 18, 2017 Email—Placement's Adversarial Posture**

***Fact 47***. On May 18, 2017, the eve of the State's own motion to dismiss the dependency, Jodi Ostrom Lay sent Kelly an email stating: "believe me, if they think that it is going to change any time soon, they have come to the wrong conclusion. It is going to be a very long and drawn out process." The email also asserted Jodi's opinion that removing the girls from the Lay home would not be good for them. Ex. 9, Kelly Dep. Tr. at 66:20–68:18; Ex. 20 (Dep. Ex. 22).

**R. Jodi Ostrom's February 9, 2018 Email—Placement's Documented Refusal to Facilitate Contact**

***Fact 48***. On February 9, 2018—during Obika's tenure as case manager—Jodi Ostrom Lay sent an email to DCS stating: "The sound of his voice makes my skin crawl. It ruins my day," referring to Aaron Wostrel. The same email stated: "If you can't get anyone to come and provide visits, they will be missed because we will not do it." Jodi wrote this while bound by a foster parent placement agreement requiring her to encourage and support the children's relationship with Aaron and to facilitate scheduled contact. Obika was the responsible case manager when this communication was sent and received. Ex. 16, Jodi Lay Dep. Tr. At 165:18-166:23; Ex. 38 (Dep. Ex. 91).

**S. Higby Email and Keith's Confirmation—Institutional Assessment**

***Fact 49***. In an April 29, 2020, email—a DCS business record—DCS Supervisor Joelle Higby informed DCS Program Supervisor Nicholas Long: "From what I gather, Wyoming decided to take jurisdiction. Jason [Keith, Program Administrator] and Shalom [Jacobs, Deputy Director] were angry it had to be open so long and thought the girls should have gone home a year ago." Ex. 14, Long Dep. Tr. at 164:19-165:16; Ex. 30 (Dep. Ex. 47).

***Fact 50***. Keith was shown Deposition Exhibit 47 at his deposition. He first said, "That's what Ms. Higby thinks," but when asked whether the characterization refreshed his recollection, Keith testified: "That's how they took it from me, I guess, that I appeared to be angry or upset." Exhibit 47 is a DCS business record reflecting Higby's

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

contemporaneous account, corroborated by Keith's deposition confirmation that he appeared angry or upset about the case duration. Ex. 3, Keith Dep. Tr. at 133:15–134:21; Ex. 15, Keith Dep. Tr. at 135:5–8; 136:16–22; Ex. 30 (Dep. Ex. 47).

**T. <u>Platter's Operational Role—Firm Admissions</u>**

***Fact 51***. Platter testified that she remained in a mentoring role on the Wostrel matter from approximately October 2017 until dismissal in April 2020, and announced as co-counsel when she appeared in court. Ex. 7, Platter Dep. Tr. at 267:1–268:8.

***Fact 52***. On February 8, 2019, Platter personally transmitted the first-dependency hearing transcript to Dr. Bennett, stating the Department wanted Bennett to review it. She copied Obika but no other attorney or party, and acknowledged no order specifically required that transcript be sent to Bennett. This finding of dependency from the first dependency trial had already been overturned by the Court of Appeals in *Aaron I*. Ex. 7, Platter Dep. Tr. at 155:10–160:10; Ex. 33 (Dep. Ex. 61); *Aaron W. v. DCS*, No. 1 CA-JV 17-0384 (Ariz. App. Jan 30, 2018) (mem. decision) ("*Aaron I*").

***Fact 53***. Platter acknowledged receipt of Bennett's March 2019 assessment, acknowledged its express finding that Aaron could care for all three girls, acknowledged its express recommendation that the twins be placed with him, and acknowledged Wyoming's safe-home approval. Ex. 7, Platter Dep. Tr. at 236–237; 241–242; 248–249; Ex. 26 (Dep. Ex. 34—Bennett Report) at 23-25; Ex. 33 (Dep. Ex. 74—WY ICPC) at 1.

***Fact 54***. Platter communicated to DCS that Father would need to self-refer for counseling. She confirmed her October 3, 2019, written objection to the request for daily telephone contact: "The Department objects." She acknowledged DCS could seek a change of physical custody and recommend transition without violating any court order. Ex. 7, Platter Dep. Tr. at 175–176; 232–235; 243; 245–246; Ex. 34 (Dep. Ex. 73).

***Fact 55***. Platter acknowledged that Bennett was retained by DCS, not the Attorney General's Office, and that his assessment was not engaged to prove dependency against Father but served, in part, the decision whether to return the children to Aaron. Ex. 7, Platter Dep. Tr. at 147–149; 163; 167.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

***Fact 56***. Platter stated she believed she staffed the transcript transmission with her client but could not recall with whom, when, or how. She expressed the belief that she "probably" staffed the implementation of Bennett's recommendation and the contact position with DCS. These equivocal recollections are noted separately from the firm admissions in Facts 52–55. Ex. 7, Platter Dep. Tr. at 156:3–160:10; 234:1–237:25.

**U. <u>Platter's Operational Role—The Oakley Evaluation Cycle</u>**

***Fact 57***. DCS's staff consulting psychologist, Dr. John DiBacco, completed a Unit Consultation Summary on April 9, 2019, assessing the proposed additional psychological evaluation of Aaron Wostrel. Dr. DiBacco concluded: "I stand by my opinion that a 'new' eval is unnecessary" and stated he "cannot ethically sign/approve" the referral. He recommended that DCS instead provide additional records to Dr. Juliano and permit Juliano to supplement his existing evaluation. The Oakley referral packet—including Dr. DiBacco's written consultation—is a DCS business record. Ex. 28 (Dep. Ex. 36—DCS Referral to Dr. Oakley and DiBacco Unit Consultation, April 2019).

***Fact 58***. Six days after Dr. DiBacco's written ethical objection, on April 15, 2019, Platter emailed Obika and Higby—marked "High Importance"—reporting that the court had authorized Dr. Oakley to conduct the evaluation, and personally directed: "please prepare the packet so that it can be submitted as soon as Dr. Oakley confirms." On April 16, 2019, Platter followed up: "Dr. Oakley confirmed so please submit the packet ASAP and indicate Dr. Oakley has agreed to do the eval on 5/3 at 930am." Platter's personal direction of the Oakley referral occurred three weeks after Bennett had issued his assessment recommending the twins be placed with Aaron and two weeks after Wyoming had approved Aaron's home. Ex. 39 (ST-Wostrel010474—Platter emails to Obika and Higby, April 15-16, 2019).

***Fact 59***. On June 12, 2019, after Dr. Oakley reported she needed additional time to complete her assessment, Platter forwarded Oakley's delay notice to all counsel and communicated: "Since all parties want to see that before making any decisions about unsupervised or overnight visits I wonder if we should vacate our status conference?"

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

Platter thus framed the Oakley delay as a basis for postponing any decision about Aaron's unsupervised access to his daughters, notwithstanding Bennett's existing placement recommendation for the twins. Ex. 40 (ST-Wostrel010599-01—Platter email to all counsel, June 12, 2019), at 1.

***Fact 60***. On June 13, 2019, in an all-counsel communication, Platter characterized Plaintiffs' counsel's advocacy for Aaron's reunification-related parenting requests as "short-sighted and kind of selfish," stating: "Respectfully, I believe that you are being short-sighted and kind of selfish because your only priority is dad's wishes, and that is not how decisions have to be made." This communication occurred while Bennett's March 2019 assessment recommending the twins be placed with Aaron was the operative professional evaluation on file. Ex. 41 (ST-Wostrel010684—Platter email to all counsel, June 13, 2019).

***Fact 61***. On September 5, 2019—twenty-one days before the Arizona Court of Appeals vacated the dependency—Platter communicated to all counsel that Aaron would need to "self refer to counseling as recommended in the eval," referring to Dr. Oakley's report; that Aaron would need to disclose his counselor to DCS so the evaluation could be transmitted; and that DCS had no specific referral questions because Aaron was simply expected to "address the issues raised in Dr. Oakley's evaluation." At that same date, DCS had still not implemented Bennett's March 2019 recommendation to place the twins with Aaron, and Wyoming's April 2019 home study approval remained unimplemented. Ex. 42 (ST-Wostrel010966—Platter email chain, September 5, 2019) at 1.

**V. <u>Appellate Disposition</u>**

***Fact 62***. On September 26, 2019, the Arizona Court of Appeals, Division One, vacated the dependency adjudication and remanded for dismissal. The court held the State failed to prove the children lacked a parent willing and able to provide proper and effective care; rejected a dependency resting on speculative future harm after Mother's imprisonment resolved the identified failure-to-protect threat; and held the first appeal's expert-evidence requirement was law of the case. *Aaron W. v. DCS*, No. 1 CA-JV 19-0039, 2019 WL 4695887, ¶¶ 1, 29–33, 37–42 (Ariz. App. Sept. 26, 2019) (mem. decision) ("*Aaron II*").

***Fact 63***. The appellate decision recounted that DCS had not supplied Dr. Juliano with the favorable information Father previously provided to the agency. *Id*. ¶¶ 26–27.

***Fact 64***. On March 5, 2020, the Arizona Supreme Court denied both the GAL's and DCS's petitions for review. Arizona Supreme Court, Minutes No. 6766, Mar. 5, 2020, at 5, item 16.

***Fact 65***. This Court's prior dismissal order records the April 14, 2020, reunion. Doc. 75 at 5.

**W. Aaron's Medical Exclusion and Service Failures**

***Fact 66***. Aaron testified he learned of S.W.'s second psychiatric hospitalization while in placement only when he picked her up, and that he informed DCS of his exclusion from medical information and decisions. He was also not informed of C.W.'s tonsil and adenoid removal, or B.W.'s seizure until he attempted to arrange an in-person visit with his children. Ex. 10, Aaron Dep. Tr. at 221:5–8; 223:1–20; Ex. 49 (WRIGHT 004881-4883).

