# EXHIBIT 1

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Aaron Wostrel, et al.,<br><br>Plaintiff,<br><br>vs.<br><br>State of Arizona, et al.,<br><br>Defendant. | Case No.:<br>2:22-cv-00312-PHX-DLR |

DEPOSITION OF BONNIE PLATTER

Phoenix, Arizona
April 24, 2026
10:06 a.m.

REPORTED BY:
Kristy A. Ceton, RPR, CRR
AZ CR No. 50200

CARRIE REPORTING, LLC
Certified Reporters
7000 North 16th Street
Suite 120 #520
Phoenix, Arizona 85020
(480) 429-7573

Phoenix, Arizona
April 24, 2026
10:06 a.m.

(Exhibits 55 and 56 were marked for identification.)

BONNIE PLATTER,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. CONNELLY:

Q. Good morning, Ms. Platter. Will you please state your name, spelling it for the record.

A. Bonnie Platter. B-o-n-n-i-e; P-l-a-t-t-e-r.

Q. And you're here today for your deposition in a case in which you're a defendant, right?

A. Yes, sir.

Q. And have you been deposed before?

A. No.

Q. You've taken depositions, though, right?

A. No.

Q. No. Okay.

Well, then, I'll just briefly give you

And that's summer of 2000.

Q. Summer block at DCS in 2000?

A. Yes.

Q. And what goes on during the summer block? What do you do?

A. The same thing that you do in an academic year. It's essentially case management.

Q. So what kind of things were you doing in the summer block in 2000 at DCS?

A. Home visits, observing court, observing foster care review boards, child visits.

Q. And you were doing those, like, shadowing a case manager?

A. For the most part. But the case manager quit, like, during midsummer, towards the beginning of the summer. So because I had already done a year one previous, they let me do it on my own.

Q. What did they let you do on your own?

A. Like, visits, child contacts, visits with parents, transportation of children.

Q. Really?

A. Uh-huh.

Q. So when did you start working at the Department full-time?

A. May of 2001.

Q. And when you were hired, did you go through the core training at that time?
A. A version of it. It's not the same as it is now.
Q. Okay. So they didn't have the formal, like, three-month program at that time?
A. No. When I started, you did two -- a two-week block ahead of time. Then you went into the field, and then you went back once a month for a period of months. So it was more like on-the-job hybrid than it is now, because everything now is up front.
Q. Okay. So when you were hired in May of 2001, what was -- what division or group were you hired into?
A. I don't understand your question.
Q. Were you doing investigations or ongoing case management?
A. I went into investigations.
Q. So you were in investigations from May of 2001 until when?
A. I don't remember the exact month, but some time in the fall of 2001.
Q. Fall of 2001?
A. Yeah. I transferred to an ongoing unit.

Q. So you were in investigations just for a couple of months?
A. Yeah. A few months.
Q. And then in the fall of 2001, you went into ongoing?
A. Yes.
Q. And for how long were you in ongoing?
A. As a worker, until I think in 2005.
Q. 2005?
A. Yeah.
Q. Do you remember when?
A. I don't remember the month.
Q. What was your next step then at the Department from there?
A. I was an ongoing supervisor.
Q. So that was from 2005 until when?
A. November 2008.
Q. What happened in November of 2008?
A. I resigned so I could cash out my retirement because I needed it for school, and then I went back in January of 2009.
Q. Okay. So you resigned from the Department in November of 2008?
A. Uh-huh. Yes.
Q. November. So you can cash out your

retirement and go to school. What did you -- is that when you were in law school?

A. I had just finished my first semester, and I lost a scholarship and a grant because I got a C+.

Q. Okay.

A. And I couldn't qualify for a private student loan, so I needed the money to pay for my books and my next semester.

Q. And then you say you came back to the Department?

A. Correct.

Q. And when was that?

A. January of 2009.

Q. 2009.

And then what role were you in when you came back in 2009 in January?

A. A hotline specialist.

Q. So you were taking hotline calls?

A. Correct.

Q. How long did you do that?

A. Well, I mean, I know the total. I'm just trying to differentiate between -- because I became a supervisor for a period of time as well. But in total, I was there until March of 2012.

Q. Until March of 2012, in the hotline specialist.
You said there was a time between January of 2009 and March of 2012 when you were a supervisor?
A. Correct.
Q. Supervisor of?
A. At the hotline.
Q. At the hotline?
A. Uh-huh. Yes.
Q. Okay. So from January of 2009 until March of 2012, you were a hotline specialist, and then at some point a hotline supervisor?
A. Yes.
Q. You just don't remember when that happened?
A. Yeah. It was in the middle.
Q. Were you working daytime hours on the hotline or overnights?
A. It varied.
Q. So you did both?
A. I did both.
Q. Okay. So you were sometimes on the after-hours hotline; is that right?
A. I did overnights for I think three semesters. And that would be 8:30 in the evening

until 7:30 in the morning.
Q. And then you graduated law school in May or June of 2012?
A. Yes.
Q. And what did you do careerwise when you graduated law school?
A. I did not go back to work. I went to study for the bar.
Q. Okay.
A. And then after the bar, I applied for jobs and had difficulty getting jobs, but eventually then went to Adult Protective Services.
Q. So did you resign the Department again in March of 2012?
A. Yes.
Q. And that was to finish up law school and prepare for the bar exam?
A. Yes.
Q. Did you go back to the Department at any time after that?
A. Not Department of Child Safety, no.
Q. Okay. So then you said after some period of time, you began working in Adult Protective Services?
A. I believe that was in October of 2012.

Q. October?
A. Yeah.
Q. And is that a department of the State somewhere?
A. Yeah. They're under DES.
Q. DES. Okay.
And so how long did you work in DES in the Adult Protective Services?
A. Until August of 2013.
Q. August 2013. So DES.
And what happened in August of 2013?
A. That's when I got my license and I got hired by the AG's Office.
Q. Okay. How long were you at the Attorney General's Office? There were a number of -- you were there and gone a couple of times; is that right?
A. Only once. I was there and gone -- or the first time I resigned was December 2019.
Q. December of?
A. 2019.
Q. 2019?
A. Yeah.
Q. Okay.
A. And then I went back in I think the end of February of 2020.

Q. And then April 30th, 2011, back to child protective services specialist III?

A. Correct.

Q. What's that about?

A. I voluntarily went back down from supervisor to specialist. It was too much with school.

Q. So a voluntary reassignment, I'll say. I won't call it a demotion.

A. Yeah. Well, it wasn't a demotion.

Q. So was that then in -- on the hotline?

A. Yes.

Q. Okay. So still on the hotline.

And then October 15th, 2012, human service specialist III. That's at DES?

A. No. That was Adult Protective Services.

Q. Yeah. In the Department of --

A. Oh, DES. Sorry. Yes.

Q. Okay. And then it says here, August 3rd, 2013, through December 4th, 2019, you were an Assistant Attorney General, and then there's that break that you talked about where you resigned for a couple of months. And what -- what was the reason again, for the resignation at that time?

A. To cash out my retirement and go take

care of my sister who was having a brain tumor removed.

Q. Okay. So you had to retire and cash out your retirement two times?

A. I didn't have to, but, yeah, I chose to.

Q. Twice, right?

A. Yes.

Q. And when you say your retirement, you're talking about the pension, the government pension, right?

A. The ASRS.

Q. Okay. And then you came back, and we see February 10th, 2020, to May 28th, 2021, as another period of an Assistant Attorney General, right?

