# Exhibit 1

**Declaration of Aaron Wostrel**

1. I am the legal father of four children: Austin, Serenity, Brooklyn, and Cheyenne.

2. My son Austin was born February 17, 2005. Austin is now 19. His mother is Rebekah Wostrel, my ex-wife.

3. We lived as a family in Wyoming until Rebekah and I separated in December 2008, when I filed for divorce. Our divorce was finalized in April 2010 when our son was five years old. We shared equal time with Austin after our divorce.

4. I filed a custody proceeding in WY on July 8, 2010 regarding my son, Austin. In late summer of 2011, Rebekah moved with Austin to Weirton, West Virginia without my consent. The custody matter was still pending when she moved across the country with our son.

5. Before they moved, the WY Court had appointed guardian ad litem Brandon W. Schneider.

6. The matter finally went to hearing on November 19, 2012. The Court, supported by the guardian ad litem, granted me primary custody of Austin.

7. My three daughters are plaintiffs in this matter: Serenity (born September 19, 2007), and twins Brooklyn and Cheyenne (born July 18, 2011). Their mother is Sheila Lay.

8. I met Sheila Lay in 2010 around the time of the finalization of my divorce with Rebekah. Serenity was a toddler at the time. Sheila's cousin was Austin's babysitter. Sheila and I slept together casually, and she got pregnant. When she told me she was pregnant I told her I'd take care of our child. She had a high risk pregnancy and was pregnant with twins, she was on bedrest for a month or so and stayed with me before giving birth to our twins at 27 weeks in July of 2011. The children were born prematurely.

9. With Sheila's full agreement the Wyoming courts affirmed me as Serenity's legal father, even with full acknowledgement that I am not her biological father. I am the biological father of the twins. Serenity is now 17. Brooklyn and Cheyenne are 13.

10. In the latter part of 2011, when the twins were small, Sheila and I traveled to Arizona

with our daughters to visit her family. While we were visiting the home of Sheila's father, Walter Lay, he bragged after he'd had a few drinks that he'd gotten his money through selling cocaine years ago at the Purple Sage Trailer Park when he lived in Wyoming. I knew that Walter Lay had lived for a number of years in Rock Springs, WY while he was still married to Sheila's mother, Joy Lay.

11. Sheila shared details with me about her troubled childhood, including the fact that her mother was a methamphetamine addict and that she had endured significant trauma during her teenage years because of drug abuse. She shared with me that her mother, Joy Lay, had introduced her to meth in her youth. However, at that time, Sheila presented as having gotten clean.

12. Public records show that Walter Lay purchased the compound where he lives in Laveen, Arizona in 2005. It's an almost 4,000 square-foot home on 1.1 acres that backs up to a preserve. Walter and Joy have three children: Eric, Sheila, and Steven. All three children who are now adults have been involved in significant criminal activity including drug charges and have all been incarcerated. Sheila Lay is currently serving a 10-year sentence in Arizona for her role in armed robbing and kidnapping. Joy Lay came to that marriage with two other older children (whom I believe Walter adopted) who also have extensive criminal histories.

13. When Sheila and I traveled in Arizona in 2011 to visit her family she physically attacked me in her Father's home in Laveen, AZ. Sheila assaulted me. I can't say for sure if Walter saw the assault, but he was aware of it. I immediately called 911. Walter had surveillance equipment in his home, and scrambled to destroy the surveillance tape that captured Sheila's attack of me. I immediately left the home with our daughters and went to Safford to be with relatives. I did not take Sheila with me.

14. I returned to Wyoming. My home and work were in Wyoming. I had a nanny that helped me with the girls because of my work schedule. I paid for Sheila to go to school to get her GED.

15. While we were in Arizona in late 2011 Sheila and I took the steps to put me on Serenity's birth certificate in AZ. Sheila told me that if anything happened to her, she didn't know who Serenity's biological father was (because Serenity was conceived when she was a teenager and having sex with a lot of different men), or to Sheila's own father, Walter Lay, because he had been involved in drugs. Sheila also told me I was a good father.

16. Sheila testified on my behalf at the November 2012 WY custody hearing in the matter in support of my obtaining primary custody of my son Austin. The guardian ad litem had met and interacted with Sheila. Sheila testified concerning her observations of my parenting skills and ability, stating I was the best father she'd ever seen.

