# Exhibit 27

No. 1 CA-JV 19-0039
ARIZONA COURT OF APPEALS DIVISION ONE

# Aaron W. v. Dep't of Child Safety

Decided Sep 26, 2019

No. 1 CA-JV 19-0039

09-26-2019

AARON W., Appellant, v. DEPARTMENT OF CHILD SAFETY, S.W., B.W., C.W., Appellees.

COUNSEL Gillespie, Shields, Goldfarb, Taylor & Houk, Mesa By DeeAn Gillespie Strub, Mark A. Sheilds, April Maxwell, and Kristina Reeves (argued) Counsel for Appellant Arizona Attorney General's Office, Phoenix By JoAnn Falgout Counsel for the Department of Child Services

---

McMURDIE, Judge

NOTICE: NOT FOR OFFICIAL PUBLICATION. UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL AND MAY BE CITED ONLY AS AUTHORIZED BY RULE. Appeal from the Superior Court in Maricopa County
No. JD33765
The Honorable Michael D. Gordon, Judge

## VACATED AND REMANDED

COUNSEL Gillespie, Shields, Goldfarb, Taylor & Houk, Mesa
By DeeAn Gillespie Strub, Mark A. Sheilds, April Maxwell, and Kristina
Reeves (argued)
*Counsel for Appellant* Arizona Attorney General's Office, Phoenix
By JoAnn Falgout
2 *Counsel for the Department of Child Services* *2

## MEMORANDUM DECISION

Judge Paul J. McMurdie delivered the decision of the Court, in which Presiding Judge Samuel A. Thumma and Judge Jennifer M. Perkins joined. **McMURDIE**, Judge:

**¶1** Aaron W. ("Father") appeals the juvenile court's order adjudicating his three children dependent based on Father's prior failure to protect his children from exposure to substance abuse and domestic violence while in their mother's care. For the following reasons, we vacate the juvenile court dependency order and remand to dismiss the dependency.

## FACTS AND PROCEDURAL BACKGROUND [1]

1 This case contains a lengthy record with conflicting accounts. We defer to the juvenile court's findings in the dependency order and resolve other factual conflicts in favor of sustaining the juvenile court's ruling, so long as it is supported by reasonable evidence. *See Alma S. v. DCS*, 245 Ariz. 146, 151, ¶ 18 (2018); *see also Minh T. v. ADES*, 202 Ariz. 76, 78-79, ¶ 9 (App. 2001) (a finding that lacks "reasonable evidence" is erroneous). The non-material facts are presented in the manner most supported by the record. We did not consider evidence that the court specifically excluded but ultimately admitted in a catchall voluminous exhibit (exhibit 130).

**¶2** Father and Sheila L. ("Mother") are the parents of twelve-year-old Serenity and eight-year-old twins Brooklyn and Cheyenne. Mother, Father, and the children lived in Wyoming until 2015

when a Wyoming court granted Mother sole legal and primary physical custody of the children, and she then moved to Arizona. Father visited the children in December 2015, and he continued to have telephone contact with them until June 2016 when Mother changed her phone number.

## THE FIRST DEPENDENCY PROCEEDINGS

**¶3** On January 12, 2017, the police executed a search warrant for kidnapping and armed robbery on Mother's home, which she shared with her boyfriend. The police found nine-year-old
3 Serenity home alone sick *3 from school and reported that she did not seem fearful of being home by herself. The police described the house as dirty, and noted there were loaded guns and drug paraphernalia within reach of the children. Mother was located picking up the twins from school, and she appeared intoxicated. The police notified the Department of Child Safety ("DCS"), but DCS did not remove the children from the home at that time.

**¶4** DCS interviewed the children on January 18, 2017. They stated they were well-cared-for and denied any abuse. DCS reported that Mother appeared to be meeting the basic needs of the children. Later that evening, the children's maternal grandfather ("Grandfather") called Father and told him that the police executed a search warrant on Mother's home, and he needed to come and get the children. Father immediately called the police to conduct a welfare check and mentioned Mother had a substance abuse history. The police visited Mother's home and later informed Father that Mother may have been intoxicated, but that they would take no further action. After the welfare check, Mother called Father and he accused her of relapsing. Mother stated that she would willingly take a drug test, but Father was unconvinced. Nonetheless, Father did not pursue his suspicion.