***Fact 67***. Aaron testified that Kelly provided no path to regain his children despite his willingness to do what was needed. He acknowledged judicial oversight and testified that DCS failed to perform ordered tasks. Ex. 10, Aaron Dep. Tr. at 322:1–10; 323:2–12; 324:5–14.

**X. Lay Placement—Agreement Obligations, Primary Caretaker, and Admitted Conduct**

***Fact 68***. DCS placed the girls with Walter Lay, their maternal grandfather, and Jodi Ostrom Lay, his live-in partner whom he married during the dependency. Walter acknowledged the foster-parent agreement required him to encourage and support the children's relationship with their family, including Aaron; that he was not supposed to interfere with telephone visits or in-person visits; and that he was not supposed to undermine Aaron to the children. Ex. 8, Walter Lay Dep. Tr. at 6:22-7:8, 103:15–104:12.

***Fact 69***. Both Walter and Jodi Lay testified that Jodi bore primary responsibility for the children's daily care throughout the placement, including hair, homework, and all

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

medical and other appointments. Jodi's own AASK intake document states: "Jodi does hair, homework, all appointments." Jodi confirmed at her deposition: "I was the one having most responsibility for the care and supervision of the children." The person exercising primary supervisory control over the children on a day-to-day basis was Jodi Ostrom Lay, not Walter Lay. Ex. 16, Jodi Lay Dep. Tr. at 124:1–125:17; Ex. 8, Walter Lay Dep. Tr. at 152:13-153:13.

***Fact 70***. Walter testified that early in the case, he and Jodi no longer wanted to facilitate calls in their home and asked DCS to handle them. Ex. 8, Walter Lay Dep. Tr. at 98:18–101:1; 104:13–105:16.

***Fact 71***. Walter admitted making one of the girls eat soap for cursing while in his custody. C.W. independently testified that Walter made the children chew and swallow soap when they used profanity. Ex. 8, Walter Lay Dep. Tr. at 130:1–131:14; Ex. 12, C.W. Dep. Tr. at 129:4–8; 130:1–6.

***Fact 72***. Jodi Ostrom Lay admitted at her deposition to using a wooden spoon for corporal punishment on the Wostrel children, claiming this conduct occurred only before the dependency placement. However, Jodi also testified that her contact with the children before placement was limited to approximately monthly visits during Sheila's drop-offs, during which Sheila "stayed outside most of the time." The AASK placement intake agreement Jodi executed during the dependency placement specifically required her to abide by DCS discipline policy and prohibited corporal punishment; she acknowledged this requirement. The girls' depositions describe Jodi using wooden spoons, spatulas, and her hands during the placement. S.W. testified under redirect examination that it was both Walter and Jodi who administered corporal punishment using belts and wooden spoons: "It wasn't unusual for that corporal punishment to take the form of being whipped with a belt," and "it wasn't unusual for the corporal punishment to take the form of being hit with a wooden spoon," confirming "it was both Walter and Jodi that would administer those forms of corporal punishment." Ex. 16, Jodi Lay Dep. Tr. at 206:18–24; Ex. 12, C.W. Dep.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

Tr. at 125:7-24; 127:13-19; 128:1-5;128:20-129:2; Ex. 13, B.W. Dep. Tr. at 31:4-25; Ex. 17, S.W. Dep. Tr. at 150:20-151:21.

***Fact 73***. The girls' depositions establish three distinct incidents of forceful physical contact by Lay adults beyond the belt and soap testimony. *First*, S.W. testified to a bathroom incident in which her head was banged against a tile wall, identifying both Walter and Jodi as involved together: when asked whether the incident involved Jodi or Walter, she responded, "Both — or together," and confirmed her head was sore to the touch afterward. Ex. 17, S.W. Dep. Tr. at 127:3-15; 144:11-19; 145:16–20. *Second*, S.W. witnessed Jodi forcibly push Cheyenne's head into the corner of a wall during a visit to Jodi's parents' home in Colorado, describing that Jodi "put her hand on her head and pushed her head into the corner." Ex. 17, S.W. Dep. Tr. at 159:10-160. *Third*, S.W. testified that B.W. suffered a seizure following corporal punishment administered in the Lay home: "Brooke had an incident with the seizure after she had gotten corporal punishment... I heard it from, like, the other room, and then I walked in, and she was, like, seizing." When plaintiffs' counsel confirmed "Having a seizure from the corporal punishment that was imposed on her?" S.W. answered: "Yes." Ex. 17, S.W. Dep. Tr. at 145.

***Fact 74***. Walter acknowledged his signature on a February 15, 2017, disclosure stating he had not been arrested, convicted, or criminally indicted, and agreed that the initial disclosure was untrue. Ex. 8, Walter Lay Dep. Tr. at 95:5–96:18.

***Fact 75***. Walter testified that his sons, Eric and Steven, visited his home approximately monthly while the girls lived in the home. He did not remember telling DCS about those visits and denied knowingly leaving the girls alone with them. Ex. 8, Walter Lay Dep. Tr. at 90:1–4; 91:13–92:15.

***Fact 76***. Walter recalled a hotline report concerning allegations of abuse in the home. He denied physical abuse, concealment, and influencing the girls through trips. Ex. 8, Walter Lay Dep. Tr. at 132:10–133:23.

***Fact 77***. Walter acknowledged the refrigerator was locked and testified the girls had fingerprint access. Ex. 8, Walter Lay Dep. Tr. at 120:1–121:17.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

***Fact 78***. Walter recalled a March 2020 appellate return ruling, said he disliked the result, and believed the girls remaining with him would be best. He acknowledged approving a new dependency petition filed on behalf of himself and Jodi after the return order. When asked to identify the harm from returning the girls to Aaron, Walter said it was hard to say and that he would have to think about it. Ex. 8, Walter Lay Dep. Tr. at 146:9–149:6; Ex. 37 (Dep. Ex. 83).

***Fact 79***. Timothy Turner, Plaintiffs' DCS standard of care expert, describes in his June 2025 report felony and drug histories involving Mother and her adult brothers and reports Mother's then-current ten-year sentence for armed robbery and kidnapping. Ex. 11, Turner Report at 4–5.

**Y. <u>B.W.'s and C.W.'s Testimony—Reported Placement Conditions, Coaching, and DCS Notice</u>**

***Fact 80***. B.W. testified that Walter struck her and her sisters on multiple occasions, that the blows left marks on their arms, legs, and torso, and that she witnessed blood during those events while they lived in the Lay placement. Walter denied physical abuse at his deposition. B.W.'s testimony establishes the account she reported and the conditions of which DCS was on notice through hotline reports and its supervisory obligation; the factual dispute about whether the physical abuse occurred is a question for trial. Ex. 13, B.W. Dep. Tr. at 43:18-23; Ex. 8, Walter Lay Dep. Tr. at 132:10–133:23.

***Fact 81***. B.W. testified that she sometimes went to school hungry; that on days the housekeeper did not bring food she stole quarters from Jodi's purse to buy lunch, or received food from classmates. Ex. 13, B.W. Dep. Tr. at 25:6-26:15; 27:9-12; 146:4-147:14.

***Fact 82***. B.W. testified that during outdoor punishment she would become too exhausted in the Arizona heat to continue and would lie on the concrete until she could recover the energy to stand; her sister C.W. collapsed during the same outdoor punishment. C.W. independently testified to the same outdoor punishment conditions, including her own collapse from heat exhaustion and being revived during that punishment. S.W.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

independently corroborated from observation that C.W. collapsed from heat exhaustion during outdoor punishment and that water from the dog bowl was used to revive her: "She had gotten very hot one day and got dizzy and passed out," and confirmed: "I believe so. Yes" when asked about the dog bowl. Three children independently describe the same outdoor punishment conditions from their own vantage points. Ex. 13, B.W. Dep. Tr. at 110:5–111:17; 145:9-146:3; Ex. 12, C.W. Dep. Tr. at 162:1–169:25; Ex. 17, S.W. Dep. Tr. at 114:8-17; 185:1-186:24.

***Fact 83***. B.W. testified that the Lays regularly told the girls bad things about Aaron and said they did not like when the girls talked to him. B.W. testified that placement's disparagement, not her own feelings, caused her at times to decline calls with her father. Ex. 13, B.W. Dep. Tr. at 124:4-125:7.

***Fact 84***. B.W. testified that Jodi told her she could only attend a movie if she did not see her father. Ex. 13, B.W. Dep. Tr. at 121:11-20; 122:12–16.

***Fact 85***. A DCS case aide's contemporaneous business record dated March 14, 2019, documents B.W. telling C.W. during a scheduled telephone contact session with Aaron: "Remember [C.], if we don't talk to dad [placement] is going to take us somewhere," and then covering her mouth upon realizing what she had said. C.W. put her finger over her lips and said, “shhhh” then took the case aide's hand and said, "let's go call daddy." The case aide documented this exchange in DCS's own records. This event occurred in the same month Bennett issued his assessment recommending the twins be placed with Aaron. The children remained in the Lay placement for thirteen additional months. Ex. 44 (DCS Case Aide Record, March 14, 2019, WOSTREL NO. 000338–339).

### Z. <u>Formal Maltreatment Reports—Documented Notice to DCS</u>

***Fact 86***. On December 12, 2018, a formal maltreatment report concerning conditions at the Lay placement home was submitted to DCS. Ex. 45 (ST-Wostrel014566).