A. Yes.

Q. In 4, I see that they've got the Attorney General's Office and the Department of Economic Security, but they don't call out the Department of Child Safety. Do you recall when it was that the Department of Child Safety was taken out of the Department of Economic Security and made its own agency or its own department?

A. I think that happened after I was already an AG. Maybe 2014.

Q. Yeah. Okay.

And do not answer to the extent that it would violate attorney/client privilege.

MR. NIEDERBAUMER: Join.

THE WITNESS: I can't even answer it unless you identify time frames.

Q. BY MR. CONNELLY: I did identify a time frame. Time frame when you were assistant -- you were the assigned Assistant Attorney General on the case.

MR. O'CONNOR: Form and foundation.

MR. NIEDERBAUMER: Join.

THE WITNESS: For most of the time that that case was open, I wasn't assigned to it at all. I was acting in a mentor capacity.

Q. BY MR. CONNELLY: Okay. So your -- you want to play these sort of games about terminology. So --

MR. O'CONNOR: Form.

MR. NIEDERBAUMER: Argumentative.

Q. BY MR. CONNELLY: You said you -- you became involved in October of 2017 with the Wostrel case, right?

A. I moved to the unit that the case was managed in. I did not have active involvement in the case until probably 20- -- mid-2018 because Chelsea

Herzhaft was managing it. She might staff things with me. But I was not actively involved with it or managing it or assigned.

Q. So in October of 2017, you moved to a unit in the Attorney General's Office that was handling the Wostrel case; is that right?

A. Yes.

Q. And what unit was that?

A. It was called Phoenix 2.

Q. And Phoenix 2 refers to some geographic area that covers dependencies that are initiated in that area?

A. It was whoever covered a particular set of courtrooms.

Q. All right. And you moved to the Phoenix 2 unit in what capacity?

A. To become a mentoring attorney.

Q. Mentoring attorney.

And did you have any other role in any other unit at the time?

A. At the same time? No.

Q. Okay. So in October of 2017, your only role at the department --

And, I mean -- I don't want to say the department because we're using that to mean DCS.

-- so at the -- at the AG's Office, was as a mentoring attorney in the Phoenix 2 unit?

MR. O'CONNOR: Form.

MR. NIEDERBAUMER: Join.

THE WITNESS: And -- No. I misspoke. I had training duties as well.

Q. BY MR. CONNELLY: Okay. And as a mentoring attorney, were you responsible for being in court to appear in relation to dependency matters on behalf of the Attorney General's Office?

A. Sometimes, yes.

Q. So as a mentoring attorney, you were not only mentoring other Assistant Attorney Generals, but you were sometimes appearing in court on behalf of the State in relation to a dependency matter?

MR. O'CONNOR: Form.

MR. NIEDERBAUMER: Join.

THE WITNESS: Sometimes that would be my mentor role. I would be sitting next to the assigned attorney training them.

Q. BY MR. CONNELLY: Okay. And outside of appearing as a mentor in court, when you were in this mentoring role, did you also appear in court as the prosecuting Assistant Attorney General on a dependency case?

MR. O'CONNOR: Form.
THE WITNESS: Sometimes, yes.
Q. BY MR. CONNELLY: Okay. So even though you were in the role of mentoring attorney, you would sometimes cross over and be the prosecuting attorney on cases, right?
MR. NIEDERBAUMER: Asked and answered.
THE WITNESS: Yes.
Q. BY MR. CONNELLY: Okay. Was there a time when you moved out of the mentoring role and moved into a prosecuting role?
MR. O'CONNOR: Form.
THE WITNESS: Did I change roles? No. My role was always mentor.
Q. BY MR. CONNELLY: Okay. And what was your title?
A. Assistant Attorney General.
Q. Okay. And no other designation, just Assistant Attorney General?
A. The official title, yes.
Q. Okay. And is mentoring attorney some -- some unspecified, as far as the job title, there's no job title -- Is there a job title called mentoring attorney within the Attorney General's Office?
A. Officially in the positions? No. Does

it exist? Yes.

Q. And so what was your -- what was your job as a mentoring attorney? What were you supposed to be doing?

A. Monitoring different courtrooms and assisting new attorneys or less experienced attorneys. If there was a complicated case, like, second chairing trials or cases with them, staffing cases. If they wanted to elevate something because, you know, whatever issue was going on, elevated stuff to me. I did training.

Q. And when they elevated things to you, did you then take over the responsibility of prosecuting the case?

A. No.

MR. O'CONNOR: Form.

THE WITNESS: Sorry.

MR. NIEDERBAUMER: Join.

Q. BY MR. CONNELLY: So in regards to the Wostrel case, in October of 2017, who was the prosecuting assistant?

A. Chelsea Herzhaft.

Q. And your role as a mentoring attorney was to do what with Chelsea and this case?

A. Staff cases, be there for her to ask

appearing in court instead of Chelsea Herzhaft?

A. I didn't appear in court instead of Chelsea Herzhaft. I believe that the first time I appeared in court may have been when we were setting the second trial. So some time in 2018. Because I was going to second chair the trial -- the trial with her.

Q. When you were the mentoring attorney beginning in October of 2017 -- Strike that.

Was Chelsea Herzhaft assigned to the case in 2018?

MR. NIEDERBAUMER: Form and foundation.

MR. O'CONNOR: Join.

Q. BY MR. CONNELLY: As the frontline attorney?

MR. O'CONNOR: Form.

MR. NIEDERBAUMER: Join.

THE WITNESS: I don't know what "frontline attorney" means, but, yes, she was assigned to it at points in time in 2018.

Q. BY MR. CONNELLY: Were there others that were assigned to the case --

A. Yes.

Q. -- in 2018?

Who?

A. I assigned Monica Malhotra.
Q. Monica?
A. Malhotra.
Q. Do you know how to spell that?
A. M-o-l-h-u-t-r-a (sic). That might not be right. She's in the e-mails.
I assigned Candy Dahl.
Q. Is that with a C or a K?
A. C-a-n-d-i-e (sic), I believe. D-a-h-l.
Q. Anybody else?
A. I think that's all in 2018. There was one additional attorney that I tried to assign in 2019.
Q. And who was that?
A. Heather Schaupp.
Q. And you say that you assigned these assistants. In your role as a mentoring attorney, did you have over -- did you have supervisory responsibilities over the -- over the assistants you were mentoring?
A. To the extent that I controlled, like, what attorneys were on what teams and how cases were divided in the teams, who became team lead, different things like that, yes.
But I couldn't do anything in terms of

discipline, approving leave. I wasn't involved in, like, communications about personnel matters.

Q. So you didn't do their performance reviews, for instance?

A. Right.

I mean, I gave input, but I didn't do them.

Q. So you said team lead. Was there a team lead on the Wostrel matter?

A. Monica was the team lead.

Q. When was she the team lead?

A. I don't recall. It was in 2018. But it wasn't for very long because she resigned.

Q. Who was the team lead after Monica?

A. Candy.

Q. Was Chelsea ever the team lead?

A. No. Because she was gone at that point.

Q. When did she leave?

A. Well, she left on leave and then came back and then left again. So between 2018 and 2019, I don't know the exact -- the exact time frames.

Q. Okay. And so going back to the role of Assistant Attorney General on dependency matters.

We talked a little bit about visitation logistics and a little bit about service provider

would it be an appropriate role for the Attorney General to be communicating with placement about issues placement was having with visitations?

MR. O'CONNOR: Form and foundation.