17. When the WY court granted me primary custody of my son Austin in November 2012, I employed a nanny to help me with the children due to my work situation.

18. A little over a year later, on or about Friday, October 18, 2013, Sheila attacked me in my WY home and scared our children. Sheila hit me in the face and bloodied my nose. Serenity (then age 6) ran outside and found my son Austin (then age 8), who had been playing. Serenity told Austin about her Mother's aggression towards me and together the two children called 911. The police took Sheila to jail for a few days until her father paid her bail. Sheila blamed Austin for this and accused him of being "a snitch."

19. I immediately took protective action for myself and the children. I recognized Sheila was growing more impulsive and exhibiting behavioral issues. I obtained an order of protection and was granted temporary custody of our girls. I did not allow Sheila to ever reside at my home after that.

20. Furthermore, I was not familiar with drug culture, as I do not, nor have I ever used illegal substances. I have never been around drug users, so I was not familiar with their identifying traits. Although I did not know it at the time, it is possible Sheila may have relapsed on methamphetamine. I was not aware of any drug use on her part at the time of her assault on me, although I knew her mother had introduced her to drugs when she was younger. As far as I knew at the time, Sheila had quit her drug use, so any potential relapse was hidden.

21. After the domestic violence incident, Sheila was arrested and held in jail until October 21, 2013. Because of the three young girls and the nature of the allegations against Sheila, Laura Jackson was appointed as guardian ad litem for the girls in 2013. The Court granted me primary custody of our girls.

22. After the incident in October 2013, Sheila was supported financially by her father, Walter Lay, who resided in Laveen, Arizona. Walter obtained and paid for Wyoming legal counsel for Sheila.

23. At the time of the October 2013 incident, I was working for Halliburton as a directional driller, and had worked for them for a few years. Around that time, there were a number of

nannies who assisted me with my girls and Austin. Lindsey Egg also assisted in the care of the girls while I was working for four weeks at a time followed by two weeks off. Lindsey later prepared a sworn declaration in 2020 which contains helpful information about the girls and the situation prior to Sheila moving to Arizona from Wyoming in May 2015 with our girls.

24. On April 11, 2014, the WY court recognized me as Serenity's legal parent even though I am not her biological father. We agreed to share custody. In case # FV2013-305, the WY Court affirmed that I would have primary custody and alternate care on a weekly basis.

25. Sheila pursued child support from me in WY around the time I lost my job with Halliburton. Her attorney, who was paid for by her father, used my Halliburton income in getting the Court to set my child support obligation. I was ordered to pay child support of approximately $3,700 per month, which became impossible to sustain.

26. I struggled financially because I had been laid off as a directional driller in the oil fields. My commitment to my children has never wavered and I continued to pay my full child support. I never missed a child support payment even though I was compelled to tap into my retirement funds to meet my child support obligation, I was deeply financially strapped. I was living out of the garage of my home and renting out the home itself in order to make the mortgage payment.

27. Because I was financially struggling in October 2014, as a protective step for my son Austin, I communicated with his mother Rebekah and made arrangements for Austin to temporarily reside with her in WV in order to get him out of the difficult situation until the circumstances improved.

28. I was clear in making arrangements with Austin's mother Rebekah that this arrangement was temporary, and I did not intend for our son to permanently reside in West Virginia while I resided in Wyoming. Despite the differences Rebekah and I have, she does love our son and I knew this was the safest place for him while I got things sorted. This was an informal agreement, and I regret not formalizing it, as that decision later came back to haunt me.

29. Meanwhile, Sheila was able to demonstrate to the satisfaction of the guardian ad litem and the WY court that she was safe with our girls. In the spring of 2015, Sheila told me if she was able to move to Arizona with our girls and work for her father in his business, my child support could be reduced. I reluctantly agreed because I could see no alternative, as

I was drowning financially.

30. On May 14, 2015, I reluctantly entered into a stipulated agreement agreeing that Sheila could move from Wyoming with our daughters to Arizona. This agreement was approved by the guardian ad litem and the WY court. I understood that Sheila would be working for her father, Walter Lay's company Allied Machine Works. She was to earn $1,618.51 per month. She demanded to be able to claim all three children on her taxes every year, which I agreed to. I was making $3,148.28 per month at my new job, which was less than my entire previous child support obligation. The new child support based off of my actual income at the time would have been slightly over $1,000 per month, but I also agreed to an upward deviation to $1,200 in monthly child support, which I paid consistently. I felt I had no other alternative but to agree to Sheila's terms.