**¶5** On January 23, 2017, DCS interviewed Mother. Mother told DCS that Father had a custody order in place in Wyoming without any restrictions but that Father had not been involved with the children for a year and a half. She admitted that domestic violence had occurred in her home in Arizona and agreed to submit to a drug test, which came back positive for methamphetamine. Nevertheless, the children remained in Mother's home. On January 30, 2017, three days after Mother failed to attend a scheduled meeting with DCS, the agency took custody of the children and placed them with Grandfather and his girlfriend Jodi (collectively "Placement"). Without attempting to contact Father, DCS petitioned for an out-of-home dependency on February 2, 2017, alleging Father neglected the children by abandoning them.

**¶6** On February 8, 2017, Grandfather notified Father that the children were in his care. Father contacted DCS stating that he and his wife were willing and able to care for the children and would like to be contacted as soon as possible. The next day Father telephonically appeared at the preliminary protective hearing where he denied the allegations in the petition and the court scheduled a contested dependency trial for May
4 26, *4 2017. DCS agreed to submit a request through the Interstate Compact on the Placement of Children ("ICPC") for possible placement with Father.[2]

[2] The ICPC facilitates cooperation between states in the placement and monitoring of dependent children. *See* Ariz. Rev. Stat. § 8-548. In *Donald W. v. DCS*, we held that an "ICPC is not required when evidence does not support a dependency as to the out-of-state parent." 247 Ariz. 9, 21 ¶ 38 (App. 2019). A growing number of states have concluded that the ICPC does not apply to placement with a parent, holding that the ICPC Regulations for placing a child with a parent "are invalid because they impermissibly expand the scope of [the ICPC]" beyond the scope given by the

legislature. *In re Emoni W.*, 48 A.3d 1, 10 (Conn. 2012); *In re R.S.*, 2019 WL 4052316, at *5, n.15 (Md. Ct. Spec. App. Aug. 28, 2019) ("Lest there be any confusion, our reading of the plain language of the ICPC, ['placement in foster care or as preliminary to a possible adoption,'] shows that it does not apply to parental placements *regardless* of whether allegations of abuse or neglect have been sustained as to the out-of-state parent . . . ."); *see also ICPC Regulations*, American Public Human Services Association, https://aphsa.org/OE/AAICPC/ICPC_Regulations.aspx (last visited Sept. 18, 2019).

**¶7** On February 10, 2017, DCS noted that Father again called "frustrated and upset that his phone calls and emails to the manager and supervisor had not been returned." He stated he had joint custody of the children, and he would like to have them transitioned into his care "as soon as possible." Father was unable to get in contact with either his court-appointed attorney or the assigned DCS case manager. A different case manager sent Father an introductory letter by mail on February 21, 2017, but before receiving the message Father contacted her to introduce himself and coordinate moving the children into his care.

**¶8** The case manager told Father that he would first need to submit to drug testing, a background investigation, and the ICPC home study evaluation. Father completed drug testing the next day—at his own expense—and agreed to participate in the ICPC home study. Father was cooperative to an extent, but he refused to participate in some services because, as he was not accused of any wrongdoing, he felt the services did not apply to him. Father's attitude created tension between him and those involved with the case.

**¶9** One of the conflicts concerned Father's state of residence for the ICPC. Father reported that he
5 and his wife lived in an apartment in *5 Colorado close to his work and that he owned a larger home in Wyoming that he was renting out. He told the case manager that he and his wife would not renew their lease for the Colorado apartment as they planned to move into his wife's grandparent's Colorado home to assist with caring for her grandfather, who had Parkinson's disease. Once the children were returned to him, Father stated that they would all move into the larger Wyoming home. The case manager informed him that if he intended to live in Colorado "*for less than a year*, [DCS] would not request the ICPC until [he was] completely moved in where [he] plan[ned] to remain." (Emphasis added.) Father explained that it was unreasonable to expect him to take on the added expenses of moving and living in the larger home along with the child support obligation he continued paying until the girls were in his care. He asked DCS to submit the ICPC for Colorado and advised that after the ICPC was complete, where the family lived "should not be the concern of [DCS]."