***Fact 87***. On September 23, 2019, after the Arizona Court of Appeals had vacated the dependency adjudication on September 26, 2019, DCS received a confidential maltreatment report documenting two separate maltreatment incidents at the Lay

placement; the report identified the perpetrator as likely Jodi Ostrom Lay. DCS was thus receiving formal maltreatment reports about the Lay home at the same time it was resisting the return of the children. Ex. 48 (ST-Wostrel018336–018340).

***Fact 88***. On March 24, 2020, three separate maltreatment allegations involving the Lay placement remained on formal record with DCS. Ex. 50 (ST-Wostrel018383).

***Fact 89***. On April 6, 2020, Aaron Wostrel formally submitted to DCS a written abuse report prepared by therapist Michelle Lunka concerning the Wostrel children. Ex. 51 (ST-Wostrel018557–018561).

**AA. <u>B.W.'s Education and Return</u>**

***Fact 90***. B.W. testified that she could not read well while attending Country Garden School during the three years she was in DCS custody at the Lay placement, and that she received no homework during that entire period. Ex. 13, B.W. Dep. Tr. at 30:6-10.

***Fact 91***. B.W. testified she was "really happy" to be returned to Aaron in May 2020 and that if given the choice between living with the Lays or with her father, she would choose her father "immediately." Ex. 13, B.W. Dep. Tr. at 152:23-153:5.

**BB. <u>30(b)(6) Institutional Admissions—Policy</u>**

***Fact 92***. Melissa Compian testified as the State of Arizona Department of Child Safety's designated Rule 30(b)(6) representative on DCS policy and procedures applicable from January 1, 2017, through June 30, 2019. Her testimony constitutes the Department's official position on those policies. Ex. 18, Compian Dep. Tr. at 5:18–9:22; Ex. 44 (Dep. Ex. 54).

***Fact 93***. Compian confirmed that DCS policy in effect in January 2017 (Chapter 2, Section 6) used mandatory language: the Department shall engage a child's family, which she confirmed expressly includes non-custodial parents residing outside Arizona, to the greatest extent possible in planning for voluntary interventions that minimize Department intrusion while ensuring child safety. She confirmed "shall" constitutes mandatory language in the policy. Ex. 18, Compian Dep. Tr. at 15:19–18:1; 33:1–33:15.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

***Fact 94***. Compian confirmed that DCS policy required investigators to make good faith efforts to locate known non-custodial parents, including by contacting relatives to obtain contact information and, if those efforts failed, by initiating a referral to the Arizona Parent Locator Service. The policy required these efforts to be documented. She confirmed the policy placed a non-custodial parent above a grandparent in the placement hierarchy, and that a non-custodial parent residing out of state remains above a grandparent in that hierarchy. Ex. 18, Compian Dep. Tr. at 51:13-54:24; 75:19–76:7

***Fact 95***. Compian confirmed that DCS policy required written and verbal notification to non-custodial parents within 24 hours of taking temporary custody, and required that a copy of the Temporary Custody Notice ("TCN") be sent to any non-custodial parent, including those residing out of state. She confirmed that bypassing a non-custodial parent in favor of a grandparent placement required documented justification. Ex. 18, Compian Dep. Tr. at 70:9–71:15; 54:19–55:13.

***Fact 96***. Compian confirmed there was nothing in DCS policy that expressly forbade considering a less intrusive interim arrangement—less intrusive than taking temporary custody—while a non-custodial parent sought modification of an out-of-state custody order to obtain legal custody of the children. Ex. 18, Compian Dep. Tr. at 63:3–65:11.

***Fact 97***. Compian confirmed there were no written DCS policies or procedures governing when to seek a psychological evaluation of a non-custodial parent or that parent's spouse. The decision to seek such an evaluation was not governed by any documented policy standard. Ex. 18, Compian Dep. Tr. at 68:1–68:18.

***Fact 98***. Compian confirmed that DCS's kinship care policy did not address how to assess a relative placement where that relative had knowledge of the custodial parent's criminal history or drug abuse. No written policy governed that assessment. Ex. 18, Compian Dep. Tr. at 68:19–69:2.

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

**CC. <u>30(b)(6) Institutional Admissions—Training</u>**

***Fact 99***. Kylah Ross Mount testified as the State of Arizona Department of Child Safety's designated Rule 30(b)(6) representative on DCS training for the period January 1, 2017, through June 30, 2019. Her testimony constitutes the Department's official position on training. She reviewed DCS training materials, core training and continuing education, for those years in preparation for her testimony. Ex. 19, Mount Dep. Tr. at 7:1–8:3; 40:6-11; Ex. 45 (Dep. Ex. 77).

***Fact 100***. Mount confirmed that DCS core training explicitly taught trainees that "unsafe doesn't automatically equal removal" and that there are alternatives to removal, including keeping a child in the home with a safety plan, placing the child with relatives or kin, or other arrangements. She confirmed that trainees were taught to look for parents, relatives, and kin simultaneously when a child was assessed as unsafe with the custodial parent. Ex. 19, Mount Dep. Tr. at: 12:19-14:9; 20:8–21:16.

***Fact 101***. Mount confirmed that for the entire period from 2017 through 2019, there was no training—in core training or any continuing education—dedicated to implementing or attempting to implement a voluntary placement agreement as an alternative to a dependency petition. The only reference to voluntary placement in the entire training curriculum for that period was a two-word bullet point in early 2017 with no trainer notes, no definition, and no explanation. After that, voluntary placement did not appear in any core or continuing training materials through 2019. Ex. 19, Mount Dep. Tr. at 26:17–27:13; 51:7–54:19; 80:15–80:22.

***Fact 102***. Mount confirmed that from January through approximately July 2017, the period during which Gattie investigated and filed the dependency petition at issue in this case, DCS maintained no proficiency standards, no quizzes, and no assessment mechanisms for new employees. No mechanism existed to verify that investigators during that period had understood or were applying any of the Department's training obligations. Mount further confirmed that formal constitutional rights training for DCS employees, which had been provided through Arizona State University computer-based trainings, was

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

discontinued in mid-2017 and did not appear in any formal courseware for the remainder of the 2017–2019 period. Ex. 19, Mount Dep. Tr. at 58:14–59:14; 77:10–78:7.

***Fact 103***. Mount confirmed that DCS core training explicitly taught employees that the Assistant Attorney General is part of the dependency case team and should be consulted on major decision points, including: filing a dependency petition, removals of children from their parents, changes in case plan goals, and changes of placement. The training taught case managers to contact the AG's Office "whenever" they needed an opinion or recommendation on those decisions. Ex. 19, Mount Dep. Tr. at 43:8–44:17; 46:22–47:10.

***Fact 104***. Mount confirmed there was no training on what set of facts would be appropriate for seeking a psychological evaluation of a parent, and no training on how to make such a referral. That knowledge was to be acquired entirely on the job. She further confirmed there was no training on whether an ICPC is required for a parent who already has a valid out-of-state custody order. Ex. 19, Mount Dep. Tr. at 45:22–46:13; 81:7–82:7.

***Fact 105***. Mount confirmed that DCS training explicitly and consistently taught employees that they must be truthful in court submissions, including when the facts do not support the allegations of a dependency petition. She confirmed: "Even if the facts and the truth don't support the allegations of a dependency petition, the employees are taught to be truthful about that information to the Court." Ex. 19, Mount Dep. Tr. at 69:20-25.

## IV. <u>ARGUMENT</u>

### A. <u>Rule 56 Requires Resolution of the Established Claims Elements and Defenses Now</u>

Rule 56(a) authorizes judgment on part of a claim, including on an established element or an unavailable defense. Rule 56(g) authorizes an order establishing material facts that require no trial. Together, these tools allow the Court to eliminate unfounded disputes, narrow the issues for trial, and prevent the retrial of matters the record conclusively resolves.

Plaintiffs bear the affirmative burden on summary judgment. The Court draws reasonable inferences for Defendants, but speculation creates no genuine dispute, and a dispute is material only when it affects the governing elements. *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248, 255 (1986). This motion rests principally on Defendants'

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

admissions, authenticated agency communications, the actual contents of professional assessments, the dependency's judicial disposition, and the Department's own institutional admissions about the standards that applied and the training that was not provided.

The specific rulings requested are set forth in Section IV.M.

**B. The State's Own Record Defeats the Premise that Aaron's Anger or a Diagnostic Label Established Parental Danger**

The constitutional starting point is the family's protected relationship. *Santosky v. Kramer*, 455 U.S. 745, 753–54 (1982). The State must assess the actual parent; administrative preference cannot replace an individualized determination. *Stanley v. Illinois*, 405 U.S. 645, 656–58 (1972). Governmental interference must remain reasonably related to the injury the State is entitled to prevent. *Wallis v. Spencer*, 202 F.3d 1126, 1136–41 (9th Cir. 2000).

DCS investigated Aaron and recorded an unequivocal result in May 2017: no identified safety threat in his care, overnight unsupervised visits, and no grounds for dependency with Father. The State circulated dismissal materials and moved to dismiss the petition as to Father. Facts 5–7. These were the agency's contemporaneous conclusions, not a parent's later characterization.