MR. NIEDERBAUMER: Join.

THE WITNESS: Potentially. There are unusual situations where -- like in this case where everything went through all of the attorneys, yes.

Q. BY MR. CONNELLY: And when you say "everything went through all of the attorneys," what are you referring to?

A. All communications were through attorneys in this case because at one point it was Court-ordered that Mr. Wostrel wasn't allowed to have any phone contact with anyone. And at some point, I don't even remember who asked for it or when, all communications went through attorneys.

So everything was communicated through the attorneys.

Q. Like what? Give me -- other than Mr. Wostrel not being -- supposed to contact people, when you say "everything," what kind of things went through the attorneys? And were these -- What kind of things went through the attorneys and were there court orders saying that these things had to go

through attorneys?

MR. O'CONNOR: Form.

THE WITNESS: So the first part of that is literally everything. Talking about coordinating visitation, talking about when and how different evaluations were going to be happening. Scheduling, relaying information about when a CFT or another meeting was set up. Everything went through attorneys.

Q. BY MR. CONNELLY: Okay. And was that something -- you're saying -- are you saying that there was a court order directing that?

A. I did not say that because I didn't answer that part yet.

Q. Well, was there a court order that directed that?

A. I don't recall.

Q. And you don't recall seeing such a court order in the 2,300 pages of documents you spent 10 hours reviewing; is that right?

MR. O'CONNOR: Form and foundation.

MR. NIEDERBAUMER: Join.

THE WITNESS: I don't recall seeing an order, no.

Q. BY MR. CONNELLY: And so did someone --

became this mentoring attorney, what did you do to familiarize yourself with the Wostrel matter?

A. I didn't specifically.

Q. Okay. Was there any point in time where you took any steps to familiarize yourself with the history of the Wostrel matter?

MR. O'CONNOR: Form.

MR. NIEDERBAUMER: Join.

THE WITNESS: The first time I remember having any communication about it was when Chelsea was trying to figure out when and how to communicate with Mr. Wostrel while he was representing himself.

Q. BY MR. CONNELLY: Okay. Going back to the question.

Was there any time that you familiarized yourself with the history of the case?

MR. O'CONNOR: Form.

MR. NIEDERBAUMER: Join.

THE WITNESS: That was when it came to my attention for the first time and I started, you know, researching what had gone on.

Q. BY MR. CONNELLY: Okay. And so when you started researching what had gone on, what did you research? What did you look at and review?

A. Everything that was in the AG's system.

MR. O'CONNOR: Form.
Q. BY MR. CONNELLY: And would the CSRA have been in the AG's system?
MR. NIEDERBAUMER: Form and foundation.
THE WITNESS: Potentially. I don't recall if it was or wasn't.
Q. BY MR. CONNELLY: But the motion to dismiss the petition would have been in the system, right?
A. Not in the AG's system. That's in the -- that was in the JAX system.
Q. So did you review that motion at some point?
A. At that time, I don't think that I did. I mean, at some point later, I probably reviewed the entire docket.
Q. So what information was in the AG's system that you reviewed when you were endeavoring to become familiar with the history of the case?
MR. NIEDERBAUMER: Form and foundation.
MR. O'CONNOR: Join.
THE WITNESS: Court reports, some pleadings. I think that the ruling on the first trial was probably in there by that time.
Q. BY MR. CONNELLY: Okay. And that would

have been in 2018. When in 2018?

A. I think that was in '17. You asked about '17.

Q. I asked about the motion to dismiss, which was in '17.

A. Right.

Q. But then the question was, when you got around to reviewing materials, what did you review? And so when was that?

MR. O'CONNOR: Form.

THE WITNESS: I believe towards the end of '17.

Q. BY MR. CONNELLY: Okay.

A. It was during the period of time Mr. Wostrel was representing himself. And I don't remember exactly when that was. I know it was the first trial, so that was in August of '17. And I don't know when it ended.

Q. All right. And so that trial ended in August of 2017 as well. It started and ended.

And so that's when you started looking at the case history?

MR. O'CONNOR: Form and foundation.

MR. NIEDERBAUMER: Join.

THE WITNESS: I wouldn't have had access

to anything until after October 10th of 2017. But I believe towards the end of 2017 is when I first had contact with the case, because Chelsea raised, again, questions about when and how to interact with Mr. Wostrel while he was representing himself.

Q. BY MR. CONNELLY: Okay. As a mentoring attorney, was it your role to communicate with the attorneys involved for the other parties, the parents, the GAL?

A. Sometimes.

MR. O'CONNOR: Form.

Q. BY MR. CONNELLY: And in your mentoring role, was it your responsibility to direct the course of the prosecution or simply to assist when the AAG had a question?

MR. O'CONNOR: Form.

MR. NIEDERBAUMER: Join.

THE WITNESS: It would depend on the circumstances of a particular case.

Q. BY MR. CONNELLY: And you would make that determination, then, about what you should -- what you should do in relation to actually participating in the prosecution itself rather than just giving advice, right?

MR. O'CONNOR: Form.

THE WITNESS: No.
MR. NIEDERBAUMER: Join.
THE WITNESS: It wasn't always determined by me.
Q. BY MR. CONNELLY: Who would make that decision?
A. My unit chief or the client.
Q. "The client" being the Department?
A. Yes.
Q. Did the Department ever come to you and specifically ask you to be the lead prosecutor on the case?
MR. O'CONNOR: Objection.
Don't answer.
MR. NIEDERBAUMER: And we do not waive attorney/client privilege, so don't answer.
THE WITNESS: I'm going to follow the advice of my attorney and not answer that question.
Q. BY MR. CONNELLY: That's fine.
Did you ever sign pleadings in the case?
A. I believe so, yes.
Q. And did you make the decision to sign those pleadings?
A. Yes.
Q. We saw that you describe yourself as

Absolutely.

Q. BY MR. CONNELLY: I didn't ask whether they asked about legal advice. I asked whether they consulted you about operational decisions that they were making in relation to moving the services and whatever else was needed towards the case plan of reunification?

MR. O'CONNOR: Form and foundation.

And don't answer to the extent it violates privilege.

THE WITNESS: Did they ask for legal advice on how to manage the case and make operational decisions, which I'm not even sure exactly what you mean? Absolutely, they did.

MR. NIEDERBAUMER: Join the last objection.

Q. BY MR. CONNELLY: Do you find it hard to separate yourself from the -- from the role of a case manager as an Assistant Attorney General?

A. No, I did not.

MR. O'CONNOR: Form and foundation.

Q. BY MR. CONNELLY: How did you -- how did you maintain that separation?

MR. O'CONNOR: Form and foundation.

MR. NIEDERBAUMER: Join.

THE WITNESS: I only engaged in providing legal advice when it was requested or we had staffings or the case was being discussed in either of the chain of commands.

Q. BY MR. CONNELLY: And you never slipped into saying, This is the way I would do this if I was a case manager?

A. I did not.

MR. O'CONNOR: Form and foundation.

MR. NIEDERBAUMER: Join.

Q. BY MR. CONNELLY: You know who Paul Obika is, right?

A. Yes.

Q. Do you know Joelle Higby?

A. Yes.

Q. Bryan Adams?

A. Yes.

Q. Nick Long?

A. Yes.

Q. Jason Keith?

A. Yes.

Q. Shalom Jacobs?

A. Yes.

Q. Cheryl Kelly?

A. Yes.

working the case properly might cause an issue regarding the Department's reasonable efforts in the case?