31. The order granted Sheila sole custody but provided me with unsupervised parenting time with my girls in the state of Arizona. I agreed to the out-of-state visitation because they were too young to fly alone. At that time, our twins were a little over 3 1/2 years old and Serenity was age 7. The order also reaffirmed my status as legal father to all three girls.

32. I traveled from Wyoming to Arizona and visited my girls over Christmas break in 2015 and spent unsupervised parenting time with my daughters during that holiday season.

33. Shortly after my visit with my daughters in Arizona, while my WY home was still being rented out, I began residing in Colorado for my new job. I moved in with my acquaintance Madelynn Ries to share expenses given my financial situation, and we eventually married nine months later in September 2016. Madelynn is a good woman and was very supportive of my quest to be a good father. My son Austin was with me for the summer of 2016 and began fifth grade in CO that fall and he resided with me until late February 2017. His mother had again begun custody litigation and was seeking to move him back to WV.

34. After my daughters relocated to Arizona with Sheila in May 2015, I would regularly call them on their mother's cell phone and speak with them. Sometime in the mid-summer of 2016, I could no longer get through to my daughters on Sheila's phone. I would, however, occasionally receive a telephone call from Serenity, who would call me on whatever phone she had access to at the time. I never abandoned my children as DCS would later allege in their dependency petition. I also always paid my child support in full.

35. Meanwhile, Austin's mother Rebekah did not honor the temporary nature of our 2014 verbal agreement and I found myself fighting an expensive custody battle with her in West

Virginia. Madelynn and I were unable to visit the girls for Christmas in AZ in 2016 because we were strapped for cash. I was still getting back on my feet after having been unemployed and having to pay for attorney's fees for the WV custody battle.

36. I was surprised when my daughters' maternal grandfather Walter Lay called my home on the evening of 1/18/17, telling me to "come get my children." He told me Sheila had gotten herself in trouble and was probably going to prison. He gave me no further details and did not tell me DCS was involved with my children or the details of what he knew about Sheila's legal troubles. He did not tell me Sheila had stopped working for his company six months prior.

37. That same evening, I immediately followed up out of concern for my children. The Peoria police were called to do a welfare check on the girls at their Mother's home. I received information back on 1/19/17 at 12:16 AM that the Peoria Police had done a welfare check at Sheila's home. She acknowledged to the police she had recently changed her phone number so I couldn't get in touch with her. Although the police noticed Sheila had been drinking, they did not express to me that the concern was significant enough to call DCS. I was also informed there was no warrant for Sheila's arrest. The police did not give me the sense that the situation was as Walter described or that I would be successful if I came to AZ to get my children.

38. Later that day, I needed to board a plane to go to WV for the custody trial for Austin which took place there on 1/20/17. (The WV court ruled on 2/14/17 with the disappointing order that our son would go back to reside with his Mother during the school year and I needed to return him to her care within two weeks. Given the need for a long-distance parenting plan, Austin would be in my care for an extended summertime period and other times when he was on break from school.)

39. Neither Walter nor DCS informed me that DCS had interviewed my children at their school on 1/18/17 (because of a hotline call they received on 1/12/17 from law enforcement about a raid on Sheila's home where drug paraphernalia, numerous guns and ammunition were found within the reach of my girls). If I had been advised of this alarming information, I would have immediately contacted DCS in order to obtain their cooperation in getting my girls back in my care. Remarkably, I was also not informed of the team decision-making meeting (TDM) that occurred on 1/27/17, either by Walter Lay, Sheila Lay, or DCS. Had I received this information, I would have participated in the TDM and provided all necessary information for DCS to facilitate my children being placed in my immediate care.

40. Instead, without my knowledge, AZ DCS served a temporary custody notice (TCN) on Sheila on 1/30/17, placing my girls with their grandfather, Walter Lay.

41. I also belatedly learned that on 2/2/17, DCS filed a dependency petition regarding my children which contained false allegations that I abandoned and neglected my children. This petition was filed without DCS ever contacting me. It also alleged there was no child support order established and that I was not paying child support. DCS' allegations about me were untrue and could have been easily verified as untrue had DCS spoken with me and included me in their investigation. DCS could have easily obtained my contact information from Walter and Sheila. My name and phone number were also easily accessible online. In fact, I have since become aware that Sheila told DCS during her interview on 1/23/17 that I lived in Wyoming and there were no restrictions on my visitation with my children.