**¶10** Around the same time, Placement stopped facilitating video calls with Father because Placement "was made to feel uncomfortable." This occurred after a call where Father told the girls that when he came to pick them up, he would rent an RV for them to drive back home as "a fun family trip." Placement reported the conversation to DCS. When DCS reported Placement's concerns to Father, he indicated that he thought Jodi was attempting to control what he was able to discuss with his daughters. The case manager explained that DCS's guidelines prohibited parents from discussing the case with the children and advised that Placement "does not have to take the responsibility to supervise contact between parents and children." She continued that because "it seems to have become a problem," DCS "is now requiring that all communication go through [DCS]." She informed Father that he could "write letters to the children, addressed to [DCS], and [she would] ensure that those letters g[ot] to the girls." And she "c[ould] request phone supervision

on calls; however, that may take some time to set up depending on our Case Aid (sic) schedules." Father responded:

> I understand everything that you have put forth. While I certainly disagree with points, it is clear that [DCS] is placed in a position of absolute authority without regard to the rights of parents or children. This appears to be more of a matter of state legislation than it does with the decisions of the department.

**¶11** A month later, in April 2017, after multiple emails to the case manager, Father reported that he 6 was still not receiving phone call *6 visitation. The case manager explained it was because the case aide did not receive Father's acknowledgment of the visitation guidelines, and he would not receive visitations until he agreed. Father asserted that the court stated he "was to have unsupervised visitation, and . . . did not include any restrictions." He believed that his "accepting of an agreement outside th[ose] terms would simply add validation to [DCS's] perceived authority over the situation." He stated that it was unacceptable for DCS to continue to deny him "communication with the[] girls for no other reason than to exercise [DCS's] power over the children." The case manager conferred with the assistant attorney general, DCS's counsel, who advised DCS had to provide Father visitation unless the court ordered otherwise, and if Father violated the guidelines, the case aide could end the visit. DCS agreed to resume visitation.

**¶12** On April 27, 2017, nine-year-old Serenity was hospitalized for suicidal ideation. Father and his wife drove to Arizona to visit Serenity. The hospital had released Serenity by the time they arrived, and the children spent the weekend unsupervised with Father and his wife at a hotel without incident. The case manager noted that DCS had no grounds for a dependency with Father, and on May 17, 2017, DCS moved to dismiss the petition stating that it had "done an investigation and is moving to dismiss the dependency as to the Father." DCS requested the court contact Wyoming and establish jurisdiction for the court to modify the parent's custody order because DCS had "significant concern for the children's safety in the care and control of Mother."[3] DCS asked that "[u]pon the modification of the existing family court orders" the court issue "an order dismissing the dependency petition in this matter" and "relieve [DCS] . . . from further responsibility in this case effective May 26, 2017, when Father [was to] appear[] in person to take custody of the children."

> [3] DCS later argued the court would be in violation of the ICPC if it were to dismiss the dependency petition and modify the custody order. Even before this court's decision in *Donald W.*, ICPC Regulations provided the court could modify the order and return the children to Father without an ICPC. *See* ICPC Regulation 3(b) (codified as Ariz. Admin. Code § R21-5-105(B)(4)) (the ICPC "does not apply in court cases of . . . custody . . . pursuant to which or in situations where children are being placed with parents").

**¶13** Under the Uniform Child Custody Jurisdiction Enforcement Act, Ariz. Rev. Stat. ("A.R.S.") sections 25-1001 through -1067, Wyoming relinquished jurisdiction to the juvenile 7 court as requested. Father appeared *7 in person for the scheduled trial date expecting to leave with the girls. Instead, less than five hours before the scheduled trial, the children's guardian *ad litem* ("GAL") filed an objection to DCS's motion to dismiss. The GAL stated she had significant concerns about Father's ability to parent and in her opinion, DCS had not done a thorough investigation concerning Father's suitability as a parent and had not yet disclosed the Colorado ICPC home study. Additionally, although Father had an unsupervised overnight visit with the children earlier in the month, the GAL said because the visit was not monitored, "there is no record of how the father interacted with the

children." With the objection, the GAL included an email from Jodi expressing Placement's concerns about Father and a DCS report that indicated Serenity told the case manager that she did not want to live with Father because she was afraid that she would not be able to see Mother, and although Father denied it, "Placement reports that [Father] has stated this on more than one occasion."