The later professional findings strengthened that record. By August 2017, DCS possessed its own safety finding, the Colorado ICPC's two in-home no-concern visits, and a military psychiatric evaluation clearing Aaron. Facts 9–11. Dr. Juliano's June 2018 evaluation, conducted by DCS's own court-ordered psychologist, documented that deliberate attempts to provoke anger during a nearly five-hour session failed; Juliano could not elicit anger management problems from Aaron, found no serious mental illness, and concluded that if major anger management problems existed, they "likely would have been elicited." Facts 15–16. Dr. Bennett, another DCS-chosen expert, observed a positive relationship, found Aaron capable of caring for all three children, and recommended placing the twins with him. Wyoming approved his home. Facts 20–28.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

The agency witnesses supplied the decisive legal concessions. DCS Program Administrator Keith agreed that untreated mental health issues alone did not justify withholding custody or unsupervised contact. DCS Program Supervisor Adams agreed that Aaron's anger toward DCS alone did not establish unfitness or justify dependency. Facts 12–13. Keith agreed that severance and adoption as an alternative case plan on these facts would have been "inappropriate." Fact 14. DCS Case Manager Kelly's own sworn testimony at the December 18, 2018 dependency trial, confirmed as truthful at her subsequent deposition, is the most powerful single admission: she told the court under oath that she understood why parents get angry when DCS takes their children, and that Aaron's "nasty e-mails" did not reflect on his ability to be a good parent. Fact 45.

Keith's own review of the CSRA in April 2020 found "nothing on Father except for 'untreated' mental health issues." He agreed that finding was insufficient justification for everything that preceded it. Fact 31. His sweeping admissions—that there were "a lot of opportunities" to return the children earlier, that the prolonged dependency and prolonged visitation restrictions were "hard to justify," and that the case "lasted too long and should have been dismissed earlier"—are not retrospective lament. They are the Program Administrator's assessment of his own department's record. Facts 29–30.

*Kelly v. Winter* establishes the governing constitutional standard: "the continued separation of a child from her custodial parent is constitutional only if 'the scope, degree, and duration of the intrusion' is 'reasonably necessary to avert the specific injury at issue.'" No. CV-25-01208-PHX-ROS, at 35 (quoting *David v. Kaulukukui*, 38 F.4th at 803, quoting *Keates v. Koile*, 883 F.3d 1228, 1237–38 (9th Cir. 2018)). After May 2017, DCS's own record identified no specific injury in Aaron's care. The Court should establish as material facts that the May 2017 findings, August 2017 findings, Juliano evaluation, Bennett assessment, and Wyoming home approval are part of the governing record, and reject the proposition that untreated mental health issues or anger toward DCS alone could establish parental danger requiring continued separation.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

Claim One against Gattie begins with a concrete record: DCS knew Aaron's identity and his Wyoming court-ordered unrestricted parenting contact. Gattie had not contacted Wyoming, conducted any documented internet search, or used DCS's own parent locator service to locate him before filing the dependency. Facts 1–4. The Department's own designated policy representative confirmed that DCS policy in effect in January 2017 required investigators to make good faith efforts to contact known non-custodial parents, to document those efforts, and to notify them within 24 hours of taking custody. Facts 92–95. The gap between what policy required and what Gattie did is established by the Department's own admissions. *Mabe v. San Bernardino County*, 237 F.3d 1101, 1106–09 (9th Cir. 2001), and *Rogers v. County of San Joaquin*, 487 F.3d 1288, 1294–97 (9th Cir. 2007), require an actual emergency for removal without prior judicial authorization. Plaintiffs seek establishment of the knowledge, lack-of-contact, and policy-violation facts; the remaining emergency-removal elements are reserved for trial.

### C. Claim Two: State Custody Created an Affirmative Obligation to Protect the Children in the Lay Placement

Children placed in foster care possess a due process right to reasonable safety and care. *Tamas v. Department of Social & Health Services*, 630 F.3d 833, 842–45 (9th Cir. 2010); *Henry A. v. Willden*, 678 F.3d 991, 1000–03 (9th Cir. 2012). The claim rests on the State's affirmative exercise of custody and its resulting obligation, not on the vicarious conduct of any private party.

#### 1. The Placement Record

The placement evidence is concrete across multiple independent sources. Walter Lay admitted making a child eat soap for cursing and acknowledged that his February 2017 criminal-history disclosure was false. C.W. independently testified to the soap incident. Facts 71, 74. Walter and Jodi acknowledged the foster parent placement agreement required them to support and not interfere with Aaron's contact with the girls; they nonetheless ceased facilitating calls and asked DCS to manage them. Facts 68, 70.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

Jodi Ostrom Lay was the primary caretaker for these children throughout the placement. Both Walter and Jodi confirmed that she was responsible for hair, homework, and all appointments. Fact 69. Jodi admitted to using a wooden spoon for corporal punishment and claimed it occurred only before placement; but her own testimony establishes that her pre-placement contact was limited to brief, casual monthly visits. The AASK agreement she executed prohibited corporal punishment. S.W. confirmed under redirect examination that both Walter and Jodi administered belts and wooden spoons during the placement, that her head was slammed against a tile wall by both Walter and Jodi together, that Jodi pushed Cheyenne's head into a wall corner at Jodi's parents' Colorado home, and that B.W. suffered a seizure following corporal punishment in the Lay home. Facts 72–73. The abuse was not limited to one foster parent—it came primarily from the person who ran the household.

DCS placed the children in the Lay home on January 30, 2017, without a completed professional home assessment. The SWHD home study was not conducted until March 9, 2017, and was not completed until March 23, 2017, fifty-three days after placement. When completed, SWHD recommended against the Lay placement. DCS left the children there anyway. Fact 36. The Department's own policy representative confirmed there were no written policy standards governing how to evaluate a kinship placement where the relative family had knowledge of the custodial parent's criminal and drug history. Fact 98. What DCS had instead was a professional red flag from its own contracted evaluator, which it ignored.

B.W.'s testimony describes conditions of which DCS was on notice: reported physical strikes leaving marks, going to school hungry and stealing quarters for lunch, outdoor punishment in Arizona heat to the point of exhaustion and collapse—with C.W. independently corroborating those same conditions, including her own collapse, and S.W. independently corroborating from observation—placement's systematic disparagement of Aaron causing B.W. to decline contact calls, and a movie-trip conditioned on not seeing

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

her father. Facts 80–84. Walter denied the physical abuse allegations, and that factual dispute will be resolved at trial.

Four formal maltreatment reports document DCS's specific notice: December 2018, September 2019 (identifying Jodi as likely perpetrator, filed after the appellate reversal), March 2020, and April 2020 (Aaron's formal submission of a therapist's abuse report). Facts 86–89. The September 2019 report is particularly significant: DCS was receiving formal maltreatment reports about the placement while simultaneously resisting return of the children.

DCS's own case aide documented on March 14, 2019, that Brooklyn was caught mid-sentence coaching Cheyenne not to speak to Aaron, covered her mouth when she realized what she had said, and that Cheyenne then took the case aide's hand to go make the call. Fact 85. This DCS business record establishes that contact interference had become so normalized in the Lay household that a child had internalized it as an operative household rule—and DCS documented it and did nothing.

**2. <u>Individualized Notice by Defendant</u>**

The three Claim Two defendants are not interchangeable.

Kelly was the original assigned case manager. Her June 9 and June 16, 2017, communications document that she personally knew placement was not answering calls for scheduled visits, that she staffed the issue with her supervisor, and that she stated she would contact placement in writing. Facts 43–44. Three weeks of missed telephone visits followed. Kelly's notice of the placement's adversarial posture was actual and documented: she received Jodi Ostrom's May 18, 2017 email declaring that returning the girls to Aaron would be "a very long and drawn out process," on the eve of DCS's own motion to dismiss. Fact 47. Kelly also received the professional warning about the Lay placement from SWHD—and DCS had placed the children there fifty-three days before that evaluation was even completed. Fact 36.

Alexander was copied on the June 9, 2017, email documenting the contact failures and was identified as the case aide's supervisor. Fact 43. That gap in follow-up is not a

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

defense on a Rule 56(g) fact motion, it establishes what Alexander received. Whether Alexander's response or non-response constituted deliberate indifference is a trial question.

Obika succeeded Kelly in approximately January 2018 and served as the responsible case manager through April 2020. Facts 18–19. Within weeks of taking over, he received Jodi's February 9, 2018 email declaring that the sound of Aaron's voice made her skin crawl and that placement would not facilitate visits. Fact 48. His lack of personal recollection does not contradict the documentary record of what was in front of him.

Deliberate indifference requires a substantial risk of serious harm and the individual official's culpable awareness and disregard. *Tamas*, 630 F.3d at 842-845. The Court should enter partial judgment establishing the children's custodial right to reasonable safety and establish under Rule 56(g) the specific individual notices and documented conditions described above. Individualized culpability for each defendant proceeds to trial on an established evidentiary record.

### D. <u>Claims Nine and Ten: Kelly Owed the Children Reasonable Care in the Protective and Reunification Work She Undertook</u>

Kelly's work concerned these specific children, not an indeterminate public. The statutory placement framework protects dependent children's safety and needs. *Lorenz v. State*, 238 Ariz. 556, ¶¶ 13–19 (App. 2015). Kelly also undertook case-management and reunification services for these children; an undertaking creates a duty of reasonable care within its scope. *Stanley v. McCarver*, 208 Ariz. 219, ¶¶ 12–16 (2004).

The assignment was explicit. The May 26, 2017, order required expedited case aide visits, a psychological evaluation of Aaron, and parenting classes in Colorado. Kelly acknowledged arranging the evaluation was her responsibility. Fact 42. Her own emails establish notice that scheduled contact repeatedly failed, a failure within her direct supervisory authority. Facts 43–44. Aaron testified she supplied no path to regain the girls despite his willingness to comply. Fact 67.