MR. O'CONNOR: Form and foundation.

MR. NIEDERBAUMER: Join.

THE WITNESS: To the extent that I know about that, I believe it was raised by Mr. Wostrel in court hearings.

Q. BY MR. CONNELLY: Okay. And do you recall having a discussion or exchanging e-mails with Kirsten Wright about Mr. Obika's lack of effort on the case?

MR. O'CONNOR: Form and foundation.

MR. NIEDERBAUMER: Join.

THE WITNESS: I don't recall.

Q. BY MR. CONNELLY: And isn't it true that in the absence of an effective case manager, that you stepped in and directed some of the actions that a case manager should be taking?

MR. O'CONNOR: Form and foundation.

MR. NIEDERBAUMER: Join.

THE WITNESS: No, I did not.

Q. BY MR. CONNELLY: Do you recall Dr. Juliano being engaged to conduct a psychological evaluation of Aaron Wostrel?

A. Yes.
Q. And you communicated directly with Dr. Juliano about his evaluation, correct?
A. I believe only to prep him for trial.
Q. Did you provide Dr. Juliano records for him to review in conducting his evaluation?
A. In conducting his evaluation, no, because I believe that it happened before I even was on the case or shortly -- between the time that I moved and it happened, I don't think that I was on the case. So did I provide him documents to perform his evaluation? No.
Q. Okay. And did you play a role in determining what documentation should be sent or not sent to Dr. Juliano?
A. No.
Q. So there was no time where you directed the Department that they should not send favorable information received from Mr. Wostrel's attorneys to Dr. Juliano?
MR. O'CONNOR: Form and foundation.
MR. NIEDERBAUMER: Join.
MR. O'CONNOR: And don't answer to the extent it would violate privilege.
THE WITNESS: I had no involvement

whatsoever in providing information to Dr. Juliano.

Q. BY MR. CONNELLY: Okay. And the specific question was, did you ever tell the Department that they should not provide positive information to Dr. Juliano that had been submitted by Mr. Wostrel's lawyers?

MR. O'CONNOR: Same objections and instructions.

MR. NIEDERBAUMER: And join.

THE WITNESS: And, again, I was not involved at all.

Q. BY MR. CONNELLY: Okay. You communicated directly with Dr. Bennett in regards to the bonding assessment, right?

A. I don't recall if I did. I communicated with his staff to send everybody's information to him.

Q. And it's the Department's role to gather and send documentation to a professional like Dr. Bennett, isn't it?

MR. NIEDERBAUMER: Form and foundation.

MR. O'CONNOR: Join.

THE WITNESS: Not always, no.

Q. BY MR. CONNELLY: And in what instances is it not the Department's role to do that?

A. When there has been substantial disclosure or information that's been received by a subpoena for a trial and the AG's office has compiled and disclosed that, usually for a trial, then the AG would be the one file sharing everything in some instances, and did in this case.

Q. And is it your testimony that the bonding assessment was only arranged with Dr. Bennett as a -- as an outcome of the trial?

MR. NIEDERBAUMER: Form. Foundation.

MR. O'CONNOR: Join.

THE WITNESS: It was not. It was the recommendation of the first ICPC.

Q. BY MR. CONNELLY: Okay. So it was a recommendation that occurred in the course of the Department seeking an ICPC to put -- place the children with Father in Wyoming, right?

MR. O'CONNOR: Form and foundation.

MR. NIEDERBAUMER: Join.

THE WITNESS: Repeat your question. I'm sorry.

Q. BY MR. CONNELLY: The decision to request a bonding assessment from Dr. Bennett, according to your testimony, was -- came out of the ICPC process that was undertaken to determine whether Father's

home in Wyoming was a safe placement for the children, right?

MR. O'CONNOR: Form.

MR. NIEDERBAUMER: Join.

THE WITNESS: That's not accurate. That first ICPC was done on his wife's grandparents' home in Colorado. But I believe that when that came back, the Court ordered that, ordered both the bonding assessment and the psych eval.

MR. METZGER: We've been going about two and a half hours. What's your long-term projection here, Tom?

MR. CONNELLY: Okay. We'll take a break. We've been going for two hours and eight minutes.

(Exhibit 57 was marked for identification.)

(A break was taken at 12:23 p.m.)

Q. BY MR. CONNELLY: Ma'am, I'm going to show you what we've marked as Exhibit 57. This is an e-mail -- a long e-mail from Jodi Ostrom, May 22nd, 2018.

MR. METZGER: It's not from Jodi, but okay.

MR. CONNELLY: It is from Jodi.

MR. METZGER: Does it say it's to Jodi?

MR. CONNELLY: May 22nd, 2018, at 5 p.m., Jodi Ostrom wrote an e-mail.

MR. METZGER: Gotcha.

Q. BY MR. CONNELLY: And then, above that, on the first page, you see that Kirsten Wright responded and asked if she could forward the e-mail to the Assistant Attorney General who was recently assigned to the case.

Do you see that?

A. Yes.

Q. You were at least overseeing the case at this time in your mentoring role, correct?

A. Yes.

Q. Are you the Assistant Attorney General that she's speaking about having been recently assigned, or is that one of the others that you mentioned earlier?

MR. O'CONNOR: Form. Foundation.

THE WITNESS: I can't speculate as to who she was referring to.

MR. NIEDERBAUMER: Join.

Q. BY MR. CONNELLY: Who was assigned as the Assistant Attorney General in May of 2018?

A. Chelsea.

Q. Okay. And did you assign Monica or Candy

to the case in 2018?
A. Yes. But I don't recall when. But Chelsea was still there May of '18, so she would have been on it.
Q. Okay. But she's specifically referring to an Assistant Attorney General who has recently been assigned the case. So you don't recall whether that is a -- whether Monica or Candy had been assigned in May of 2018?
A. No, I don't recall. Well, I take that back. I said they were assigned in 2018, but I don't recall when.
Q. Right.
And so you don't know whether one of those two is who she's referring to?
A. Correct.
Q. And she may even be referring to you, correct?
A. It's speculative, but I don't know.
Q. Okay. And you notice that in the cc line, there aren't any counsel for Mr. Wostrel copied there. Is this a -- if she's going to send this to the other attorneys for the other parties, do you agree she should have been sending it to counsel for Mr. Wostrel?

MR. O'CONNOR: Form and foundation.
MR. NIEDERBAUMER: Form and foundation.
THE WITNESS: I can't answer that question. I don't know who Jessica Shook is, and I don't know what she should have done.
Q. BY MR. CONNELLY: Oh, let me ask you a question about the retention of records at the Attorney General's Office.
While you were an Assistant Attorney General working on this case, did you have a regular habit or routine of deleting e-mails or any other correspondence related to the case?
MR. NIEDERBAUMER: Form and foundation.
MR. O'CONNOR: Join.
THE WITNESS: A regular habit, no.
Q. BY MR. CONNELLY: Did you have -- was there a time when you purged your file regarding this case of any records?
A. Of any records? I can't say.
Q. Any e-mails or anything else?
A. I can't say.
Q. Okay. Was there a time where you deleted any e-mails --
A. I can't say.
Q. -- in relation to this case?