42. I now recognize that Walter Lay only called me to come pick up my children on 1/18/17 because he knew enough about Sheila's troubles that he was likely afraid his grandchildren would be placed in foster care. He was aware of the 1/12/17 police raid on his daughter Sheila's home, the considerable trouble his daughter was in, and that DCS had interviewed my girls at their school on 1/18/17. He was not aware that he would be able to be their placement. When he called me later that day, Walter Lay only provided me with cursory information, and withheld critical information from me that was damaging to his daughter.

43. Had Walter and DCS timely shared with me the information they had about my children's welfare, to wit,

- that DCS was aware Sheila's home was raided by the police on 1/12/17 arising from a warrant for kidnapping and armed robbery;
- that during that search, drug paraphernalia, many weapons, and ammunition were observed within reach of my children;
- that DCS was aware the Sheila was in an abusive relationship with David Rojas-Navarrete and the children had witnessed multiple instances of domestic violence;
- that Sheila was abusing alcohol and was drinking and driving;
- that Sheila submitted to a hair follicle test as part of DCS' January 2017 investigation, and that she tested positive for methamphetamine on 1/24/17;
- and that Sheila had left her employment with her father six months prior to the police raid on her home;

I would have had the necessary and vital information to file an emergency custody order in the WY family court, and my children would never have been taken into the State's care.

44. Per the May 2015 stipulated custody agreement from WY, I was entitled to unrestricted visitation with my children. Had I been timely provided with the above key information, I would have immediately sought an emergency family court order of custody to prevent my children from being taken into the state's care. DCS should have facilitated me obtaining custody in a family court due to their concerns about Sheila. The children should have been placed in my care while I obtained the emergency court order, but instead DCS never contacted me at all prior to rushing straight to a dependency.

45. After Walter finally informed me my children had been taken into DCS' care and placed with him, and that a dependency petition had been filed, I immediately called DCS on 2/8/17. When I called DCS, I was not provided with all the details, as stated above. DCS told me it was "a process" and I would need to cooperate with them. I told them I wanted to cooperate with them in order to have my children returned to my care. I was not informed that my children had participated in rapid response assessments, nor was I timely provided with the results. I was also not consulted regarding my children receiving counseling, nor was I provided with timely information regarding the same. In fact, I was left with the sense that I could not come to AZ to see them until DCS gave me permission.

46. I was informed that in early May 2017, my daughter Serenity was hospitalized in a behavioral health unit. At this point, DCS gave me explicit permission to come to AZ. After receiving permission, Madelynn and I made immediate arrangements a few hours later to travel to AZ to visit with Serenity and her sisters. We also made arrangements for Austin to come from WV to visit the girls with us. During this important trip, we were allowed to have an unsupervised weekend with my daughters. Our family had a wonderful visit together and there are photographs that demonstrate the happiness of the children's interactions with Madelynn and myself. When it was time for us to fly back to CO, Serenity cried at the airport, as she wanted to get on the plane and leave with us. I was very sad to have to leave my daughters once again as well.

47. During the visit, I learned that the reason Serenity was hospitalized with severe emotional distress was because the Lays revealed to her that I wasn't her "real" father. I determined that this emotionally shattered my daughter Serenity, given her already fragile state due to the trauma she had experienced in her Mother's care.

48. During the May 2017 visit, while my wife and I were at Walter Lay's home, he offered me a job in Arizona. Walter told me the job would pay more than six figures. I declined to work for Walter because I believed at least historically his business was not above board and did

not want to involve myself in anything that might be potentially sketchy. I believe Walter offered me the job because he wanted to ensure his granddaughters and I remained under his control.

49. When I lived in Rock Springs, WY, Walter's elderly father also lived there and requested that I serve as his life alert contact. One indication that Walter trusted me is that he did not interfere with his elderly father's request. There was more than one occasion when I was remote and received a life alert and had to facilitate services because Walter's father had fallen. This occurred before Walter's aging father moved into Walter's home, which occurred around the same time he took custody of my daughters in 2017.