**¶14** The court denied DCS's motion to dismiss, citing "the Court's concerns." Because DCS declined to amend or continue to prosecute the petition, the court substituted the GAL as the petitioner, continued the trial, and granted leave for the GAL to file an amended petition. At the same time, the court ordered DCS to provide Father a case aide for supervised visits, a psychological evaluation, and parenting classes in Colorado.

**¶15** The GAL filed an amended petition on June 2, 2017, alleging: "The children are dependent . . . because the children are in need of proper care and control and because they have no parent or guardian willing or able to exercise such care and control." As the factual basis, the petition asserted: "Father is neglecting his children" by: (1) "failing to provide them with the basic necessities of life," including abandoning them; (2) failing to protect them from Mother's substance abuse and domestic violence by failing to check on them or attempt to modify the custody order when he was aware that Mother had a history with substance abuse; and (3) "Father's behavior toward [Serenity] places the children at risk for emotional abuse." On June 14, 2017, Colorado approved the ICPC conditioned on Father submitting to a bonding assessment. The same day, DCS put in a request to have Father scheduled for a psychological evaluation.

**¶16** The juvenile court rescheduled Father's trial for August 2, 2017. *But see* Ariz. R.P. Juv. Ct. ("Rule") 55(B) (the dependency adjudication hearing must be *completed* within 90 days of service of the petition and may only be continued beyond the prescribed time "upon a finding of extraordinary circumstances"). While Father
8 waited to receive an *8 appointment for a psychological evaluation, he continued to be deprived of his phone visitations. On June 16, 2017, Father, his wife, and his son—from a previous marriage—were together waiting for a phone call from the girls, but when the case aide arrived at the girls' summer camp to place the call, she was informed that Placement picked up the children 15 minutes before the scheduled call. The case manager attempted to contact Placement, but they did not answer. Father believed Placement was deliberately trying to interfere because at that point the children had not been made available for visitation for three consecutive weeks.

**¶17** Although he was resistant to participate in services when recommended by DCS, Father complied with court orders. Father submitted a mental health assessment that was conducted on June 19; Father and his wife both completed parenting classes on June 21; and Father began counseling. He filed the documentation with the court on July 17, 2017, evidencing his completion of the tasks. To address the GAL's concerns concerning a "record of how the father interacted with the children," Father provided the case manager's notes from a positive visit she supervised with Father, his wife, his son, and the girls. Nevertheless, the court found the children dependent in August 2017, finding that the GAL had proven by a preponderance of the evidence that Father had failed to protect the children and that he posed a risk of emotional abuse to the children. Father appealed.

**¶18** In January 2018, this court vacated the August 2017 order finding the children dependent as to Father. *See Aaron W. v. DCS* ("*Aaron I*"), 1 CA-JV 17-0384, 2018 WL 615165 (Ariz. App. Jan. 30, 2018) (mem. decision). The court held the juvenile court improperly permitted Mother to leave the trial after Father declared his intention to call her as a witness, violating his due-process rights. *Id*. at *3, ¶¶ 13-17. This court also held the

juvenile court erred by finding that the children were dependent as to Father because of the risk of emotional abuse without testimony from a medical doctor or psychologist as required for an emotional abuse finding under A.R.S. § 8-201(2). *Id*. ¶ 12. We stated "a 'concern' about emotional abuse is insufficient evidence under the statute." *Id*.

**¶19** Nonetheless, this court stated there was enough evidence for the juvenile court to conclude that Father had failed to protect the children from Mother's behaviors described above. *Aaron I*, 2018 WL 615165, at *2-3, ¶¶ 10-11. The court rejected Father's argument that because DCS had assumed temporary physical custody of the children, any risk to them had been resolved. *Id*. at *2, ¶ 10, n.4. We noted that the failure to protect giving rise to a dependency action "need not be continuous or actively occurring at the time of the
9 adjudication hearing to support a finding of *9 dependency . . . the substantiated and unresolved threat is sufficient." *Id*. (quoting *Shella H. v. DCS*, 239 Ariz. 47, 51, ¶ 16 (App. 2016)). Because Mother's rights to the children were still in place at that time, we concluded that the juvenile court did not err by finding the threat of neglect unresolved. This court remanded the case for a new trial consistent with its decision.