Gross negligence requires conduct creating an unreasonable risk of bodily harm and a high probability of substantial harm, with knowledge or reason to know. *Walls v. Arizona*

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

*Department of Public Safety*, 170 Ariz. 591, 595–96 (App. 1991). *Donald W. v. DCS*, 247 Ariz. 9, ¶¶ 43–51, 67–68 (App. 2019), reinforces the governing reunification principle: the agency cannot rely on conditions its own failures helped create while withholding meaningful efforts to correct them.

The Court should enter partial judgment establishing Kelly's duty of reasonable care within her assigned and undertaken services, and Rule 56(g) findings establishing her assignment, notice, and the causal predicate.

**E. <u>Platter's Operational Participation in Reunification is Outside Absolute Prosecutorial Immunity</u>**

Platter's own testimony places her inside the Department's evaluation, services, and reunification decisions. The question is what function she performed. *Miller v. Gammie*, 335 F.3d 889, 896–898 (9th Cir. 2003) (en banc); *Burns v. Reed*, 500 U.S. 478, 492–496 (1991). *Kelly v. Winter* confirms that DCS personnel who participate in submitting court filings containing false or materially misleading statements are not entitled to absolute immunity. No. CV-25-01208-PHX-ROS, at 28. This Court already applied the functional rule and held Platter had not established immunity for alleged out-of-court direction of DCS personnel. Doc. 75 at 8–10.

Arizona state law confirms the same functional principle. In *Neeley v. Thomas*, No. 1 CA-CV 25-0113 (Ariz. App. Aug. 18, 2026), the Arizona Court of Appeals held that quasi-judicial immunity requires both a sufficient nexus between the actor and the court and a sufficient nexus between the performed function and the court's function. *Id.* ¶¶ 22, 30. The doctrine protects only those performing functions pursuant to a court directive. *Id.* ¶¶ 21, 25–26.

The record now establishes five discrete operational acts outside any court directive.

*First*, Platter personally transmitted the first-dependency hearing transcript to Bennett on February 8, 2019. No order required that transmission. Fact 52.

*Second*, she received and acknowledged Bennett's favorable assessment and Wyoming's approval without acting on either in favor of reunification. Fact 53.

*Third*, she erected self-referral and counselor-disclosure requirements twenty-one days before the Court of Appeals vacated the dependency—requirements grounded in an evaluation her own client's psychologist had refused to approve. Fact 61. She confirmed "The Department objects" to daily telephone contact after the appellate reversal. Fact 54.

*Fourth*, Platter personally directed the Oakley referral forward six days after DCS's own staff consulting psychologist wrote in a DCS business record that the evaluation was "unnecessary" and that he "cannot ethically sign/approve." Fact 57. Six days later, Platter emailed Obika marked "High Importance" and directed him to submit the referral packet "ASAP." Fact 58. No court directed Platter to transmit the administrative referral packet; the court's authorization of the evaluation is distinct from Platter's operational direction of its submission. DCS's own designated policy representative confirmed there was no written policy governing when to seek a psychological evaluation of a parent—the decision was entirely discretionary. Fact 97. Platter's direction of that discretionary referral over DiBacco's documented ethical objection is a fourth operational act.

*Fifth*, Platter used the Oakley report's delay to defer decisions about Aaron's unsupervised access (Fact 59) and characterized advocacy for Aaron's reunification wishes as "selfish" in an all-counsel communication while Bennett's placement recommendation remained the operative professional finding on file (Fact 60).

The Department's own training representative confirmed that AGs were taught to be part of the dependency case team and consulted on major decisions—dependency filings, removals, case plan changes, and placement changes. Fact 103. Platter's documented conduct falls squarely within the categories the training identified as AG operational involvement. Platter's "mentoring only" characterization is inconsistent with what the Department itself trained its workers to expect from the AG's role. The operational character of her participation is established by the training record itself.

Platter's operational service role is outside absolute immunity. The Court should enter partial judgment rejecting absolute prosecutorial immunity for Platter's operational

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

administration of evaluations, services, contact, and reunification. Qualified immunity analysis, individualized causation, and damages are reserved for trial.

**1. <u>The Oakley Evaluation Does Not Rehabilitate the Record or Confer Immunity</u>**

The record will show that Dr. Oakley's May 2019 psychological evaluation reached a Narcissistic Personality Disorder diagnosis. Defendants will rely on this finding. The Court should understand its full context.

The evaluation was commissioned in the face of DCS's own psychologist's written ethical objection. Fact 57. The evaluation's own standardized clinical instruments—the PAI and the MMPI-2-RF—showed results within normal limits, with no significant clinical elevations suggesting psychopathology. The NPD diagnosis rested primarily on clinical interview impressions and record review, not on clinical measure elevations. The Oakley evaluation did not supersede Bennett's March 2019 assessment: Bennett was DCS's own evaluator, and his recommendation to place the twins with Aaron remained the operative professional case plan. Oakley identified no specific safety risk to the children in Aaron's care. The evaluation did not identify any basis for dependency that was legally sufficient under the standard the Court of Appeals applied six weeks after Oakley submitted her report.

The Oakley evaluation cannot rehabilitate three years of documented separation that DCS's own Program Administrator agreed was "hard to justify" and "lasted too long." Nor can it confer immunity on Platter's operational conduct in directing the referral over her own client's psychologist's ethical objection, managing the delay to block unsupervised visits, and erecting post-reversal compliance requirements. The Court should reject any suggestion that the Oakley NPD diagnosis defeats the motion's relief. Facts 52–61.

**F. <u>Claim VI: The Corrected Record Must Include the Favorable Findings that Defeat the Grave-Danger Narrative</u>**

Judicial deception reaches deliberate or reckless material falsehoods and material omissions. *David v. Kaulukukui*, 38 F.4th 792, 800–04 (9th Cir. 2022); *Benavidez v. County*

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

*of San Diego*, 993 F.3d 1134, 1146–48 (9th Cir. 2021); *Hardwick v. County of Orange*, 844 F.3d 1112, 1116–19 (9th Cir. 2017); *Kelly v. Winter*, No. CV-25-01208-PHX-ROS (D. Ariz. Mar. 10, 2026); *Scanlon v. County of Los Angeles*, 92 F.4th 781, 798–805 (9th Cir. 2024). *Kelly v. Winter* reinforces that the right to be free from judicial deception in dependency proceedings is clearly established, and that DCS case managers who prepare and submit progress reports are not entitled to absolute immunity for material omissions. No. CV-25-01208-PHX-ROS, at 28–29.

Significantly, the Department's own training representative confirmed that DCS employees were explicitly taught to be truthful in court submissions even when the facts do not support the dependency allegations. Fact 105. The grave-risk characterizations in the September 2018 Progress Report, submitted after Obika had possessed the Juliano evaluation for three months, violated the truthfulness obligation Kelly and Obika were both trained to honor.

*Neeley v. Thomas* reinforces this conclusion. Under *Neeley*, quasi-judicial immunity does not protect a non-judicial actor's submission of unsolicited reports or recommendations the court did not direct. *Id*. ¶¶ 25–26. Kelly's Progress Report omissions were her own operational choices. Obika's subsequent submissions reflect the same operational judgment.

**1. <u>The September 10, 2018 Progress Report</u>**

By September 10, 2018, DCS possessed three independent favorable findings that directly contradicted any grave-risk characterization: (1) the May 2017 safety finding; (2) the August 2017 supervisory review; and (3) Dr. Juliano's June 2018 evaluation. Facts 5–6, 9–11, 15–17. Obika had been in possession of the Juliano evaluation for approximately three months when he submitted the September 2018 Progress Report repeating grave-risk language. The *Costanich* standard is satisfied. *Costanich v. DSHS*, 627 F.3d 1101, 1111–15 (9th Cir. 2010). Facts 18–19.

For submissions after March 2019, Obika also possessed Bennett's affirmative placement recommendation and Wyoming's home study approval. Any court submission

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

omitting those findings is subject to the same corrected-record analysis. Facts 19, 20–28, 53.

**2. Kelly's Specific Claim Six Conduct**

Kelly's December 14, 2017, Progress Report, the last court submission she signed, repeated grave-risk characterizations while three independent favorable findings were in the DCS file and within her supervisory knowledge. Facts 5–11; Fact 18; Fact 45.

**3. What the Corrected Record Must Include**

The corrected record before the September 2018 Progress Report must include: the May 2017 safety findings, the Colorado ICPC no-safety-concern finding, the military psychiatric evaluation, and Dr. Juliano's June 2018 findings. The corrected record for any submission after March 2019 must also include Bennett's findings, twin-placement recommendation, and Wyoming's home study approval. Facts 5–11, 15–28.

The appellate court's finding that DCS had withheld favorable information from Juliano is the textbook application of *Hardwick*. Fact 63.

**G. Claims Three and Four: State Custody Did Not Extinguish the Family's Medical Participation Rights**

*Wallis* recognizes parents' right to make important medical decisions. 202 F.3d at 1141–42. *Mann v. County of San Diego*, 907 F.3d 1154, 1161–65 (9th Cir. 2018). Aaron testified he learned of S.W.'s second psychiatric hospitalization only when he picked her up and that he reported his exclusion to DCS. Fact 66. The claim is not answered by the bare fact of court jurisdiction over custody.

**H. Claims Five and Eleven: The Children's Rights Define the Education and Supervision Issues; Faust's Negligent Training**

Parental direction of education is a protected liberty interest. *Pierce v. Society of Sisters*, 268 U.S. 510, 534–35 (1925). B.W. could not read well after three years at the DCS- and placement-selected Country Garden School and received no homework during that period. Fact 90.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

Claim Eleven concerns Faust's own alleged negligent hiring, training, and supervision. *Kassman v. Busfield Enterprises, Inc.*, 131 Ariz. 163, 166 (App. 1982). The 30(b)(6) training testimony now provides this claim concrete evidentiary content.