Do you know how the Attorney General's Office maintains your e-mail files?
A. I do not.
MR. CONNELLY: Let's mark this one.
(Exhibit 58 was marked for identification.)
Q. BY MR. CONNELLY: Do you know who Angela Syregelas is?
A. She was another Assistant Attorney General.
Q. Did you assign her to this case?
A. I did not.
Q. Did someone else assign her to the case?
A. I don't know.
Q. Was she working on the case when you were mentoring the assistants on the case?
A. I don't know.
Q. Well, you were mentoring the case in June of 2018, right?
A. Yes. But I wasn't Angela's mentor.
Q. So you didn't mentor everybody that was on the Wostrel case, only certain people?
MR. O'CONNOR: Form and foundation.
MR. NIEDERBAUMER: Join.
THE WITNESS: I mentored courtrooms. And

so I mentored whoever was in that courtroom at particular times on the case. And she was never in that courtroom or on any of my teams.

Q. BY MR. CONNELLY: But we clearly see her involved right now in this case on June 27th, 2018, right?

MR. O'CONNOR: Form. Foundation.

MR. NIEDERBAUMER: Join.

THE WITNESS: We see her sending an e-mail. I don't know what "involved" means.

Q. BY MR. CONNELLY: We see her sending an e-mail that says, "I did forward him the information," meaning Dr. Juliano, "and talked to Dr. Juliano."

Was it proper for an Assistant Attorney General to be having ex parte communications with professional engaged by the Department to provide services to the father?

MR. O'CONNOR: Form and foundation.

MR. NIEDERBAUMER: And misstates evidence.

THE WITNESS: I can't speak on the propriety of what she did. They were our witnesses. So did we communicate with them in the context of litigation preparing a witness for trial? Yes.

Q. BY MR. CONNELLY: Okay. And you agree with me, she doesn't mention anything about preparing Dr. Juliano for trial in this e-mail, does she?
MR. O'CONNOR: Form and foundation.
MR. NIEDERBAUMER: Join.
MR. O'CONNOR: Have you reviewed -- did -- can she --
MR. CONNELLY: She can take all the time she wants to read it.
MR. O'CONNOR: Read it before you answer any questions about substance.
THE WITNESS: Can you repeat your question? I'm sorry.
Q. BY MR. CONNELLY: In her e-mail, Angela doesn't say anything about preparing Dr. Juliano for trial, does she?
MR. O'CONNOR: Form and foundation.
MR. NIEDERBAUMER: Join.
THE WITNESS: No.
Q. BY MR. CONNELLY: And the trial didn't begin until October of 2018; isn't that right?
A. I believe so.
Q. And so is there any policy or protocol at the Attorney General's Office about contacting third-party professionals who have been engaged by

the Department to provide services to a parent?

MR. NIEDERBAUMER: Misstates evidence.

MR. O'CONNOR: Form and foundation.

THE WITNESS: Is there a policy and procedure at the AG's office?

Q. BY MR. CONNELLY: Yeah.

A. I don't know.

Q. Is it appropriate for the Attorney General's Office to be having ex parte communications with a third-party service provider --

MR. NIEDERBAUMER: Misstates evidence.

Q. BY MR. CONNELLY: -- when those communications are not in relation to preparing for trial?

MR. O'CONNOR: Form and foundation.

MR. NIEDERBAUMER: And misstates evidence.

THE WITNESS: Your question was broken up, so if you would repeat it for me.

MR. CONNELLY: Read it, please.

(The record was read by the court reporter as follows: Is it appropriate for the Attorney General's Office to be having ex parte communications when those communications are not in relation to preparing for trial?")

THE WITNESS: Honestly, I can't answer that question.

Q. BY MR. CONNELLY: Okay. Do you recall there coming a time when Dr. Thal was being contacted about conducting a psychological evaluation?

A. I don't specifically recall, no.

Q. You testified earlier that there was a time when there had been some agreement, quote, unquote, about the attorneys communicating and coordinating the services in the case. Am I characterizing that earlier testimony correctly?

A. No.

MR. NIEDERBAUMER: Form.

Q. BY MR. CONNELLY: You said there was some point in time that came when everyone agreed the attorneys should communicate service issues and things amongst themselves rather than communicating those things through the Department to, for instance, the father.

MR. O'CONNOR: Form.

Q. BY MR. CONNELLY: Is that right? What was the -- do I have -- Did I characterize that correctly?

MR. O'CONNOR: Form and foundation.

MR. NIEDERBAUMER: Join.

THE WITNESS: Not exactly. Because at first your question was what did everything mean? And I just gave you examples of what everything was. In terms of when I said everything going through attorneys, what did everything mean, and I gave you examples.

Q. BY MR. CONNELLY: Okay. So what was the --

First of all, you said there was no court order that pertained or you couldn't remember a court order. And I asked you whether there was an e-mail reaching this agreement amongst all the attorneys, and you couldn't remember that. And I haven't seen any in the record.

And so when in time did this agreement arise is really what I want to know right now?

MR. O'CONNOR: Form.

THE WITNESS: As I said before, I don't recall specifically when it did.

Q. BY MR. CONNELLY: You don't recall when it happened and you don't recall how it came about, right?

MR. O'CONNOR: Form.

MR. NIEDERBAUMER: Join.

THE WITNESS: Correct.

(Exhibit 59 was marked for identification.)
Q. BY MR. CONNELLY: Go ahead and take a look at 59 before I ask you any questions.
MR. O'CONNOR: Is there one for me?
MR. CONNELLY: I gave you one.
MR. O'CONNOR: Thank you.
Q. BY MR. CONNELLY: You've had a chance to review it, right?
A. Yes.
Q. Let's start with the question who is Sylvia Algiene, A-l-g-i-e-n-e?
A. She was a -- I don't know what her title was, but she was one of the people in the unit that actually does the scheduling and assignment of providers and services.
Q. Okay. So she's not actually an attorney herself?
A. Correct.
Q. Okay. And did you direct her to reach out to Dr. Thal to schedule psychologicals of Madeleine Wostrel and/or Aaron Wostrel?
A. Did I reach out to her?
Q. Yeah. Did you direct her to -- to schedule these appointments?

A. No.
Q. And can you tell me why the Department is scheduling psychological appointments and not -- or the -- the Attorney General's Office is scheduling these appointments and not the Department?
A. The Department did schedule the appointments.
Q. Well --
A. There was issues with the two -- the various appointments and whether or not they were going to be kept and by whom.
Q. So --
A. And I -- I was the intermediary to be telling information to Mr. Wostrel's attorney. There's reference to that in here.
Q. Right.
You see on the second page, Obika writes to you and says, Let Father's attorney know of the appointment, or let their attorney, meaning Aaron and Madeleine, I guess, right?
A. I don't know what his -- his use of the word "their" meant. Ms. Gillespie didn't represent Madeleine.
Q. Right. I don't think anybody represented Madeleine.

A. Right.
Q. I don't think Madeleine was a party. I don't know whether she was represented or not.
But Mr. Obika says, Please let their attorney know that they've missed their appointment, right?
A. Yes.
Q. And the only people who have appointments at this time with Dr. Thal are Madeleine and Aaron, right?
A. Correct.
Q. So we can assume that "their" means Madeleine and Aaron, correct? It's a logical assumption from the use of the English language in this sentence?
MR. O'CONNOR: Form.
THE WITNESS: I'm not going to speculate as to who Paul was referring to.
Q. BY MR. CONNELLY: Is it proper for you to be communicating this information to the father or should it be Mr. Obika?
MR. O'CONNOR: Form.
THE WITNESS: He clearly asked me to.
Q. BY MR. CONNELLY: That wasn't my question. I see that he's clearly asking you to.