50. I became very frustrated with DCS due to their unwarranted interference in my relationship with my daughters and repeated violation of the Court's orders. For instance, early in the case, the Court approved me to have unsupervised telephonic contact with my daughters, but DCS tried to compel me to have supervised phone contact instead. Later, I was to have at least weekly calls with my girls, but DCS did not ensure these calls occurred. I was deeply disturbed that DCS did not follow their own rules and policies. The Lays hired private counsel to represent them, intervened in the dependency, and aligned themselves with DCS to prevent me from taking custody of the girls. The girls were kept from returning home to Madelynn and me for three long years, during which time we suffered a protracted legal battle, and I incurred significant legal fees in my efforts to get my daughters back and prevent the matter from moving to severance of my parental rights. Apart from the one unsupervised visit in May 2017, the State only allowed me intermittent supervised visits with my daughters when I was able to travel to Arizona. Despite the significant expense of travelling back and forth to Arizona, my visits were limited to just a few hours at a time.

51. Early in the dependency matter in May 2017, the State filed a Motion to Dismiss after the girls had been with the Lays for two and a half months. It was the State's position that the dependency should be dismissed and they would facilitate me getting legal custody orders to bring the girls home. This was before the Lays hired private counsel, submitted their Motion to Intervene, and aligned with DCS. However, Kirsten Wright, Serenity's guardian ad litem, stepped in to oppose the State's motion and intent to return the children to me. I believe she did so at the Lays' urging. Even though in May 2017, DCS had sought to remedy their error and do the right thing, their case reports contained many false and highly prejudicial statements alleging that I neglected and abandoned my children and that I had foreknowledge of Sheila's meth abuse.

52. After the May 2017 visit, DCS never again permitted me to have unsupervised time with my children until the AZ Court of Appeals mandated they return them to me in April 2020. I was promised weekly phone calls with my daughters which rarely happened due to the Lays' interference. The Lays made it known they initially wanted the girls returned to Sheila, then after she was sentenced to ten years in prison, that they wanted the children to stay with them. Attempting to communicate with my children while they were in this hostile environment was very challenging.

53. Sheila had already legally stipulated to the State's allegations that she was unfit to parent. An evidentiary hearing was held on 8/2/2017 because I contested the dependency. My court-appointed attorney hadn't subpoenaed any of the witnesses I had told her about, nor had she prepared for my case at all, so at the beginning of the trial I fired her.

54. I'm not a lawyer and realized I was at a disadvantage and the Court refused to continue the hearing, so I was compelled to represent myself. I couldn't articulate all of the relevant facts set forth herein, in part because I didn't yet have all the information provided above, including dates and the correct timing of events. Shortly after the hearing, because I had been denied due process, the Court incorrectly found the guardian ad litem had proven the grounds of dependency as to me.

55. I appealed the decision and it was reversed because the Court of Appeals found there was a due process violation -- I should have been able to call Sheila as a witness and was not able to do so. I then hired private counsel. After I hired private counsel, DCS was also seeking a concurrent plan of severance and adoption by the Lays. At the State's request, I did a psych evaluation with Dr. Daniel Juliano. He took no issue with my ability to parent and indicated that my anger was focused on the government's wrongful involvement with my family.

56. There was a second multi-day dependency trial in late 2018. The Lays' private attorney, two attorneys for the State, and guardian ad litem Kirsten Wright all advocated that I was not fit to parent my children. I was made to be the enemy and the trial turned into a character assassination of my wife and me. The Court went along with the majority of voices and once again incorrectly found a dependency. I again appealed the decision.

57. In September 2019, the Court of Appeals again reversed the Juvenile Court's decision. In that decision, the Court of Appeals stated:

> *A Child is not entitled to a perfect parent or even a good one. What a child is entitled to is a parent that does not 'engage in conduct that is unlawful or to abuse or neglect a child in violation of the laws of the State.'* ARS 1-602(B) *We recognize that a parent 'has an inalienable right to parent and [his or her] child without obstruction or interference from this State.'* Donald W., 247 ARIZ. @ 21.

My children should have been promptly returned to my care. Instead, DCS filed a Petition of Review of the Court of Appeals' decision to the AZ Supreme Court which further delayed the return of my children. For well over a year while the appeal was pending, DCS continued to interfere with my phone calls and visits, and continued to require that I be supervised during the latter. My children and my relationship with them was harmed by this further unnecessary delay.