## THE SECOND DEPENDENCY PROCEEDINGS

**¶20** On April 20, 2018, Mother was sentenced to ten years in prison for armed robbery. Accordingly, she was no longer a potentially viable placement for the children for the foreseeable future.

**¶21** A series of procedural events caused significant delays of the new trial. DCS replaced the GAL as the petitioner; Placement intervened; and, eventually, the court scheduled a two-day dependency trial for October 31 and November 1, 2018. On the first day of the new trial—21 months after the children were removed—Father moved to dismiss the risk of emotional abuse allegation, arguing that DCS had not disclosed a medical doctor or psychologist as required by *Aaron I*. Surprisingly, DCS objected, claiming they lacked notice and urged the court to find the court of appeals erred by holding that the juvenile court made a finding of emotional abuse when, in fact, the juvenile court had found a dependency based on a "*risk* for emotional abuse."[4] The first day of the new trial was spent almost entirely arguing over whether the juvenile court had to follow the holding of the court of appeals. DCS maintained that despite this court's holding in the first appeal, a therapist's testimony would suffice to prove the risk of emotional harm. The juvenile court disagreed, but acquiesced and permitted the petitioners to present "all the evidence they intended to present" as an evidentiary proffer for any appeal. Father objected, claiming that allowing the irrelevant evidence would cause another delay in an already unduly delayed proceeding, thereby prejudicing the children's relationship with Father. *See Joshua J. v. ADES*,
10 230 Ariz. 417, 424, ¶ 24 (App. *10 2012). The court denied Father's motion and continued the trial. The evidentiary proceedings did not conclude until December 21, 2018.

[4] The position taken by DCS is not supported by the record. This court specifically noted what the juvenile court found in its previous order. *See Aaron I*, 2018 WL 615165, at *1, ¶ 5 ("A contested dependency hearing was held on August 2, 2017, after which the superior court found the GAL had proven the grounds of failure to protect and *risk* of emotional abuse by a preponderance of the evidence." (emphasis added)).

**¶22** The case manager testified that she had been concerned with Father's behavior early on and that Colorado verbally expressed concerns about Father's mental health "[b]y a phone call [and that she did] not have anything in writing." She stated her "concerns were his tendency to threaten individuals that were, you know, associated with the case. He made allegations against Placement

with no proof, just allegations, and you know, basic threats. He was also, as per our case aide's records, generally inappropriate when talking to the girls." When asked to elaborate, the case manager stated that the prior case aide reported "while there was nothing specific, there were no cuss words, there were no, you know, specific you're a horrible person kind of statements, nothing like that, that the tone he would take, . . . and that it was just, in her words, off of what she would expect between a parent and children." The case manager additionally testified that when Serenity was hospitalized, she reported to the psychiatrist there that it was because of people making negative comments about Mother. Although Serenity had not alleged Father had made the statements, the case manager testified that Father had made derogatory statements about Mother to her, and she said that "the case aides ha[d] reported that he ha[d] made statements." The case manager was unable to testify to any events beyond January 2018, nearly a year before the dependency hearing, when she was removed from the case.

**¶23** The girls' therapist testified that she had seen the girls weekly since January 2018. She stated the therapy sessions would sometimes include Jodi, but she had never spoken to the girls' parents. She testified that the girls had "bonding and attachment issues" that, if not adequately treated, placed the children at risk for substance abuse, criminal activity, poor behaviors, joblessness, and instability. She agreed that witnessing domestic violence and substance abuse would not be suitable for the children. However, she admitted that she did not "have any interaction or knowledge of [Father] directly."