The Department's designated training representative confirmed that for the entire period from 2017 through 2019, there was no training dedicated to implementing a voluntary placement agreement as an alternative to a dependency petition—the very tool that could have placed the children with Aaron, or with the Lays on a short-term basis while Aaron obtained a Wyoming custody order, without any dependency. Facts 101. She confirmed that from January through July 2017, when Gattie investigated and filed the dependency that initiated this case, DCS maintained no proficiency standards, quizzes, or assessment mechanisms for new employees. There was no mechanism to verify that investigators were applying their training obligations. Fact 102. She confirmed that formal constitutional rights training was eliminated in mid-2017 and did not appear in any formal courseware for the remainder of the period. Fact 102. She confirmed there was no training on what factors justified seeking a psychological evaluation of a parent. Fact 104.

The Department's policy representative independently confirmed that the policies governing the 2017–2019 period required mandatory engagement with non-custodial parents before removal, mandatory notification obligations, and a placement hierarchy that elevated a non-custodial parent above a grandparent. Facts 92–95. That policy existed. The Department chose not to train its employees to implement it.

The pattern is the claim: a Department with mandatory policy obligations, an undertrained investigative workforce, no proficiency standards during the critical investigation period, and no formal training on the very alternatives the policy required to be considered. Claim Eleven asks whether Faust's own hiring, training, and supervisory decisions caused foreseeable harm. The 30(b)(6) record establishes what the Department knew, what it trained, and what it chose not to train. The causal question between those choices and the Wostrel dependency's trajectory is reserved for trial; the predicate institutional facts are established now.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

### I. Claim Eight: The Appellate Dismissal Establishes Favorable Termination of the Vacated Dependency

Arizona's wrongful-institution claim requires favorable termination. *Bradshaw v. State Farm Mutual Automobile Insurance Co.*, 157 Ariz. 411, 416–18 (1988). Appellate review vacated the dependency adjudication for insufficient evidence and directed dismissal; review was denied. Facts 62–64. This was a merits disposition, not a negotiated compromise. The Court should enter partial judgment establishing favorable termination.

*Stephens v. State*, No. CV-25-0070-PR, ¶¶ 27–38 (Ariz. May 22, 2026), does not permit Plaintiffs to equate reversal with absence of probable cause. The ruling requested here is narrower: favorable termination only.

#### 1. Continuation of Dependency Proceedings—Kelly and Obika

Kelly's December 14, 2017, Progress Report, submitted while she possessed the May 2017 safety finding, the Colorado ICPC determination, and Aaron's military psychiatric evaluation, repeated grave-risk characterizations directly contradicted by the favorable evidence in DCS's file. The Department's training representative confirmed employees were trained to be truthful even when the facts don't support the allegations. Fact 105. Kelly's omissions violated that obligation. Facts 18–19; Fact 42; Fact 45.

Obika's continuation contribution is separately established. He submitted the September 10, 2018, Progress Report three months after receiving the Juliano evaluation directly disproving its grave-risk characterization. He subsequently received Bennett's recommendation and Wyoming's approval and continued submitting reports. Facts 18–19. Each submission omitting a favorable finding he had received constitutes a discrete act of continuation. That specific continuation theory is preserved for trial; favorable termination is established now.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

**J. Claim Twelve: Reckless Infliction of Severe Distress is Actionable Without a Separate Purpose to Harm**

Arizona requires extreme and outrageous conduct, intent or reckless disregard of the near certainty of emotional distress, and resulting severe distress. *Ford v. Revlon, Inc.*, 153 Ariz. 38, 43–44 (1987).

The evidence for Claim Twelve concerns sustained control over a family's access and reunification across the full dependency period, from February 2017 through April 2020. Kelly established the initial framework of unremedied contact failures and documented placement hostility. Obika's twenty-six-month tenure represents the larger portion of the sustained pattern.

Kelly received Jodi Ostrom's May 18, 2017 email declaring return of the children to Aaron would be "a very long and drawn out process" on the eve of DCS's own motion to dismiss. Fact 47. Within one month of Obika assuming responsibility, he received Jodi's February 9, 2018 written declaration that the sound of Aaron's voice made her skin crawl and that visits "will be missed because we will not do it." Fact 48. The placement's refusal and its express statement of intent to obstruct were in Obika's file from his first month on the case.

The DCS case aide's own business record from March 14, 2019 documents B.W. coaching C.W. not to speak to Aaron, then covering her mouth when she realized what she had said. Fact 85. DCS observed this. The children remained in the Lay home for thirteen more months.

Jodi Ostrom Lay was the primary caretaker throughout. She committed physical punishment as the person running the household. S.W. testified to the bathroom tile incident involving both Walter and Jodi, Jodi's pushing of C.W.'s head into a wall corner in Colorado, and B.W.'s seizure following corporal punishment in the home. Facts 72–73. The State's sustained failure to act occurred in the context of documented, escalating harm to children in its custody.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

The Higby email and Keith's deposition constitute an institutional acknowledgment that the separation was prolonged past any legitimate justification. Facts 49–50.

B.W.'s testimony of reported physical injury, food deprivation, outdoor heat punishment to the point of exhaustion and collapse, corroborated independently by C.W. and S.W., and systematic disparagement of Aaron places the State's sustained failure in its actual, injurious context. Facts 80–85.

*Kelly v. Winter* found that DCS state actors who continued to impose barriers and require demonstrably irrelevant compliance programs after learning their basis for the dependency was untenable committed unwarranted interference with familial association rights. No. CV-25-01208-PHX-ROS, at 33–34. After Bennett's March 2019 assessment and Wyoming's April 2019 home approval, DCS possessed no legitimate professional basis for opposing the twins' return. Platter received both, acknowledged both, and nonetheless communicated "The Department objects" to post-reversal daily telephone contact. Facts 53–54. The Court should establish the proved notices, communications, and recommendations as predicate facts for Claim Twelve. The remaining conduct and damage issues are reserved for trial.

### K. <u>Neither Immunity Nor Judicial Oversight Provides a Blanket Defense to the Proved Wrongs</u>

Qualified immunity must address the actual conduct and the law already in place when it occurred. *Tamas* and *Henry A*. preceded the placement events. *Hardwick*, *Costanich*, and *Chism v. Washington State*, 661 F.3d 380, 392–93 (9th Cir. 2011), supplied notice against deliberate or reckless material deception in dependency submissions. *Wallis* preceded the medical events.

A judicial decision procured through material deception does not automatically sever the deceiving actor's causal responsibility. *Hardwick*, 844 F.3d at 1116–19; *Costanich*, 627 F.3d at 1111–15; *Kelly v. Winter*, No. CV-25-01208-PHX-ROS, at 34–35. *Kelly v. Winter* confirms that qualified immunity provides no refuge for judicial deception in dependency proceedings. No. CV-25-01208-PHX-ROS, at 29–30.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

The Department's own training testimony establishes that Kelly and Obika were trained to be truthful in court submissions even when facts don't support the allegations. Fact 105. No reasonable officer who received that training could have believed that submitting progress reports containing grave-risk characterizations—while in possession of contrary professional findings—was constitutionally permissible.

The March 2020 communications—a CAR drafted and held, a "lookout" message when Aaron said he was coming for his children, and Adams's "That will help" response when placement took the children out of town—are not administrative routine. They document the institutional response to an imminent lawful reunification. Facts 37–39. Keith's admissions—that there were many earlier exit points, that the prolonged dependency was hard to justify, and that the case lasted too long—are probative against any claim that reasonable officials could have disagreed. Facts 29–30.

*Neeley v. Thomas* confirms that Arizona law denies immunity for operational acts performed pursuant to agency direction or personal initiative without court appointment, order, or directive. *Id.* ¶¶ 19, 21, 26. Kelly's progress report omissions, Platter's transcript transmission, the Oakley referral direction, and the contact-objection communications were all performed on DCS's authority and reporting schedule—not pursuant to court directives. Both federal and Arizona law deny immunity for those operational acts.

### L. <u>**Kaplan—Role in the Established Record; Long and McKay as Dismissed Parties**</u>

This motion seeks no Rule 56(a) judgment against Kaplan individually. Long and McKay have been voluntarily dismissed.

Nikki Kaplan is identified in the August 7, 2017 supervisory case progress review as Kelly's supervisor. The review Kaplan co-authored records the Colorado ICPC no-safety findings, the military psychiatric evaluation, and DCS's withdrawal of its dependency motion, all three favorable findings, as part of the institutional record the Court should establish under Rule 56(g).

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

Gregory McKay has been voluntarily dismissed. Evidence of McKay's role as DCS Director during the relevant period, including evidence that the decision to seek Arizona Supreme Court review of the dependency reversal rose to the director's or deputy director's level, remains in the record and may bear on the institutional decision-making claims that proceed to trial.

Nicholas Long has been voluntarily dismissed. Long's dismissal does not affect the admissibility of: (1) the April 29, 2020 Higby-to-Long email chain (Ex. 30 [Dep. Ex. 47]), a DCS business record; (2) Long's deposition testimony; and (3) Long's response in that email chain—"Those kids are going to be worse off for it"—which reflects the institutional posture toward the pending reunification. That evidence remains part of Finding 22.

## M. <u>The Court Should Enter These Partial Judgment and Material Fact Findings</u>

### 1. <u>Rule 56(a) Partial Judgments</u>

Under Rule 56(a), Plaintiffs request:

(1) **Judgment** establishing the children's custodial right to reasonable safety and care in State-arranged foster placement, as the legal standard governing Claim Two. Individualized culpability of Kelly, Obika, and Alexander proceeds to trial on the established evidentiary record.