A. Right.

Q. Is it your -- is it appropriately your role as an Assistant Attorney General to be communicating scheduling of psychological evaluations with the parent?

MR. O'CONNOR: Form.

THE WITNESS: It occurs often if -- particularly if my client requests it.

Q. BY MR. CONNELLY: Okay. And so the only reason you did so was because your client requested you to do so; is that right?

MR. METZGER: Form and foundation.

MR. O'CONNOR: Join.

MR. NIEDERBAUMER: Join.

THE WITNESS: I don't know if it was the only reason. It's a reason.

Q. BY MR. CONNELLY: And then you have a communication with Dr. Thal where you're giving him your view of events that have occurred in the case. Yet, you don't copy any of the other parties. Is it proper for you to be having that sort of communication with Dr. Thal, ex parte communication with Dr. Thal?

MR. O'CONNOR: Form and foundation.

MR. NIEDERBAUMER: Form and foundation.

Misstates evidence.

MR. CONNELLY: What's the basis for the misstates evidence objection you have made several times?

MR. NIEDERBAUMER: Yeah. I'll tell you what the basis is. It's the fact that you are assuming that these people are providing services to him. They're not providing services. They're providing a psychological evaluation.

MR. CONNELLY: Is that not a service?

MR. NIEDERBAUMER: Nope. That is an evaluation from which -- it's an expert report from which other decisions can be made and evidence presented. It is not a service. Service would come after that depending on what the psychological evaluation found.

MR. CONNELLY: Let's change the question to employ Mr. Niederbaumer's technical definition of the word services.

MR. NIEDERBAUMER: Let's make it the actual definition of services.

Q. BY MR. CONNELLY: Is it proper for you to be having a communication with a provider of psychological evaluations engaged by the Department without including the other parties in the

communication?

MR. NIEDERBAUMER: Form and foundation.

MR. O'CONNOR: Join.

THE WITNESS: Proper? Does it happen? Yes. And I believe it was appropriate.

Q. BY MR. CONNELLY: Okay. I didn't ask whether it happened. We know it happened. We see it happening.

So your response to whether it's proper or not is, yes, you believe it's -- it's appropriate for you to have these kind of ex parte communications with psychological -- psychologists who are providing evaluations of the father in the case?

MR. NIEDERBAUMER: Asked and answered.

MR. O'CONNOR: Join.

Q. BY MR. CONNELLY: Right?

A. It's not ex parte because it doesn't involve the Court at all. These are communications, one, in an effort to try and see if we can get one person to use an appointment if the other person is not going to.

And the other is, this would be in preparation for future litigation.

Q. So it's your testimony today that your e-mail to Dr. Thal on February 12th of 2019, where

you're giving him your view of events that have happened in the case, is preparing him for trial that isn't scheduled to occur until October of 2019; is that right?

MR. O'CONNOR: Form and foundation.

MR. NIEDERBAUMER: Join.

THE WITNESS: Yes.

Q. BY MR. CONNELLY: Okay. And you agree with me that nowhere in your communication to Dr. Thal and his assistant Tammy, do you say, Dr. Thal, I know you're going to be testifying in this matter or you may be testifying in this matter, so let's get you prepared for trial, right?

MR. O'CONNOR: Form and foundation.

MR. NIEDERBAUMER: Join.

THE WITNESS: Is that written? No.

Q. BY MR. CONNELLY: And all the information you're giving Dr. Thal here is for his use in conducting anticipated evaluations of Mr. Wostrel and Madeleine Wostrel, correct?

MR. O'CONNOR: Form and foundation.

MR. NIEDERBAUMER: Join.

THE WITNESS: I don't understand your question. Please rephrase it.

Q. BY MR. CONNELLY: None of the information

that you're conveying on this e-mail is couched in terms of what you're -- what Dr. Thal's testimony is expected to be at a trial, correct?

MR. O'CONNOR: Form and foundation.

MR. NIEDERBAUMER: Join.

THE WITNESS: Well, discussing the underlying facts that someone has failed to comply with court orders to give us past and current mental health information is in preparation for future litigation because that --

Q. BY MR. CONNELLY: And how --

A. Could I finish?

Q. Please do finish.

A. Because it impacts the evaluation itself and what he might later testify to.

And then with respect to Father, it's also talking about a deficiency in a prior evaluation.

So does that prepare him for testimony in a future anticipated litigation, it absolutely does.

Q. Dr. Thal -- Okay.

Dr. Thal would have no basis to testify about whether or not the father has complied with court orders; isn't that right?

MR. O'CONNOR: Form and foundation.

MR. NIEDERBAUMER: Join.
THE WITNESS: Well, that -- I don't know how to answer your question. That particular statement is not about Father. That's about Madeleine. That's not about Father.
Q. BY MR. CONNELLY: Okay. Well, regardless, Dr. Thal wouldn't have any basis for testifying about whether or not Madeleine Wostrel complied with court orders, right?
MR. NIEDERBAUMER: Form and foundation.
Q. BY MR. CONNELLY: And his testimony in that regard would be hearsay, wouldn't it, because it's coming from you, right?
MR. NIEDERBAUMER: Form and foundation.
Q. BY MR. CONNELLY: Let me withdraw those two questions because I know that -- well, I'll leave your answers because --
Do you expect a jury to believe that your testimony that this e-mail is in -- is meant to prepare Dr. Thal for possible testimony and not for his use in conducting the evaluations?
MR. O'CONNOR: Form and foundation.
MR. METZGER: I do. I expect a jury to believe that.
MR. NIEDERBAUMER: And I would also

expect it never to come into trial, because again this would go to claims that have already been dismissed for which she has absolute prosecutorial immunity for.

THE WITNESS: And my answer would be, yes, it's for the purpose of both. Every psychologist doing a psych eval in a dependency case is doing it for potential future litigation.

Q. BY MR. CONNELLY: So the purpose is not to advance the case plan of family reunification; it's to prepare for trial?

MR. O'CONNOR: Form and foundation.

Q. BY MR. CONNELLY: The purpose of an evaluation?

MR. NIEDERBAUMER: Join.

THE WITNESS: It's both.

Q. BY MR. CONNELLY: And so how do you separate out when you're giving information that is meant to be used to conduct the evaluation versus information that is meant to be preparing a witness for trial?

MR. O'CONNOR: Form and foundation.

MR. NIEDERBAUMER: Misstates evidence.

THE WITNESS: It doesn't have to be separated because it's both.

Q. BY MR. CONNELLY: Okay. And so if it's both, then it's not protected by attorney/client privilege. Well, we know that because we have it here in front of us.

But if it's both, then you're not only preparing the witness for trial, but you're also providing your -- you're also directing his conduct in the substantive issue of conducting an evaluation of the -- of the client, right?

MR. O'CONNOR: Form and foundation.

MR. NIEDERBAUMER: Join.

THE WITNESS: I'm absolutely not directing him how to do an evaluation. I'm providing him information.

Q. BY MR. CONNELLY: And you're providing him information to use in an evaluation and doing so without including the other parties in those communications, right?

MR. O'CONNOR: Form and foundation.

MR. NIEDERBAUMER: Join.

THE WITNESS: In this particular instance, yes.

Q. BY MR. CONNELLY: And there was no time where you informed the parties, the other parties that you had this communication with Dr. Thal,

correct?

MR. O'CONNOR: Form.

MR. NIEDERBAUMER: Join.

THE WITNESS: I don't believe that that's accurate. I believe that we specifically had the lengthy discussion about it in a court hearing, and that's how we came to the -- the scheduling scheme of the evaluation with Dr. Oakley.