58. Finally, in March 2020, the AZ Supreme Court declined to accept DCS' Petition for Review, and a Mandate was issued for the return of my children. However, Kirsten Wright, acting in concert with the Lays, immediately filed another dependency petition. There were hearings held in AZ on 3/30/20 and 4/1/20. The Wyoming Court also weighed in and affirmed it continued to have original jurisdiction regarding custody issues for my children. My attorneys filed a special action with the AZ Supreme Court which resulted in a very clear order that my daughters were to be immediately returned to my care, which finally happened on 4/14/20. Madelynn and I returned with the girls to WY.

59. Things were okay for a few weeks, but the depth of the girls' trauma from their unnecessary and unwarranted three-year separation and being held in an environment hostile to me soon became apparent. The girls began to act out within a month or so. Serenity, Brooklyn and Cheyenne engaged in significant emotional dysregulation. The girls tried to compete for affection, often in ways that were inappropriate for a father-daughter relationship. All my girls have significant boundary issues with relationships. I was shocked to see them banging their heads against the wall. It has taken four years to try to help make these behaviors. I worry that there will be lifelong ramifications.

60. Serenity in particular was extremely violent with Madelynn, physically attacking her and even leaving scars. The final straw came when Madelynn discovered that Serenity had been sneaking into our bedroom to record video on her phone of Madelynn and me sleeping. We took her in for psychiatric care and she received 8 months of inpatient treatment after that.

61. Unfortunately, the stress and strain were too much for Madelynn. By July 2020, she had mentally checked out. She didn't want to be around the house or the kids anymore. She

finally separated in February 2021 and thereafter divorced. Even so, we remain on amicable terms, and she still cares about the girls.

62. My son Austin returned to live with me for his sophomore and junior years of high school (2022-2023). Austin lived with me from age 17 until he turned 18. His girlfriend lived with us as well for about six months. He accelerated his high school graduation to go to college with her, as she is a little older than him. They moved out together when he turned 18 and are now living together. Austin is now doing HVAC in WV.

63. I'm very concerned for my daughter, Serenity. She has suffered repeated and significant trauma, and disclosed to Madelynn and me that she was exposed to her uncles' criminal behavior while she lived with the Lays. She had at least one additional in-patient hospital stay before she returned to my care. Serenity manifests serious behavioral issues. She ran away from my home in 2023 for approximately two months. She turned herself in to the high school and returning home to her sisters and me. She behaved for a few months, but I later learned she was selling drugs at the school. She ran away again in June 2024. She is now staying with Lindsey Egg in Texas with my permission.

64. On or about September 15, 2024, Brooklyn and Cheyenne were having a scheduled phone call with Sheila, who is still incarcerated. I overheard Sheila tell the girls she was going to "take me out." I immediately ended the call.

65. The trauma that my children, my ex-wife Madelynn, and I were compelled to endure was completely unnecessary and could have been prevented if the State and Walter Lay had given me the appropriate information in a timely manner. The fallout for my children breaks my heart. I was unable to protect them from the repercussions of the State's failures and Walter Lay's intentional and unwarranted interference, despite doing everything in my power to secure their return. I believe the damage done to my children from our prolonged and unnecessary separation was also very harmful to my marriage to Madelynn.

I declare under penalty of perjury that the foregoing is true and correct.

Signed on the 9th day of January, 2025.

Aaron Wostrel

Aaron Thomas Wostrel

# Wostrel Declaration- 1.9.25

Final Audit Report 2025-01-09

| | |
|---|---|
| Created: | 2025-01-09 |
| By: | DeeAn Gillespie (astrub@gillaw.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAOs-zl5iZTagWu5U0LLCEHT4z49ihgn_K |

## "Wostrel Declaration- 1.9.25" History

Document created by DeeAn Gillespie (astrub@gillaw.com)
2025-01-09 - 11:28:18 PM GMT

Document emailed to Aaron Wostrel (aaronwostrel@gmail.com) for signature
2025-01-09 - 11:28:22 PM GMT

Email viewed by Aaron Wostrel (aaronwostrel@gmail.com)
2025-01-09 - 11:28:37 PM GMT

Document e-signed by Aaron Wostrel (aaronwostrel@gmail.com)
Signature Date: 2025-01-09 - 11:29:16 PM GMT - Time Source: server

Agreement completed.
2025-01-09 - 11:29:16 PM GMT