**¶24** Most of the therapist's testimony was regarding Serenity. The only testimony the therapist was able to provide concerning Serenity's relationship with Father was that "Serenity has described him as being mean," but she would not elaborate. She later testified: "I know [Serenity] has talked about him saying just negative things about [Mother] and the things she has done. But I don't recall specifics." She testified that it was her understanding that it was the reason Serenity would no longer speak with *11 her Father. The therapist stated that she could not speak to whether it would be harmful to place Serenity in Father's care.

**¶25** Dr. Daniel B. Juliano conducted a psychological assessment in June 2018 and testified about his report. He felt that he had inadequate information for a proper assessment, and he did not feel it would be appropriate for him to provide an addendum with the additional information he had been given since, or even to conduct another evaluation on this case, for "a number of reasons." Although he submitted his report to DCS and spoke to the assistant attorney general three days after the assessment, he testified that both Father and his attorney contacted him stating that DCS had not disclosed the report and they wondered why he had not completed the evaluation.

**¶26** Dr. Juliano testified that "this process has been so distorted and contorted that I really don't see myself as a value." He testified that because of the "severe" behavioral issues reported in the December 2017 DCS Report, he "was very confrontive with [Father] on the issues of concern" and "with me, you know, he was able to manage himself quite well. . . . I was worried about whether he had an anger problem, and I did feel an obligation to see if—with confrontations, just how he would handle, and he was able to get through it."

**¶27** Dr. Juliano thought his limited background information was "an issue." Dr. Juliano testified that what Father asserted was "fairly dramatic" and he wanted further supporting documentation. DCS did not provide Dr. Juliano with any of the favorable information that Father previously provided to the agency. When confronted with the favorable information, the doctor testified that if Father's reported accomplishments "turned out to

be validated, that would suggest that there's probably less of a serious mental health issue than what most people were hypothesizing." Rather than post-evaluation consideration, "[w]hat [the doctor] would have liked was to have the information when [he] saw him." Because Dr. Juliano did not feel that he had the appropriate information to evaluate Father properly, much of his testimony was based on speculation, which he continuously mentioned "[he] was uncomfortable with."

**¶28** The court took the matter under advisement and issued its ruling on January 23, 2019—two years after DCS removed the children. The court ruled that the children were dependent concerning Father due to Father's failure to protect the children from Mother's bad behavior while in Arizona. Father filed a timely notice of appeal, and we have jurisdiction under A.R.S. § 8-235(A)
12 and Rule 103(A). *12

## DISCUSSION

**¶29** A child is not entitled to a perfect parent or even a good one. What a child is entitled to is a parent that does not "engage in conduct that is unlawful or to abuse or neglect a child in violation of the laws of this state." A.R.S. § 1-602(B). We recognize that a parent "has an inalienable right to parent [his or her] child without obstruction or interference from this state." *Donald W.*, 247 Ariz. at 21, ¶ 36 (quotations omitted) (citing A.R.S. § 1-602(A), (D)). But, the State also "has an interest in the welfare and health of children," and "[i]f the interest of the state is great enough—that is, *if the welfare of the child is seriously jeopardized*—the state may act and invade the rights of the parent and the family." *Cochise County Juv. Action No. 5666-J*, 133 Ariz. 157, 161, (1982) (citations omitted) (emphasis added).

**¶30** A child is dependent and a ward of the State, when the petitioner can prove one of the grounds in A.R.S. § 8-201(15)(a). "[T]he juvenile court must consider the circumstances as they exist at the time of the dependency adjudication hearing in determining whether a child is a dependent child." *Shella H.*, 239 Ariz. at 48, ¶ 1. We review the court's interpretation and application of the dependency statute *de novo*. *Carolina H. v. ADES*, 232 Ariz. 569, 571, ¶ 5 (App. 2013). "All reasonable inferences must be taken in favor of supporting the findings of the trial court, and if there is any evidence to support the judgment, it must be affirmed." *Maricopa County, Juv. Action No. J-75482*, 111 Ariz. 588, 591 (1975).

**¶31** Here, insufficient evidence supports the court's dependency order. The petitioners failed to prove that the children lack a parent willing and able to provide them with proper and effective parental care and control (for brevity, "basic care").