(2) **Judgment** establishing Kelly's duty of reasonable care within the protective and reunification work she was assigned under the May 26, 2017, court order and undertook as case manager, for Claims Nine and Ten.

(3) **Judgment** rejecting absolute prosecutorial immunity for Platter's operational administration of evaluations, services, contact, and reunification as established in Facts 52–61. Qualified immunity analysis, causation, and damages proceed to trial.

(4) **Judgment** establishing favorable termination of the dependency adjudication vacated on September 26, 2019, and directed to dismissal, for the children's Claim Eight against Kelly.

The Court should also reject, as a matter of law: (a) the proposition that untreated mental health issues or anger toward DCS alone established parental danger requiring any restriction on Aaron's contact or custody; and (b) the proposition that dependent-child custody status alone extinguishes the family's medical-participation rights.

**2. Rule 56(g) Material Fact Findings**

Under Rule 56(g), Plaintiffs request an order establishing the following material facts:

***Finding 1***: DCS knew Aaron's identity and his unrestricted Wyoming court-ordered parenting contact. Gattie had not contacted Wyoming authorities, conducted documented internet searches, or used the Department's own parent locator service to obtain Aaron's address before the dependency was filed, and DCS filed the dependency petition without ever contacting Aaron. Facts 1–4.

***Finding 2***: The May 2017 supervisory update recorded no identified safety threat in Aaron's care, overnight unsupervised visits, and no grounds for dependency with him; DCS circulated dismissal materials and instructed the AG's Office to file a motion to dismiss. Facts 5–7.

***Finding 3***: By August 2017, DCS possessed its own safety finding, the Colorado ICPC's in-home no-safety-concern determination after at least two visits, and a military psychiatric evaluation clearing Aaron of mental health concerns—all before the September 10, 2018 Progress Report repeated grave-risk language to the dependency court. Facts 9–11.

***Finding 4***: Dr. Juliano's June 2018 psychological evaluation documented that deliberate evaluator challenges during a nearly five-hour session failed to elicit anger management problems from Aaron; that Aaron exhibited good behavioral control and did not lose his cool; and that if he had major anger management problems, they likely would have been elicited. Juliano's diagnostic impressions were limited to Adjustment Disorder with Mixed Mood and Prominent Narcissistic Features; he identified no serious mental illness, psychosis, thought disorder, or substance abuse. Facts 15–16.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

***Finding 5***: Bennett recorded a positive interaction and no observable fear or intimidation, found Aaron capable of caring for all three girls, recommended placing the twins with him, and recommended counseling and therapeutic visitation before S.W.'s return. Facts 20–24.

***Finding 6***: Wyoming approved Aaron's home for all three children in April 2019; Platter acknowledged the approval, its contents, and receipt of the Bennett recommendation and Wyoming approval within approximately two months of each other. Facts 27–28, 53.

***Finding 7***: Kelly was responsible for the services assigned under the May 26, 2017, court order. The June 9 and June 16, 2017, emails document her actual notice of repeated telephone visitation failures, her supervisor staffing, and her stated intention to contact placement in writing. Alexander was copied on the June 9, 2017, correspondence in his capacity as case aide supervisor. Facts 42–44.

***Finding 8***: DCS placed the children in the Lay home on January 30, 2017, without a completed professional home assessment. Southwest Human Development conducted its home study of the Lay placement on March 9, 2017—thirty-eight days after the children were placed—and completed it on March 23, 2017, fifty-three days after placement. The completed home study recommended against the placement. DCS left the children in the Lay home notwithstanding that recommendation. Kelly recalled being informed of the negative recommendation. Fact 36.

***Finding 9***: Platter personally transmitted the dependency hearing transcript to DCS's evaluator, Bennett, on February 8, 2019; acknowledged receipt of Bennett's assessment and its express findings; confirmed her October 3, 2019, objection to daily telephone contact; and communicated that Father would need to self-refer for counseling. These firm admissions are established without reliance on Platter's equivocal "probably staffed" recollections. Facts 52–54.

***Finding 9A***: DCS's staff consulting psychologist assessed the proposed second psychological evaluation of Aaron on April 9, 2019, concluded it was professionally unnecessary, and stated in writing that he could not ethically approve the referral. Six days

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

later, Platter personally directed the assigned case manager to submit the Oakley referral packet immediately, marked “High Importance.” Platter's direction occurred three weeks after Bennett had recommended placing the twins with Aaron and two weeks after Wyoming had approved his home. No court directed Platter to transmit the administrative referral packet; the court's authorization of the evaluation is distinct from Platter's operational direction of its submission. The Department's own policy representative confirmed there was no written DCS policy governing when to seek such an evaluation. Facts 57–58, 97.

***Finding 10***: The appellate court vacated the dependency finding and directed dismissal on September 26, 2019; the Arizona Supreme Court denied review on March 5, 2020. Facts 62–64.

***Finding 11***: The March 2020 emails concerned: a CAR drafted and held pending further developments; Adams's "lookout" message when Aaron said he was coming for his children; and Adams's "That will help" response when told placement was taking the children out of town. Facts 37–39.

***Finding 12***: Keith's own April 2020 review of the case file found nothing on Father except an "untreated" mental health label. Keith agreed those issues alone were insufficient to justify dependency, withholding custody, or denial of unsupervised contact. He agreed the prolonged dependency and prolonged visitation restrictions were "hard to justify," that there were many opportunities to return the children earlier, and that the case lasted too long and should have been dismissed earlier. Facts 29–31.

***Finding 13***: Keith agreed that severance and adoption as an alternative case plan based only on untreated mental health issues and hostile emails would have been "inappropriate." Fact 14.

***Finding 14***: Keith agreed it is not the assistant AG's role to determine which service providers to approach for psychological evaluations; if the assistant AG directed Lay inclusion in the Bennett referral questions, that would have been "improper"; after SWHD

found the Lay placement inappropriate, DCS "should have reassessed" rather than engage a second provider to study the same home. Facts 33–35.

***Finding 15***: Jodi Ostrom Lay was the primary caretaker for the Wostrel children throughout the Lay placement, as confirmed by both her own testimony and Walter Lay's. Jodi admitted to using corporal punishment on the children. Her claimed limitation of that conduct to the pre-placement period is contradicted by her own testimony establishing that her pre-placement contact was limited to casual monthly visits. The AASK intake documentation she signed prohibited corporal punishment. S.W. testified to a bathroom tile incident in which her head was banged against a tile wall by both Walter and Jodi together; witnessed Jodi forcibly push C.W.'s head into the corner of a wall at Jodi's parents' Colorado home; and testified that B.W. suffered a seizure following corporal punishment in the Lay home. Facts 72–73.

***Finding 16***: Walter Lay acknowledged the foster-parent agreement's family-contact obligations, his admission that a child ate soap at his direction, and the inaccuracy of his initial criminal-history disclosure. C.W. independently corroborated the soap incident. Facts 68, 71, 74.

***Finding 17***: B.W. testified to reported physical abuse leaving marks; going to school hungry and stealing quarters for lunch on days the housekeeper did not bring food; outdoor heat punishment to the point of physical exhaustion and collapse. C.W. independently corroborated the outdoor punishment testimony, including her own collapse. S.W. independently corroborated from observation that C.W. collapsed from heat exhaustion during outdoor punishment and was revived with water from the dog bowl, and that B.W. suffered a seizure following corporal punishment in the home. B.W. also testified to placement's systematic disparagement of Aaron causing her to decline contact calls, and a movie-trip conditioned on not seeing her father. Walter denied the physical abuse; the dispute is for trial. The testimony of all three children, given independently at separate depositions, establishes their reported accounts, the conditions DCS was on notice of, and the children's own experiences as they lived them. Facts 80–85.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

***Finding 18***: B.W. testified she could not read well after three years at the DCS-controlled Country Garden School and received no homework during that period; and that she was "really happy" to return to Aaron and would choose him immediately. Facts 90–91.

***Finding 19***: Kelly confirmed under oath at the December 18, 2018, dependency trial that Aaron's hostile emails did not reflect on his parenting ability, and confirmed at her deposition that her prior sworn testimony was truthful. Fact 45.

***Finding 20***: On May 18, 2017, Jodi Ostrom sent Kelly an email declaring that returning the children to Aaron would be "a very long and drawn out process," reflecting overt placement opposition to reunification on the eve of DCS's own motion to dismiss the dependency. Fact 47.

***Finding 21***: On February 9, 2018—Obika's first month as assigned case manager—Jodi Ostrom sent a communication stating that the sound of Aaron's voice made her skin crawl and that scheduled contact calls would be missed because the placement would not facilitate them. This documented the placement's active refusal to facilitate court-ordered contact and its express personal animosity toward Aaron, both of which were in Obika's file from the outset of his tenure. Fact 48.

***Finding 22***: The April 29, 2020, Higby email, a DCS business record, records that DCS management appeared angry that the case had been open so long and believed the girls should have gone home a year earlier; Keith's deposition confirmed that he appeared angry or upset about the case duration when he reviewed the records. Long's response to that institutional assessment is part of the supervisory record of the dismissal period. Facts 49–50.