Q. BY MR. CONNELLY: And you told everybody at that court hearing that you told Dr. Thal that Madeleine had failed to comply with court orders or give you names of her past and current mental health providers?

A. I don't specifically recall if that's -- that's exactly what I told them, but we discussed it at length in a court hearing.

Q. And you told the other parties in that court hearing and the Court that you told Dr. Thal that Father needed an updated evaluation because Dr. Juliano had no -- no records or information and recommended a new eval by someone else who has the additional information?

MR. O'CONNOR: Form.

MR. NIEDERBAUMER: Join.

THE WITNESS: That part was specifically

discussed in court.

Q. BY MR. CONNELLY: And --

A. Because the whole reason why he was doing a new evaluation, Dr. Juliano recommended it with someone who had all the information.

Q. Do you know -- did you know exactly what information Dr. Juliano actually had?

A. No. Because I wasn't part of that. It only came out during trial.

Q. Okay. And so you didn't go back and look at the time that you were mentoring the case to see what had actually been provided to Dr. Juliano before you started talking to Dr. Thal about what Dr. Juliano did or did not have, right?

MR. O'CONNOR: Form.

MR. NIEDERBAUMER: Join.

THE WITNESS: That's not accurate. Because at some point, DCS did provide their full packet -- well, actually, no, it was Dr. Juliano -- provided the full packet that he got from DCS as well as information I think that Dad had provided him. So we knew exactly what Dr. Juliano had after the fact, but not at the time.

Q. BY MR. CONNELLY: After what fact?

A. After he did the evaluation and after he

testified and testified that he didn't have all the information, so somebody else needed to do another evaluation. That was in the second trial.

Q. Right.

Well, in his report he suggested that he didn't have all the information, correct? So the Department and, by implication, the Attorney General's Office knew at the time of his report that he didn't have all the information he thought he needed, right?

MR. O'CONNOR: Form and foundation.

MR. NIEDERBAUMER: Join.

THE WITNESS: I don't know who knew what at that time. I knew about it when it came out at trial.

Q. BY MR. CONNELLY: Were you aware that after Dr. Juliano's report, that the Department sent out a referral package for a second evaluation?

A. I believe so, because it was Court-ordered.

Q. So now I'm really confused. You said a second ago that you didn't know that Dr. Juliano didn't have all the information until he testified to such at trial. But now you just said that you knew that the Department sent out a referral for an

additional evaluation after receiving Dr. Juliano's report.

So when is it that you knew?

A. That's not exactly what I said.

MR. O'CONNOR: Form.

THE WITNESS: They made the referral after Dr. Juliano's testimony, because they first went to him and said, Well, you do it. And he said, No.

Q. BY MR. CONNELLY: Dr. Juliano's report is dated June 4th of 2018, and he sent it to the parties on June 7th, 2018. And that was after the first dependency trial. The second dependency trial didn't begin until October 31st of 2018.

So is it your testimony that between June 7th of 2018, and October 31st of 2018, you had no idea that Dr. Juliano was saying he didn't receive all the information he should have and that an additional report should be done?

MR. O'CONNOR: Form and foundation.

MR. NIEDERBAUMER: Join.

THE WITNESS: I was not actively working the case at that point. These e-mails are from February of 2019, and Chelsea is still on them. And Chelsea was on it in that time frame that you're

talking about.

Q. BY MR. CONNELLY: These are e-mails to Dr. Thal, and we're talking about Dr. Juliano alerting the parties that he felt that he didn't have sufficient information and that an additional evaluation may be prudent. That was in June of 2018.

MR. O'CONNOR: Form. Foundation.

THE WITNESS: No.

Q. BY MR. CONNELLY: And I'm trying to pin down what it is that you understood because your testimony is conflicting on that point.

MR. O'CONNOR: Form.

THE WITNESS: It's not actually conflicting.

MR. NIEDERBAUMER: Join.

THE WITNESS: And I'll say it again. I didn't know when he was issued his report what he said, because I was not actively managing the case. This e-mail is from February 12th of 2019, after the second trial and after Juliano's testimony. I learned about it from Juliano's testimony.

Q. BY MR. CONNELLY: Okay. So you didn't review Juliano's report before the trial?

A. Of course I did it before the trial, but not when the period you're talking about.

Q. And so when you reviewed it in -- before trial, you didn't see that he was suggesting an additional evaluation may be prudent because he didn't think he had all the information he needed?

MR. O'CONNOR: Form.

MR. NIEDERBAUMER: Join.

THE WITNESS: I don't believe that that's in his written report. If it is, then I could be wrong. What happened during the trial is I asked him questions he said that he didn't feel comfortable answering or he didn't have the information to answer it, as did DeeAn.

So to both of us, he basically said, it sounds like it would be prudent to do another evaluation with someone who has all this information. And the Judge ordered it then.

Q. BY MR. CONNELLY: Okay. And then was it you who sent him the additional records?

A. Nothing was sent to Dr. Thal because Dr. Thal never did anything.

Q. Right. Right. Okay.

That's when there was discussion about engaging Dr. Oakley, right?

A. Correct.

Q. And you were driving those discussions

between the parties, right?
A. No.
MR. NIEDERBAUMER: Form.
Q. BY MR. CONNELLY: You didn't send out a rash of e-mails to -- to the counsel for -- for everyone except Mr. Wostrel strategizing about who the therapist should be to conduct the additional evaluation?
MR. O'CONNOR: Form and foundation.
THE WITNESS: No, I did not. I sent e-mails to everyone with a laundry list of all of the psychologists I could remember off the top of my head. And that's specifically what the e-mail says. Here's a list of ones that I have off the top of my head.
And then we were all supposed to confer, research them, pick one, whatever.
Q. BY MR. CONNELLY: Okay.
A. I never specifically identified, pick this person. Mr. Wostrel actually picked Dr. Oakley.
Q. The testimony at trial, at the second trial was that you had communicated with Dr. Juliano after he completed his evaluation; is that correct?
MR. O'CONNOR: Form and foundation.
MR. NIEDERBAUMER: Join.

exactly what I was speaking about earlier. It talks about me resending the file share because my office had sent everything by file share, including Father's records. And that was because we had them all from the trial.

And he apparently didn't get them, so we just had to resend it. And on the second page, Paul is asking us to do that.

Q. BY MR. CONNELLY: On the -- Right. On the second page, he's asking you to do that.

My question to you, though, is, is the standard way that these communications operate is between the professional and the Department, correct?

MR. O'CONNOR: Form.

MR. NIEDERBAUMER: Join.

THE WITNESS: It's not a standard way. This happens as well, as I've testified.

Q. BY MR. CONNELLY: Dr. Bennett was engaged by DCS. He wasn't engaged by the Attorney General's Office, right?

A. Correct.

Q. And he was engaged to provide services deemed necessary to the Department in making decisions for taking actions towards resolution of the case plan, correct?

A. No.

Q. And you don't know -- you can't sit here and testify today with any certainty that Jodie Cantor sent the file share documents to the other parties, right?

MR. O'CONNOR: Form.

MR. NIEDERBAUMER: Join.

THE WITNESS: 100 percent certainty, no.

Q. BY MR. CONNELLY: Now, the first page at the bottom, you write to Dr. Oakley. "Dr. Oakley, These are for your consideration in conducting Father's psych eval. I will also send you specific questions."

Do you see that?