**¶32** Before a child can be found dependent, the petitioner must allege and prove by a preponderance of the evidence one of the grounds found in A.R.S. § 8-201(15), which may include the fact that a child requires basic care, but has no parent willing or able to provide it. *Carolina H.*, 232 Ariz. at 571, ¶ 7; *see* A.R.S. § 8-201(15)(a)(i). "[T]he focus of this portion of the statute is not on the conduct of the parents but rather the status of the child." *Santa Cruz County Juv. Dependency Action Nos. JD-89-006 & JD-89-007*, 167 Ariz. 98, 102 (App. 1990).

**¶33** A dependent child can also be defined as a child whose home is unfit because of neglect, abuse, cruelty, or depravity of a parent. A.R.S. § 8-201(15)(a)(iii). When a parent's conduct or behavior cannot be proven improper in accordance
13 with a subsection that provides for expressly *13 prohibited behavior, we must be vigilant in ensuring that the basic care provision in A.R.S. § 8-201(15)(a)(i) is not interpreted so broadly as to capture conduct that may be subjectively improper or ineffective, but adequate nonetheless. In *JD-89-006 & JD-89-007*, we held that the language of the statute was not unconstitutionally vague because it

"utilizes commonly understood terms which give clear notice of the standard to be applied in the adjudication proceeding." 167 Ariz. at 102.

**¶34** In this case, the petition alleged: "The children are dependent . . . because the children are in need of proper care and control and because they have no parent or guardian willing or able to exercise such care and control." The petition alleged: (1) Father is neglecting his children by abandoning them; (2) Father is neglecting the children by failing to protect them from exposure to substance abuse and domestic violence in Mother's home, which placed the children at risk of abuse or neglect; and (3) Father's behavior toward [Serenity] puts the children at risk for emotional abuse.

**¶35** When the juvenile court disallowed the petitioner to pursue the "risk of emotional abuse" allegation without the evidence required by *Aaron I*, the petitioners moved to stay the trial and requested permission for leave to amend the petition. The court—mindful that the children had been in DCS's custody for 21 months—denied the motion to amend and refused to delay the trial any longer. After the trial, the court found the petitioners had proved only the failure to protect allegation. **A. A Dependency Relates to a Child's Current Conditions, and an Allegation of a Parent's Prior Action is Only Relevant to the Extent it Affects the Parent's Ability to Currently Care for the Child.**

**¶36** The court found that Father failed to protect the children from the previous exposure to bad behavior in Mother's home. The court also found that Father had reason to know that Mother had relapsed and failed to take appropriate actions to protect the children from Mother's neglect. The court connected the past failure to the present conditions by finding that Father was aware that Mother was violent and testified that she had assaulted him on several occasions. The court found "the risk associated with this type of neglect persists" because "Father's experience as a domestic-violence victim according to him, is neither isolated nor aberrant. Absent intervention, the danger of it persisting is real. He reported to his therapist that 'every woman that I've been around is violent.'" The court noted that "[w]hile there is no evidence that Father's current wife
14 poses *14 those precise risks, he reported serious concerns about her mental health including attention-seeking behavior and self-harming."

**¶37** Our caselaw supports using a parent's prior failure to protect as evidence of that parent's continuing inability to provide basic care for a child when the petitioner is able to prove that: (1) the conditions were sufficient to declare the child dependent; (2) the threat giving rise to those conditions remains unresolved; and (3) the threat continues to pose an imminent risk of harm to the child. *5666-J*, 133 Ariz. at 161 (speculative risk is insufficient); *Shella H.*, 239 Ariz. at 51, ¶ 16 (substantiated and unresolved threat); *Pima County Juv. Dependency Action No. 96290*, 162 Ariz. 601, 604 (App. 1990) (imminent risk of harm). Here, as we noted in *Aaron I*, there was sufficient evidence to support a finding that Father failed to protect the children from behavior that would constitute a dependency regarding Mother. However, at the time of the second dependency hearing, petitioners failed to prove that the threat that Mother posed to the children remained unresolved, or it continued to pose an imminent risk of harm to the children.