***Finding 23***: Paulinus Obika succeeded Cheryl Kelly as the assigned DCS case manager in approximately January 2018 and remained the responsible case manager through April 2020—a tenure of approximately twenty-six months. The September 10, 2018, Progress Report was Obika's submission; Kelly had departed the case approximately nine months before that report was filed. Obika received Dr. Juliano's June 7, 2018,

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

evaluation approximately three months before submitting that report. Obika was also the responsible case manager when DCS received Bennett's March 2019 assessment and Wyoming's April 4, 2019, home study approval. His inability to recall the case or the reports at his deposition does not contradict the documentary record establishing what was in his file at each of those dates. Facts 18–19; Exs. 25, 26, 35 (Dep. Exs. 33, 34, 74).

***Finding 24***: The DCS case aide's own contemporaneous business record from March 14, 2019 documents B.W. coaching C.W. not to speak to Aaron, stating that placement would take them somewhere if they spoke to him, and then covering her mouth upon realizing what she had said. DCS documented this event. The children remained in the Lay placement for thirteen additional months. This record establishes that contact interference had become so normalized in the Lay household that the children had internalized it as an operative household rule, and that DCS had actual documentary notice of that interference during Obika's tenure. Fact 85.

***Finding 25***: The Department's own designated Rule 30(b)(6) policy representative confirmed the following as the Department's official position: (a) DCS policy in effect in January 2017 used mandatory language requiring investigators to engage a child's entire family, including non-custodial parents residing outside Arizona, in planning for voluntary interventions before taking temporary custody; (b) DCS policy required good faith efforts to locate known non-custodial parents, including through the Arizona Parent Locator Service, and required those efforts to be documented; (c) DCS policy required written and verbal notification to non-custodial parents within 24 hours of taking temporary custody and required a copy of the TCN to be sent to non-custodial parents, including those out of state; (d) DCS policy placed a non-custodial parent above a grandparent in the placement hierarchy, even when the non-custodial parent resided out of state, and required documented justification for bypassing a non-custodial parent in favor of a grandparent placement; (e) no written DCS policy or procedure governed when to seek a psychological evaluation of a non-custodial parent, making any such decision entirely discretionary; and (f) no written DCS policy addressed how to evaluate a kinship placement where the relative

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

family had knowledge of the custodial parent's criminal or drug history. The Department's own designated Rule 30(b)(6) training representative confirmed: (g) for the entire period from 2017 through 2019, there was no training dedicated to implementing a voluntary placement agreement as an alternative to a dependency petition; (h) from January through approximately July 2017, DCS maintained no proficiency standards, quizzes, or assessment mechanisms for new employees; (i) formal constitutional rights training was eliminated in mid-2017 and did not appear in any formal courseware for the remainder of the 2017–2019 period; (j) there was no training on what factors justified seeking a psychological evaluation of a parent; and (k) DCS employees were trained to be truthful in court submissions even when the facts do not support the allegations of a dependency petition. Facts 92–105.

## V. <u>**CONCLUSION**</u>

The undisputed record establishes the safety findings, favorable assessments, placement recommendation, individual notices, operational participation, causation predicates, and appellate disposition identified above. Those matters need no trial. The agency's own Program Administrator agreed the case lasted too long, the restrictions were hard to justify, and there were many earlier opportunities to return the children to their father. The assigned case manager confirmed under oath at the dependency trial that the anger she witnessed was understandable and did not reflect on Aaron's parenting ability. DCS's own evaluators—Juliano in 2018 and Bennett in 2019—produced findings favorable to Aaron. Wyoming inspected his home and approved it. DCS's own staff psychologist said an additional evaluation (i.e., the Oakley referral) was professionally unnecessary and that he could not ethically approve it. The placement's primary caretaker admitted corporal punishment while documenting visceral contempt for Aaron in writing. DCS's own case aide documented a child coaching her sister not to speak to her father—and left the children in that home. And the Department's own designated policy and training representatives confirmed, under oath and on the Department's behalf, the mandatory standards that were violated and the training that was never provided.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

Plaintiffs request the specified partial judgments and Rule 56(g) findings, with individualized liability, causation, and damages reserved. This case should proceed on what the record actually establishes, not on a renewed assumption that Aaron's disagreement with DCS proved danger to his daughters and unfitness to parent.

**RESPECTFULLY SUBMITTED** this 22nd day of October 2026.

**MILLS + WOODS LAW PLLC**

By *__/s/ Thomas A. Connelly__*
Thomas A. Connelly
Robert T. Mills
Sean A. Woods
5055 North 12th Street, Suite 101
Phoenix, AZ 85014

**GILLESPIE, SHIELDS, & TAYLOR**
DeeAn Gillespie Strub
7319 North 16th Street
Phoenix, AZ 85020

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on October 22, 2026, I electronically transmitted the foregoing document to be filed electronically with the Clerk's Office through the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to be served on all counsel of record via the Court's CM/ECF system.

*/s/ Thomas A. Connelly*

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

## VI. NUMERICAL TABLE OF CONTENTS FOR EXHIBITS

(Plaintiffs' Motion for Partial Summary Judgment)

1. Excerpts from the Deposition of Emelinda Diaz
2. Excerpts from the Deposition of Amber Gattie
3. Excerpts from the Deposition of Jason Keith
4. Excerpts from the Deposition of Brian Adams
5. Excerpts from the Deposition of Dr. Andrew Clark
6. Excerpts from the Deposition of Paulinus Obika
7. Excerpts from the Deposition of Bonnie Platter
8. Excerpts from the Deposition of Walter Lay
9. Excerpts from the Deposition of Cheryl Kelly
10. Excerpts from the Deposition of Aaron Wostrel
11. Timothy Turner Report, June 2025
12. Excerpts from the Deposition of C.W.
13. Excerpts from the Deposition of B.W.
14. Excerpts from the Deposition of Nicholas Long
15. Excerpts from the Deposition of Jodi Ostrom Lay
16. Excerpts from the Deposition of S.W.
17. Excerpts from the Deposition of Melissa Compian (30(b)(6) — Policy), April 22, 2026
18. Excerpts from the Deposition of Kylah Ross Mount (30(b)(6) — Training), April 28, 2026
19. Deposition Exhibit 54 — Notice of 30(b)(6) Deposition, Melissa Compian, Policy Topics
20. Deposition Exhibit 22 — Jodi Ostrom Email to Cheryl Kelly, May 18, 2017
21. Deposition Exhibit 26 — Email Chain re: Telephone Visit Contact Failure, June 9, 2017
22. Deposition Exhibit 27 — Email re: Telephone Visit Contact Failure, June 16, 2017
23. Deposition Exhibit 28 — May 26, 2017 Court Order
24. Deposition Exhibit 30 — DCS Supervisory Case Progress Reviews, May 2017 and August 2017
25. Deposition Exhibit 33 — Dr. Juliano's Psychological Evaluation of Aaron Wostrel, June 7, 2018

26. Deposition Exhibit 34 — Dr. Bennett's Bonding and Best-Interest Assessment, March 2019
27. Deposition Exhibit 35 — DCS Staff Psychologist DiBacco Unit Consultation, April 9, 2019
28. Deposition Exhibit 36 — Dr. Oakley's Psychological Evaluation of Aaron Wostrel, August 2019
29. Deposition Exhibit 39 — Email Chain re: Motion to Dismiss Dependency and UCCJEA Conference, May 19, 2017
30. Deposition Exhibit 47 — DCS Business Record: Joelle Higby Email to Nicholas Long, April 29, 2020
31. Deposition Exhibit 50 — March 2020 Email Chain re: Draft Court Authorized Removal Application
32. Deposition Exhibit 51 — March 2020 Email Chain re: "Lookout" Message and Lake Havasu Trip
33. Deposition Exhibit 61 — February 8, 2019 Email: Platter Transmission of Dependency Hearing Transcript to Dr. Bennett
34. Deposition Exhibit 73 — October 3, 2019 Written Objection by Platter to Daily Telephone Contact
35. Deposition Exhibit 74 — Wyoming Department of Family Services ICPC Approval Letter, April 4, 2019
36. Deposition Exhibit 79 — Southwest Human Development Home Study of Lay Placement, March 23, 2017
37. Deposition Exhibit 83 — Lay Dependency Petition Filed After Appellate Reversal
38. Deposition Exhibit 91 — Jodi Ostrom Email re Contact Refusal, February 9, 2018
39. ST-Wostrel010474 — Platter Email Directing Oakley Referral Submission, April 15–16, 2019
40. ST-Wostrel010599-601 — Platter Email Managing Oakley Report Delay, June 12, 2019
41. ST-Wostrel010684 — Platter Email Characterizing Reunification Advocacy as Selfish, June 13, 2019
42. ST-Wostrel010966 — Platter “Self-Referral” and Counselor-Disclosure Email Chain, September 5, 2019
43. WOSTREL NO. 000772-773 — Order for Father to Complete Additional Psychological Assessment, December 2018
44. DCS Case Aide Record, March 14, 2019, ST-Wostrel000338-339)
45. ST-Wostrel014566 – Maltreatment Report in Lay Placement, December 12, 2018
46. Deposition Exhibit 3 – WY Custody Order
47. COA Mandate

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

48. ST-Wostrel018336–340 – Maltreatment Report in Lay Placement, September 26, 2019

49. WRIGHT 0004881-3 – Email from GAL to Platter re: no visit because C.W. in surgery and B.W. seizure, February 26, 2020

50. ST-Wostrel018383 – Maltreatment Report against Aaron by Placement's counsel, March 24, 2020

51. ST-Wostrel018557–561 – Maltreatment Report in Lay Placement, September 19, 2019

52. Deposition Exhibit 77 — Notice of 30(b)(6) Deposition, Kylah Ross Mount, Training Topics

53. Dr. Clark Report, March 11, 2025

54. Deposition Exhibit 52 — Keith email to Adams, April 14, 2020

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556