A. Yes.

Q. And so were you formulating the specific questions for Dr. Oakley to respond to?

MR. NIEDERBAUMER: Form and foundation.

MR. O'CONNOR: Join.

THE WITNESS: In conjunction with my client, yes.

Q. BY MR. CONNELLY: So did you have a staffing with the Department about what the referral questions should be to Dr. Oakley?

MR. O'CONNOR: Form and foundation.

MR. NIEDERBAUMER: Form.

MR. O'CONNOR: And don't answer to the extent it violates attorney/client privilege.

THE WITNESS: That specifically goes into my advice.

Q. BY MR. CONNELLY: My question was, did you have a -- it's not asking for any advice that you may have given or not given. But did you have a staffing with the Department about the specific referral questions that should be asked of Dr. Oakley? Did a staffing occur?

MR. O'CONNOR: Same objection.

The broader question is, I think, okay to answer to the extent that it doesn't violate attorney/client privilege.

When you refer to specific substance, did they staff, did they discuss a specific substance, that's attorney/client privilege.

So did a staffing occur as a result of this meeting I think is circumstantial. I think she can answer that. So only the second question. I'm instructing her not to answer the first one.

Q. BY MR. CONNELLY: Well, did a staffing occur in regards to referral questions for Dr. Oakley?

MR. O'CONNOR: Same -- same -- form and foundation.

MR. NIEDERBAUMER: Join.

MR. O'CONNOR: If you can answer without violating attorney client, go ahead.

THE WITNESS: I did have a meeting about what questions to ask Dr. Oakley to address.

Q. BY MR. CONNELLY: Okay. And who was in that meeting?

A. I don't specifically recall.

Q. When did the meeting occur?

A. Before I would have sent her anything.

Q. How far in advance of you sending this e-mail would it have occurred?

A. I can't answer that.

Q. And then, at the top of the first page, you -- oh, at the bottom, you don't include any of the other parties in your correspondence with Dr. Oakley, correct?

A. Correct.

Q. And you don't include any other assistant AGs, correct?

A. Not on that e-mail, no.

Q. And at the top of the page, in your e-mail to Dr. Oakley, you don't include any of the

other parties, correct?
A. Correct.
Q. And you don't include any other assistant AGs, correct?
A. Correct.
Q. And in that e-mail, you say, "The parties are waiting to see the results of your evaluation to make ongoing decisions on this case."
Do you see that?
A. Yes.
Q. And what ongoing decisions were you referring to when you wrote this sentence?
A. The whole point of doing that evaluation was to figure out whether or not Mr. Wostrel had mental health. If he did, were there services he needed to do? If he did, how would it impact his parenting? And, essentially, like, would there be reunification at that point?
Would it be a little more time? Like, what needed to come from that evaluation. That was the whole point to doing it.
Someone with all of the information throughout the case was going to be reevaluating him and making recommendations.
Q. Okay. And so the recommendations were

geared towards what's going to be the resolution of the case, return home or some other -- some other permanency goal, right?

MR. O'CONNOR: Form.

THE WITNESS: That's not the purpose of her evaluation. It was more to get recommend --

Well, first, one, is there anything? And then, two, what recommendations do you have.

Q. BY MR. CONNELLY: "Is there anything," meaning does Mr. Wostrel have a mental health issue that would prevent him from being a safe parent?

A. Correct.

MR. NIEDERBAUMER: Form.

THE WITNESS: Sorry.

MR. CONNELLY: Does anybody need a break?

(A break was taken at 3:21 p.m.)

Q. BY MR. CONNELLY: This is Exhibit 68, Ms. Platter.

(Exhibit 68 was marked for identification.)

Q. BY MR. CONNELLY: Let me know when you've had a chance to look it over.

A. So these don't go together. I don't know if you knew that.

Q. I think they're together because they

approval on what to do. They would be seeking my legal advice on what to do.

Q. BY MR. CONNELLY: Okay. So they didn't need your approval about what to do --

MR. O'CONNOR: Form.

Q. BY MR. CONNELLY: -- would be your response, right?

MR. NIEDERBAUMER: Join.

THE WITNESS: Again, I don't know how to answer that question. It doesn't make sense to me.

Q. BY MR. CONNELLY: All right. Did you believe you had the authority to override or shape DCS's operational decisions in regards to this case?

MR. O'CONNOR: Form.

MR. NIEDERBAUMER: Join.

THE WITNESS: No, I did not.

Q. BY MR. CONNELLY: Did you ever tell DCS personnel what position they would take before they themselves announced their decision to you?

MR. O'CONNOR: Form.

THE WITNESS: I did not.

MR. NIEDERBAUMER: Join.

Q. BY MR. CONNELLY: Did you want to say something else?

A. I'm answering too fast for their

objections to get on the record.

Q. Did you ever give a directive in this case without first obtaining approval from the case manager or supervisor?

MR. O'CONNOR: Form and foundation.

MR. NIEDERBAUMER: Join.

THE WITNESS: That question doesn't make sense. I wouldn't give a directive without -- I wouldn't give a directive after seeking case manager's approval. If I gave a directive, it would be in the context of providing legal advice.

Q. BY MR. CONNELLY: So you don't believe you ever acted in a way that was more consistent with a case management -- excuse me.

And I'm not -- When I use the word "case management," I'm not talking in reference to a case manager.

Do you agree that you acted at times in a way more consistent with case management than with a conventional prosecuting attorney role?

MR. O'CONNOR: Form.

MR. NIEDERBAUMER: Join.

MR. O'CONNOR: Foundation as well.

MR. NIEDERBAUMER: Join all of it.

THE WITNESS: No, I did not.

Q. BY MR. CONNELLY: How do you distinguish between giving legal advice versus giving case management advice?

MR. O'CONNOR: Form.

MR. NIEDERBAUMER: Form.

THE WITNESS: One informs on the law.

Q. BY MR. CONNELLY: That would be legal advice?

A. Yes. And that's all I ever engaged in.

Q. And it was in the context of you being presented with a set of facts and different options that the Department could take in relation to those facts, right?

MR. O'CONNOR: Form.

MR. NIEDERBAUMER: Join.

THE WITNESS: That's conflating a ton of different decisions that they sought legal advice from me on.

Ultimately, if they needed the advice, they contacted me, I provided the advice, and they, you know, did whatever they did.

Q. BY MR. CONNELLY: And it's your testimony today that you were never directing the Department's conduct outside of the courtroom; is that right?

MR. NIEDERBAUMER: Asked and answered.

MR. O'CONNOR: Form.
THE WITNESS: I didn't direct their contact -- conduct. I provided legal advice on what to do to comply with orders.
Q. BY MR. CONNELLY: Okay. So --
A. That happens outside of the courtroom. You said nothing outside of the court.
Q. Okay. Well, you -- it's your testimony today that you never directed the Department's actions in relation to how to manage the dependency case in relation to services such as visits and counseling and therapists, correct?
MR. O'CONNOR: Form and foundation.
MR. NIEDERBAUMER: Join.
THE WITNESS: I provided legal advice on how to comply with court orders to manage the case. And in this case, almost everything involved a court order. This was an unusual case.
Q. BY MR. CONNELLY: There's always a court order in every dependency case regarding -- regarding visitations, correct?
A. A court order for, like, a minimum. There weren't specific orders -- there aren't specific orders for specific providers or whether it's therapeutic and who can supervise. Those aren't

exhibits as well.

(The proceedings concluded at 5:37 p.m.)

____________________________
BONNIE PLATTER