**¶38** While living with Mother, the children were exposed to significant substance abuse and domestic violence—and Father had good reason to know they were at risk and failed to protect them. However, on April 20, 2018, Mother was sentenced to ten years in prison for armed robbery. Mother's behavior no longer poses a risk to the children, and given the length of her prison term, the circumstance does not remain "unresolved." *See Shella H.*, 239 Ariz. at 51, ¶ 16. The conditions at the second dependency trial reflected that Father is a parent of the children, and there is no threat that the children will be in Mother's care.

The juvenile court's speculative and attenuated possibility of some future harm is insufficient to deprive Father of the care, custody, and control of his children. Potential speculative harm does not reflect imminent harm. *See 5666-J*, 133 Ariz. at 161. The dependency finding on this basis is vacated for lack of evidence.

## B. This Court's Previous Determination that Proving a Parent Poses a Risk of Emotional Abuse to a Child Required Petitioners to Present Evidence in Accordance with A.R.S. § 8-201(2) is Law of the Case.

**¶39** On remand, the petitioners expended hours arguing that the court of appeals was wrong in *Aaron I*, and a doctor or psychologist is not required to testify to the "risk of emotional abuse," only for a diagnosis of emotional abuse. In *Aaron*
15 *I*, we stated: *15

> While the child safety specialist testified about "concerns" she had with Father's behavior and stated she had discussed the issue with the Children's therapist and a DCS staff psychologist, no evidence was presented from either a medical doctor or a psychologist which would support a diagnosis of emotional abuse. Nor did the child safety specialist testify to any specific findings or diagnosis given by the staff psychologist which would track the statutory definition under § 8-201(2). Concluding there was a "concern" about emotional abuse is insufficient evidence under the statute.

*Aaron I*, 2018 WL 615165, at *3, ¶ 12. Although the petitioners referred to this portion of the decision as "dicta," this court explicitly stated: "On remand, the GAL may attempt to cure the lack of evidence on this issue." *Id.* at n.5. The court then remanded the case "for further proceedings consistent with this decision." *Id.* at *5, ¶ 22. Directing a party to comply with a statutory requirement to eliminate a lack of evidence is not *dicta*.[5]

5 "Judicial dictum" is a statement the court expressly declares to be a guide for future conduct and is therefore considered authoritative and must be followed. *Resolution Trust Corp. v. Segel*, 173 Ariz. 42, 45 (App. 1992). "Obiter dictum," on the other hand, is "[a] judicial comment made during the course of delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential (although it may be considered persuasive)." *Phelps Dodge Corp. v. Ariz. Dep't. Water Res.*, 211 Ariz. 146, 152, ¶ 22, n.9 (App. 2005) (quoting Black's Law Dictionary 490-91 (2d Pocket ed. 2001)).

**¶40** No participant petitioned our supreme court to review the decision in *Aaron I*, and the mandate issued on March 6, 2018. No participant asserts there has been a change in the law after *Aaron I*. Therefore, "law of the case" applies to the petitioners' claim that there is a different standard for *risk* of emotional abuse.

**¶41** As applicable here, the term "law of the case" refers to a legal doctrine providing that the decision of an appellate court finally resolves the issues decided throughout all subsequent proceedings, both on remand in the trial court and on a subsequent appeal, provided the facts, issues, and evidence are substantially the same as those upon which the first decision rested. *Dancing Sunshines Lounge v. Indus. Comm'n*, 149 Ariz. 480, 482 (1986). As the juvenile court noted, the
16 petitioner was proceeding on the same *16 petition, the prior dependency order found the same allegation was proven, and the court in *Aaron I* held it was error to proceed without expert testimony. Based on the holding in *Aaron I*, the juvenile court correctly ruled that the petitioners could not establish the risk of emotional abuse allegation without the appropriate expert testimony.

## CONCLUSION

**¶42** Because reasonable evidence does not support a finding that the children are dependent, we vacate the juvenile court's dependency order and remand for entry of dismissal. A.R.S. § 8-844(C)(2) (if the court does not find the allegations in the petition are true, "the court shall dismiss the petition"); *see also* Ariz. R.P. Juv. Ct. 55(E)(2) (after dismissing the petition, the court must "return the child to the parent").[6]

6 Father also appeals the juvenile court's order for his wife to complete a psychological evaluation. The order is not a final appealable order. Furthermore, given the disposition in this case, the issue is moot. --------

casetext